**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re** | § | **Chapter 11** |
| | § | |
| **NPC INTERNATIONAL, INC.,** | § | **Case No. 20–33353 (DRJ)** |
| *et al.*, | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |

**DECLARATION OF ERIC KOZA IN SUPPORT
OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Eric Koza, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer ("**CRO**") of NPC International, Inc. ("**NPC**") and its direct and indirect subsidiaries and affiliates that are debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**"). I have served as the Company's CRO since January 2020. Prior to becoming the CRO of the Company, I advised the Company in my capacity as Managing Director at AlixPartners LLP (together with its affiliate AP Services, LLC, "**AlixPartners**") beginning in December 2019.

2. AlixPartners has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases. I have personally been involved in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are NPC International, Inc. (7298); NPC Restaurant Holdings I LLC (0595); NPC Restaurant Holdings II LLC (0595); NPC Holdings, Inc. (6451); NPC International Holdings, LLC; (8234); NPC Restaurant Holdings, LLC (9045); NPC Operating Company B, Inc. (6498); and NPC Quality Burgers, Inc. (6457). The Debtors' corporate headquarters and service address is 4200 W. 115th Street, Suite 200, Leawood, KS 66211.

recent comparable chapter 11 reorganizations such as *In re Chino Holdings, Inc.*, Case No. 20-32181 (Bankr. E.D. Va. May 4, 2020), in which I served as financial advisor to J. Crew Group Inc. and certain of its affiliates; *In re Avaya, Inc.*, Case No. 17-10089 (Bankr. S.D.N.Y. Jan. 19, 2017), in which I served as CRO of Avaya Inc.; *In re Deluxe Entm't Servs. Grp. Inc.*, Case No. 19-23774 (Bankr. S.D.N.Y. Oct. 3, 2019), in which I served as financial advisor to Deluxe Entertainment Services Group Inc.; *In re Sungard Availability Servs. Capital, Inc.*, Case No. 19-22915 (Bankr. S.D.N.Y. May 1, 2019), in which I served as CRO to Sungard Availability Services Capital, Inc.; *In re Fullbeauty Brands Holdings Corp.*, Case No. 19-22185 (Bankr. S.D.N.Y. Feb. 3, 2019), in which I served as financial advisor to Fullbeauty Brands Holdings Corp.; and *In re Cenveo Inc.*, Case No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018), in which I served as financial advisor to Cenveo Inc.  I specialize in providing leadership to troubled and underperforming companies and advising senior executives, boards of directors, and creditors.  I was recently recognized for my role as the chief restructuring officer of Avaya, Inc. by Turnaround Management Association's 2018 Transaction of the Year - Mega Company and was named one of the industry's top "People to Watch" by Turnarounds & Workouts 2018. My combination of restructuring, operating, and transaction experience spans multiple countries and a variety of industries.

3.       I have more than 20 years of experience serving in a variety of roles, including in senior management positions, as a financial advisor, a principal investor, and director of public and private companies.  I have served as a Managing Director of AlixPartners since 2018, when AlixPartners acquired my previous financial advisory firm, Zolfo Cooper.  I held several roles at Zolfo Cooper from 2009 to 2011 and from 2013 until its acquisition in 2018, including Managing Director from 2015 to 2018.  Prior to that, I held a variety of roles, including

Senior Vice President, Corporate Development and Financial Strategy at Comverse Technology, Inc. from 2011 to 2013; Founding Partner of private equity firm Verax Capital LLC from 2006 to 2009; and Partner in various investment funds at investment manager W.R. Huff Asset Management Co. LLC from 1999 to 2006.  I received a B.S. from Boston College in 1996, and an M.B.A. from Boston University in 1999.  I have been a CFA® charterholder since 2003.

4.     In my capacity as the Debtors' CRO, I am generally knowledgeable and familiar with the Debtors' day-to-day operations, businesses and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.  In these chapter 11 cases, I have overseen (and continue to oversee) the services provided by AlixPartners, which include:  designing, negotiating and implementing a restructuring strategy designed to maximize enterprise value; evaluating the Debtors' cash-flow projections and identifying liquidity-enhancing opportunities; assessing the Debtors' liquidity and cash flow models; working with the Company and its advisors in evaluating and negotiating financings; contingency planning; developing a revised business plan and other related forecasts and financial analyses; evaluating the separation of the Company's Pizza Hut and Wendy's businesses; coordinating and providing administrative support for developing the Debtors' chapter 11 reorganization plan; preparing the necessary components of a disclosure statement and chapter 11 plan; managing the claims and claims reconciliation processes; assisting with electronic data collection; leading the Debtors' communications with outside parties; and assisting with vendor payments.

5.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Except as otherwise indicated herein, the facts set forth in this

declaration (this "**Declaration**") are based upon my personal knowledge, my review of relevant documents, information provided to me by my team, employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration on that basis.

6.      The Debtors have requested a variety of relief in their "first day" motions (collectively, the "**First Day Pleadings**") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases on their operations and their various constituents.  I am familiar with the contents of each First Day Pleading, and I believe that the relief sought therein is necessary to permit the Debtors the most seamless transition into chapter 11.  This, I believe, will serve to preserve and maximize the value of the Debtors' estates.

7.      This Declaration is intended to provide a summary overview of the Debtors' chapter 11 cases, and is organized as follows:  **Part I** provides a preliminary statement; **Part II** describes the Debtors' businesses; **Part III** describes the Debtors' prepetition corporate and capital structure; **Part IV** describes the key events that led to the commencement of these chapter 11 cases, the Debtors' prepetition negotiations with key stakeholders, and the goals that the Debtors seek to accomplish through the commencement of these chapter 11 cases; **Part V** summarizes the Debtors' proposed use of cash collateral; and **Part VI** provides the evidentiary support for the First Day Pleadings filed concurrently herewith.

## I.      Preliminary Statement

8.      For the past 58 years, the Company, known for its entrepreneurial spirit, has steadily grown from its modest roots as an operator of a handful of Pizza Hut™ restaurants into the largest franchisee company in the United States with over 1,600 franchised restaurants

across two iconic brands—Wendy's™ and Pizza Hut™—spanning 30 states and the District of Columbia.[2]   Today, as the largest franchisee in both the Wendy's and Pizza Hut systems, the Company plays a critical and prominent role within each system, and its performance is inextricably tied to the underlying success and strength of each individual brand.  The Company operates more than 1,200 franchised restaurants in the Pizza Hut system, which in recent years has seen a significant drag on profitability due to a lack of sales growth and a significant inflationary cost environment.  The lack of sales growth is largely the result of continued loss of market share to competitors, the ever-expanding optionality of pizza restaurants, pricing pressures in the pizza category, reduced foot traffic, and certain developments and barriers specific to the Pizza Hut brand.  Although Pizza Hut has recently communicated its commitment to orchestrate a brand turnaround and to reinvigorate interest in the brand, over the past several years these factors have worked together to strain the financial performance of the Company and have restricted and limited its ability to operate profitably under its current balance sheet.  More recently, both of the Company's brands have faced significant headwinds on a macro level, including the shifting political climate and the trade wars that have created volatility in the commodities market as well as increased labor pressures due to the competitive labor markets and increasing minimum wage rates driven by state and local market legislation.

9.      Many of the pressures on the Company's business have been further exacerbated by the ongoing national health crisis caused by the COVID-19 pandemic (the "**COVID-19 Pandemic**") and the corresponding business disruption.   Like other quick-service restaurants ("**QSRs**"), the Company has had to respond to fluctuating consumer

---

[2]   Solely for convenience, trademarks and trade names referred to herein may appear with or without the ® or ™ symbols, but such references are not intended to indicate in any way that the Debtors do not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to such trademarks and trade names.

demand and changing regulations and operating environments.  The COVID-19 Pandemic has had opposite impacts on the sales of the Company's Wendy's and Pizza Hut businesses. Namely, after an initial sharp drop, the Pizza Hut business saw a substantial spike in pizza sales as a result of value proposition for home meal replacement and reduced optionality for food delivery and take-out.  Conversely, the Wendy's business saw initial decreases in sales as a result of dramatic decline in foot and drive-thru traffic, which was compounded by a less developed delivery infrastructure that relied on third-party delivery services.  However, given the two businesses' historical performance, these trends are likely to be short-lived as local economies continue to reopen.  The recent sales trends of both businesses and more specifically declines in post-COVID-19 sales growth rates for the Pizza Hut business and steady improvement in sales growth rates for the Wendy's business, evidences as much.

10.     For much of 2019, the Company and its current ownership undertook multiple initiatives to combat the challenges to the operating model, including, engaging with its lenders, the Pizza Hut Franchisor (as defined below), and suppliers to explore various opportunities to improve liquidity, mitigate market pressures, and restore profitability.  As the Company continued to explore these and other strategic options throughout 2019, discussions with the Pizza Hut Franchisor failed to gain traction while the pressures continued to mount, leaving the Company facing a substantial liquidity shortfall in early 2020.

11.     In January of 2020, due to its rapidly deteriorating liquidity position, the Company had no choice but to seek emergency financing from its First Lien Lenders (defined below) for an infusion of working capital.  While the terms of the emergency financing contained certain milestones toward a broader balance sheet restructuring, it importantly provided the Company with $35 million of much needed liquidity runway to continue engaging with the Pizza

Hut Franchisor on a global restructuring deal supported by the First Lien Lenders. To that end, contemporaneously with—and as a condition to—the financing, the Company negotiated a forbearance agreement with the Pizza Hut Franchisor to allow restructuring discussions to progress without any potential franchise agreement defaults hanging over the Company.

12.     With this financing and forbearance in place, the Debtors, with support of an ad hoc group of Priority First Lien Lenders (defined below) and First Lien Lenders (as constituted from time to time, the "**Ad Hoc Priority/1L Group**"), sought to achieve a consensual resolution on a go-forward business plan and operating partnership with the Pizza Hut Franchisor and the Pizza Hut Franchisor's parent company, Yum! Brands, Inc. ("**Yum!**"). The Company brought these parties together with the goal of engaging in a collaborative process to achieve a consensual restructuring transaction that would be accretive for both Pizza Hut and the Company, implemented either out-of-court or in court through a pre-negotiated chapter 11 plan to maximize value for all stakeholders. To that end, the Company worked for months leading up to the commencement of these chapter 11 cases—in close communication with the Pizza Hut Franchisor—on detailed business plans, information sharing, diligence meetings, and a comprehensive list of "asks" to build a mutually beneficial partnership of profitability and growth. Yet, despite the Company's efforts and the Ad Hoc Priority/1L Group's support, the Company was ultimately unable to reach a deal with the Pizza Hut Franchisor in advance of the June 30th expiration of the PH Forbearance Agreement (defined below), but the Company expects to continue those discussions in these chapter 11 cases.

13.     While the Company's prepetition engagement on restructuring efforts with the Wendy's Franchisor (defined below) was much more limited than those with the Pizza Hut Franchisor, the Company maintains a strong relationship with the Wendy's Franchisor, which the

Company intends to continue to maintain during these chapter 11 cases.  Although not immune to some of the macro challenges and market forces impacting the QSR industry as whole (discussed above), the Company's Wendy's business has historically performed well.  Given the overall strength of the Company's Wendy's business, the Company had originally intended to engage with the Wendy's Franchisor and begin a marketing process for the Wendy's business prepetition but such efforts were delayed by the COVID-19 Pandemic.  Indeed, in the months leading up to the filing of these chapter 11 cases, there were exchanges between the Company and the Wendy's Franchisor with respect to potential partnerships and/or transactions, and the Company intends to explore all potential alternatives with respect to the Wendy's business in chapter 11, including a potential sale of some or all of the Wendy's business.

14.     Ultimately, the Company, unable to fully drive negotiations out-of-court, has commenced these chapter 11 cases to preserve its assets and utilize the protections and tools of chapter 11 to optimize its operations and its restaurant footprint.  In the few short weeks leading up to these chapter 11 cases and prior to the expiration of the PH Forbearance Agreement, the Debtors were able to negotiate the framework for a consensual restructuring with the Ad Hoc Priority/1L Group, executing the RSA[3] attached hereto as **Exhibit B** along with a term sheet (the "**Plan Term Sheet**") outlining the material terms of a restructuring to be implemented through a plan of reorganization (the "**Pre-Negotiated Plan**") for the Company. The RSA currently has the support of 92.26 percent of the Priority First Lien Lenders, 85.03 percent of the First Lien Lenders, and 17.13 percent of the Second Lien Lenders (as defined below).  The milestones and transaction structure as proposed in the RSA provide the

---

[3]   That certain Restructuring Support Agreement, dated as of July 1, 2020, among the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**" or the "**Restructuring Support Agreement**").

Company with an opportunity to continue discussions with the Pizza Hut Franchisor inside of chapter 11 with the goal of achieving a value-maximizing solution for both the Company and the Pizza Hut Franchisor.  Importantly, as further discussed below, the RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of the Company's largest creditor constituency.

## II.    The Debtors' Businesses

### A.    History and Formation

15.    NPC, an indirect subsidiary of NPC Restaurant Holdings I LLC ("**NPC RH I**") and a wholly-owned subsidiary of NPC Restaurant Holdings, LLC, a Delaware limited liability company ("**NPC RH**"), was founded in 1962 and became one of the very first franchisee companies in the U.S. and one of the first franchisee companies of the Pizza Hut™ brand.  NPC was incorporated in 1974 under the name Southeast Pizza Huts, Inc., and in 1984, changed its name to National Pizza Company.  It was subsequently renamed NPC International, Inc. in 1994.

16.    NPC opened its initial Pizza Hut franchise location in Pittsburg, Kansas in 1962 and continued to open additional Pizza Hut restaurants.  By 1984, NPC had ninety-four (94) locations in nine (9) states with annual sales of over $35 million and had gone public under the name National Pizza Company.  By 1990, the number of  locations had grown to 320 Pizza Hut restaurants with over $113 million in annual sales.  During the late 1980s and early 1990s, NPC's growth focused mostly outside of the Pizza Hut franchise system.  In 1989, NPC acquired Skipper's, a 214-unit chain of quick-service fish-and-chips restaurants based in Bellevue, Washington.  The Company operated Skipper's for more than five years and eventually divested the seafood chain in March 1996.  This divesture enabled NPC to focus more resources on the development of another franchisor chain it had acquired in 1993, Tony Roma's, a rib and barbecue chain with twenty-seven (27) company-owned restaurants and 114 franchise

9

locations.  Over the next five years, NPC continued to expand the franchise and had over 190 Tony Roma's restaurants by 1998, with annual revenue of more than $350 million when it divested the franchise in a private transaction.

17.     From 1995 through 2001, NPC set its focus back on the Pizza Hut brand and began acquiring Pizza Hut restaurants in earnest, adding 588 units in ten separate transactions.  In 1998, the Company relocated its headquarters from Pittsburg, Kansas, to the Kansas City metro area.  In 2001, the Company's shareholders approved a management buyout taking the Company private once again.  By early 2006, NPC was operating 790 Pizza Hut restaurants in twenty-six (26) states, making it the largest Pizza Hut franchisee and the largest franchisee of any restaurant concept in the United States.  In May 2006, the Company was sold to Merrill-Lynch Global Private Equity in a leveraged buyout transaction.  From 2006 to 2011, the Company continued its Pizza Hut-focused expansion strategy, executing eight multi-unit acquisition transactions and growing to over 1,150 restaurants in twenty-eight (28) states.

18.     In December 2011, the Company was sold to Olympus Growth Fund V, L.P. and certain of its affiliates ("**Olympus**") in a leveraged buyout transaction, through which all of the outstanding membership interests of NPC RH were acquired by NPC International Holdings, Inc. ("**NPCIH**"), an entity controlled by Olympus.

19.     In 2013, as part of its ongoing growth efforts, NPC strategically decided to expand its operations into the Wendy's franchise system.  During the two subsequent years, NPC acquired more than 189 Wendy's restaurants in six separate transactions.  In April of 2017, NPC acquired sixty-two (62) Wendy's restaurants in Pennsylvania, and in May of the same year, acquired an additional 140 Wendy's restaurants in and around the Baltimore, Washington, D.C.,

and Virginia area, becoming the largest Wendy's franchisee and the fifth-largest restaurant operator in the United States based on unit count.

20.     On January 31, 2018, WPH Holdings II Parent LLC and Eldridge NPC Holdings LLC purchased the Company's business and became the ultimate equity sponsors (the "**Sponsors**") of the Company (such acquisition, the "**2018 Acquisition**").

## B.     Debtors' Business Operations

21.     Today, the Debtors are the largest franchisee of any restaurant concept in the U.S., based on unit count, according to the 2019 "Top 200 Restaurant Franchisees" by the *Restaurant Finance Monitor*, and are the fifth largest restaurant unit operator, based on unit count, in the U.S., operating both Pizza Hut™ and Wendy's™ locations.  With its headquarters located in Leawood, Kansas, and a shared services center located in Pittsburg, Kansas, the Company has a total of approximately 7,500 full time employees and approximately 28,500 part-time employees, and operates in 30 states and District of Columbia.  As franchisees of the Pizza Hut and Wendy's brand, the Company's performance is inextricably tied to the overall performance of each brand, and although the Company continually seeks to optimize its businesses as discussed more fully below, there are certain headwinds facing the broader Pizza Hut system that NPC cannot directly combat without brand support.

22.     The Boards of NPC RH I and NPC RH (defined below) oversee the Company as a whole, and NPC's Pizza Hut and Wendy's franchise businesses share certain services (including back office services and cash management systems).  However, each franchise business is independently run and directed by its own executive management team— including separate chief executive officers and chief financial officers—with separate and distinct field operation support systems.

1.      **Pizza Hut Franchise Business**

23.     Since the first Pizza Hut restaurant was opened in 1958 in Wichita, Kansas, the Pizza Hut brand has become one of the most recognized brands in the restaurant industry.  Pizza Hut is one of the world's largest pizza QSR companies, with over 18,000 restaurants worldwide, including licensed units, operating in over 100 countries and territories. Pizza Hut, LLC (f/k/a Pizza Hut, Inc.) (the "**Pizza Hut Franchisor**") is the owner and franchisor of the Pizza Hut restaurant system in the U.S.  The Pizza Hut Franchisor is currently owned and operated by Yum!.

 

24.     As of the Petition Date, the Debtors operate 1,227 Pizza Hut units in twenty-seven (27) states, with significant presence in the Midwest, South, and Southeast.  As of fiscal year-end 2019, the Debtors' Pizza Hut operations represented approximately 20 percent of the domestic Pizza Hut restaurant system as measured by number of units, excluding licensed units which operate with a limited menu and no delivery.  The Company's Pizza Hut locations are diversely located, ranging from large metro areas to "small towns" which have populations of 20,000 or less.  The size and scale of the Debtors' restaurants are intended to provide operating efficiencies and geographic and market diversity within certain regions of the country.

25.     The Debtors operate their Pizza Hut locations through three different formats: (i) delivery and carry-out units ("**Delcos**"), (ii) "Red Roof" units ("**RRs**"), and (iii) "Restaurant-Based Delivery units" ("**RBDs**"), to specifically cater to the needs of their customers in each respective market.  Delcos are typically located in strip centers and provide delivery and carry-out.  RRs are traditional, free-standing, dine-in restaurants which offer on-location dining room service as well as carry-out service, and are principally located in small towns.  RBDs conduct delivery, dine-in, and carry-out operations from the same location.  In response to evolving customer needs and preference for delivery, and the need to lower overall cost structure, the Company has been migrating many of its dine-in restaurants to the higher margin Delco format over recent years, which now makes up approximately 60 percent of the Company's Pizza Hut locations.

26.     The Company's Pizza Hut operations are structurally divided into three (3) divisions (East Central, Mid Central, and South East), each of which is divided into six (6) regions comprised of approximately 40 to 100 locations.  Each region is overseen by a regional manager and supported by 167 district managers who are responsible for approximately seven to ten locations.  Each location employs anywhere between 6 to 45 employees on both a full-time and part-time basis depending on store format and sales volumes, with an average of 20 employees per location.

27.     All Pizza Hut product ingredients are high quality and prepared in accordance with proprietary formulas established by the Pizza Hut Franchisor.  In addition, all NPC Pizza Hut restaurants utilize an approved purchasing and distribution network as required by the Pizza Hut Franchisor.  The Company purchases substantially all food products required in its operation of the Pizza Hut restaurants from McLane Company, Inc. ("**McLane**"), and

substantially all of the supply chain and negotiation activities are provided by Restaurant Supply Chain Solutions, LLC ("**RSCS**"), a cooperative set up to act as the central procurement service for the Pizza Hut Franchisor, which works in coordination with McLane.  In addition, RSCS directs various hedging and procurement programs for cheese, meat, and certain other commodities to help reduce the price volatility of such commodities and help better leverage power of the entire Yum! and Pizza Hut restaurant system.

### 2. Wendy's Franchise Business

28.     Since first founded in Columbus, Ohio, in 1969, the Wendy's brand is one of the three most recognizable hamburger fast food chains, along with Burger King and McDonald's.  As of 2018, Wendy's is the world's third largest QSR company in the hamburger sandwich segment, with over 6,700 franchised and company-operated restaurants operating in over 30 countries and territories.  The Wendy's restaurants are generally free-standing and includes a pick-up window and dining room with counter service.  Quality Is Our Recipe, LLC is the owner and franchisor of the Wendy's restaurant system in the U.S. (the "**Wendy's Franchisor**" and together with the Pizza Hut Franchisor, the "**Franchisors**").




29.     As discussed above, the Company has been part of the Wendy's restaurant system for seven (7) years and has continued to grow its footprint with recent acquisitions.  The Company's Wendy's locations are primarily located in and around the mid-Atlantic region and the Salt Lake City and Kansas City metropolitan areas.   In 2017, the Company acquired 140 Wendy's restaurants in Maryland and the District of Columbia, and became the largest franchisee of Wendy's, representing approximately seven (7) percent of the domestic Wendy's restaurant system as measured by number of units.  As of the Petition Date, the Debtors operate 393 Wendy's restaurants in eight (8) states and the District of Columbia.

30.     The Wendy's operations are structurally divided into two divisions (East and West), each of which is divided into four (4) region comprising of sixty (60) districts with a restaurant manager assigned to each district.  Each location employs between approximately 30 to 35 employees on both a full-time and part-time basis depending on store format and sales volumes.

31.     The Wendy's restaurant system supply chain is overseen by a purchasing cooperative, the Quality Supply Chain Co-op, Inc. ("**QSCC**"), of which the Wendy's Franchisor and franchisees of the Wendy's brand, including NPC, are members.  As the third-largest co-op in the food service industry, QSCC negotiates pricing using the scale of the Wendy's system for food, equipment, and services as well as improved distribution and logistics with key suppliers.  Through QSCC, the Company utilizes two (2) authorized suppliers for the majority of food products for the Wendy's restaurants: Sysco Corporation, and SYGMA (together, the "**Wendy's Suppliers**").

3.      **The Franchise Agreements**

i.      **Pizza Hut**

32.      The counterparty to all of the PH Franchise Agreements (defined below) is NPC.  Starting in 2003, the Company began operating under new franchise agreements with the Pizza Hut Franchisor, pursuant to three types of agreements: (i) territory franchise agreements ("**TFAs**"), which govern the franchise relationship with respect to a specific geographical territory, (ii) location franchise agreements ("**LFAs**"), and (iii) go-forward franchise agreements ("**GFFAs**" and together with the TFAs and LFAs, the "**PH Franchise Agreements**").  The LFAs and the GFFAs, which are substantially similar to the TFAs, govern the franchise relationship with respect to specified restaurants.

33.      The PH Franchise Agreements govern the operation of the respective franchises with respect to issues such as restaurant upkeep, advertising, purchase of supplies and equipment, food specifications and standards, use of trademarks and trade secrets, training and assistance, books and records, and employee relations.  The PH Franchise Agreements require the payment of certain fees—such as new development fees, monthly franchise fees, and monthly advertising fees—and abidance by certain development and upgrade schedules.[4]  The Company is also party to certain other agreements with the Pizza Hut Franchisor relating to asset update requirements, one of which is known as the "**Asset Partner Plan**".  In response to the cash flow deceleration experienced across the Pizza Hut franchisee system in recent years, in late 2019, the Pizza Hut Franchisor offered its franchisees deferments until 2020 of certain of the remaining 2019 Asset Partner Plan requirements, which were further extended to 2021, but

---

[4]    As discussed further below, the payment dates of certain fees under the PH Franchise Agreements were deferred as a result of the PH Forbearance Agreement (as amended from time to time).

withheld such deferrals for the Company, citing "ineligibility" reasons.  Additionally, the Pizza Hut Franchisor worked together with members of its franchisee base to provide trade terms with the sole approved food and beverage distributor, but the Company was also excluded from those efforts.

  **ii.**   **Wendy's**

  34.  The counterparty to all of the Wendy's franchise agreements (each, a "**Wendy's Franchise Agreement,**" collectively, the "**Wendy's Franchise Agreements**," and together with the PH Franchise Agreements, the "**Franchise Agreements**") is NPC Quality Burgers, Inc. ("**NPC QB**").  The Wendy's Franchise Agreements are location-specific, resulting in individual Wendy's Franchise Agreements for each restaurant.  The Company pays certain fees under each Wendy's Franchise Agreement, including a technical assistance fee at commencement or renewal, monthly royalty fees, monthly advertising fees and local co-op contributions, and certain other digital and program fees.

  35.  The Wendy's Franchise Agreements govern the operations of the respective franchises with respect to issues such as food specifications and standards, inspections, use of proprietary trademarks and trade secrets, and employee training and compliance, as well as timely completion of remodeling requirements (known as "**Image Activation**" activities).  As discussed further below, in response to the COVID-19 Pandemic, the Wendy's Franchisor offered a deferment of certain rent, royalty and advertising payments, as well as capital investments required in conjunction with the 2020 Image Activation requirements to its franchisees, including the Company.  The Company is party to certain other agreements with the Wendy's Franchisor relating to the Company's development rights within specified geographical areas.

### III.    Debtors' Corporate and Capital Structure

**A.    Corporate Structure**

36.    An organizational chart showing the Debtors is attached hereto as **Exhibit A**.  As set forth on the organizational chart, NPC RH I is the Company's ultimate parent, which directly or indirectly owns each of the Debtor entities.

37.    As a result of the 2018 Acquisition, NPCIH became a wholly-owned subsidiary of NPC Holdings, and NPC Holdings assumed NPCIH's existing indebtedness.

38.    The equity interests of NPC RH I are predominately held by the two Sponsor entities:  WPH Holdings II Parent LLC, holding approximately 49.99 percent, and Eldridge NPC Holdings LLC ("**Eldridge**"), holding approximately 49.99 percent. NPC Restaurant Holdings II LLC ("**NPC RH II**") is the direct subsidiary of NPC RH I, which is the 99.72 percent shareholder of NPC Holdings.  NPC Holdings is the parent company of NPCIH, which is the parent company of NPC RH.  NPC is the direct subsidiary of NPC RH, and it is also the parent company of NPC Operating Company B, Inc. and NPC QB.

39.    NPC is the contract counterparty to the PH Franchise Agreements, and NPC QB is the contract counterparty to the Wendy's Franchise Agreement.  As the operating entities, NPC and NPC QB share certain services, including accounting, information technology, payroll, and real estate development.  Approximately 234 employees are employed in shared services.

**B.    Prepetition Capital Structure**

**1.    Prepetition Indebtedness**

40.    As of the Petition Date, the Debtors' prepetition capital structure consists of approximately $903 million in total funded debt, made up of: (i) an $80 million first lien superpriority secured term loan facility, under which approximately $40 million of priority term

loans were outstanding as of the Petition Date, (ii) an approximately $703 million first lien secured credit facility, consisting of (x) a $100 million first lien revolving credit facility, under which approximately $63 million of revolving loans were outstanding as of the Petition Date and approximately $37 million of letters of credit were issued and outstanding as of the Petition Date and (y) a $580 million first lien secured term loan facility, which was upsized to $605 million pursuant to an incremental facility on April 9, 2018 and upsized again to $655 million pursuant to an incremental facility on August 19, 2019 (together, the "**2019 Incremental Upsize**"), and under which approximately $640 million is outstanding as of the Petition Date; and (iv) a second lien secured term loan facility in an outstanding principal amount of approximately $160 million as of the Petition Date, as more fully discussed below.

### i.     Super-Priority Term Loan Credit Agreement

41.     On January 21, 2020, the Debtor Borrowers entered into the Priority Term Loan Financing (as defined and discussed further below) pursuant to that certain Super-Priority Term Loan Credit Agreement (as amended by that certain Waiver and Amendment No. 1 to Credit Agreement and Security Agreement, dated as of February 25, 2020 (the "**Amendment No. 1**"), that certain Omnibus Amendment, Waiver and Consent No. 2, dated as of April 21, 2020 (the "**Amendment No. 2**"), that certain Omnibus Amendment and Consent No. 3, dated as of May 20, 2020 (the "**Amendment No. 3**"), and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Super-Priority Term Loan Credit Agreement**"), by and among NPC, NPC QB, a Kansas corporation, and NPC Operating Company B, Inc., a Kansas corporation, each as a borrower (collectively, the "**Debtor Borrowers**"), NPC RH, as guarantor, KKR Loan Administration Services LLC ("**KKR**"), as administrative agent (the "**Prepetition Priority Agent**"), Deutsche Bank Trust Company Americas ("**DB**"), as collateral agent ("**Prepetition Priority Collateral Agent**") and the lenders

from time to time party thereto (collectively, the "**Priority First Lien Lenders**").  The original principal amount of the priority term loans under the Super-Priority Term Loan Credit Agreement on January 21, 2020 was $35 million (the "**Original Priority Term Loans**"), which was upsized to $80 million (the "**Priority Term Loans**") pursuant to Amendment No. 3. Obligations under the Super-Priority Term Loan Credit Agreement rank senior in right of payment to the obligations under the First Lien Credit Agreement (defined below) pursuant to the First Lien Intercreditor Agreement (defined below), and in respect of lien priority are secured on a *pari passu* basis with the obligations under the First Lien Credit Agreement by a first priority lien on substantially the same assets that secure the First Lien Credit Agreement.

### i.        First Lien Credit Agreement

42.        On April 20, 2017, certain of the Debtors entered into that certain First Lien Credit Agreement (as amended by Amendment No. 1 to First Lien Credit Agreement, that certain Joinder Agreement, dated April 9, 2018, that certain Omnibus Amendment, Consent and Forbearance, dated as of January 21, 2020, that certain Amendment No. 2, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), by and among the Debtor Borrowers, NPC RH, as guarantor, KKR, as administrative agent (as successor to Antares Capital LP ("**Antares**"), the "**Prepetition 1L Agent**," and together with the Prepetition Priority Agent, the "**Prepetition Priority/1L Agents**"), and DB, as collateral agent (as successor to Antares and KKR, the "**Prepetition 1L Collateral Agent**"), and the lenders from time to time party thereto (collectively, the "**First Lien Lenders**").  As of the Petition Date, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $703 million, which amounts consist of the following, each secured by the same collateral with *pari passu* lien priority: (a) approximately $640 million in term loans (the "**First Lien Term Loans**"),

(b) approximately $63 million under the revolving facility (the "**Revolver Loans**"), and (c) approximately $37 million of issued and outstanding letters of credit (together with the First Lien Term Loans and Revolver Loans, collectively, the "**First Lien Debt Obligations**"). Obligations under the First Lien Credit Agreement are secured by a first priority lien on substantially all of the Debtors' assets, other than Excluded Stock and Stock Equivalents (as defined in the First Lien Credit Agreement) or Excluded Property (as defined in that certain Amended and Restated First Lien Security Agreement, dated as of January 21, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Security Agreement**"), among the Debtor Borrowers, NPC Holdings, and the Prepetition 1L Collateral Agent, for the benefit of the First Lien Lenders).

### ii.        Second Lien Credit Agreement

43.    On April 20, 2017, the Debtor Borrowers also entered into that certain Second Lien Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), by and among the Debtor Borrowers, NPC RH, as guarantor, Wilmington Savings Fund Society, FSB, as administrative agent (as successor to Antares and KKR, the "**Prepetition 2L Agent**"), DB, as collateral agent (the "**Prepetition 2L Collateral Agent,**" and together with the Prepetition Priority Collateral Agent and Prepetition 1L Collateral Agent, the "**Prepetition Collateral Agents**") and the lenders from time to time party thereto (collectively, the "**Second Lien Lenders**").   As of the Petition Date, the aggregate principal amount outstanding under the Second Lien Credit Agreement is $160 million (the "**Second Lien Term Loans**").   Obligations under the Second Lien Credit Agreement are secured by a second priority lien on substantially all of the Debtors' assets, other than Excluded Stock and Stock Equivalents (as defined in the Second Lien Credit Agreement) or Excluded Property (as defined in that certain Second Lien

Security Agreement, dated as of April 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Debtor Borrowers, NPC Holdings, and the Prepetition 2L Collateral Agent, for the benefit of the Second Lien Lenders).

### iii. Intercreditor Agreements

44. The relative contractual rights of the Priority First Lien Lenders, on the one hand, and the First Lien Lenders, on the other hand, are governed by that certain First Lien Intercreditor Agreement, dated as of January 21, 2020 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"). The First Lien Intercreditor Agreement controls the rights and obligations of holders of the Debtors' obligations outstanding under the Super-Priority Term Loan Credit Agreement and the First Lien Credit Agreement with respect to, among other things, priority of payment, equal priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

45. The relative contractual rights of the First Lien Lenders and the Priority First Lien Lenders, on the one hand, and the Second Lien Lenders, on the other hand, are governed by that certain First Lien/Second Lien Intercreditor Agreement, dated as of April 20, 2017 (as supplemented by that certain Representative Supplement No. 1, dated as of January 21, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien/Second Lien Intercreditor Agreement**"). The First Lien/Second Lien Intercreditor Agreement controls the rights and obligations of holders of the Debtors' obligations outstanding under the First Lien Credit Agreement and the Super-Priority Term Loan Credit Agreement, on the one hand, and the Second Lien Credit Agreement, on the other hand, with respect to, among other things, priority

22

of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

## IV.     Events Leading to Commencement of Chapter 11

46.     In recent years, the Company has faced headwinds and unfavorable trends that continue to exert negative pressure on its businesses, including:  political influences driving uncertainties on trade and commodities, drastic shifts in the labor market increasing pressure on hiring wages; a consistently downward trending performance of the Pizza Hut business; changes in the Pizza Hut brand strategies affecting not only the Company but also other franchisee businesses within the Pizza Hut restaurant system; and the recent and ongoing COVID-19 Pandemic and its impact on the QSR and fast food industry.  This steady decline in Pizza Hut brand performance has resulted in a dramatic increase in the Company's leverage over the past two years.  As discussed further below, despite the Company's various initiatives and efforts, the combination of these challenges impacted the Company's liquidity and profitability and thus its ability to sufficiently overcome these challenges.

## A.     Trends and Uncertainties Affecting the Businesses

### 1.     Economic Environment and Industry Trend

47.     Over the past few years, the changing economic environment and certain trends in the fast-food industry have exerted a downward pressure on the Company's Pizza Hut operation and performance.  As discussed further below, while the COVID-19 Pandemic has unexpectedly provided some relief in the form of concessions from the Wendy's brand and a temporary boost in sales for the Pizza Hut business, such relief is expected to only be short term. The COVID-19 Pandemic has had a negative impact on the Wendy's business as the QSR and fast food industry is faced with sluggish traffic, largely a result of the Quarantine Orders (defined below) that were issued in various states.  The Wendy's business was forced to close its dining

rooms and provide food service solely by drive-thru service in early March, which negatively impacted sales. The Company is in the early stages of re-opening its dining rooms in alignment with local orders within each jurisdiction in which the Company operates as well as brand directives on requirements for in-store service. While there have been mixed sales results across each brand, both brands have incurred meaningful expenses to ensure the health and safety of their customers and employees during the COVID-19 Pandemic. Further, certain political influences driving uncertainty on global trade as a whole and fresh beef supply availability directly correlated with the COVID-19 Pandemic are impacting commodity prices and other inputs upon which the Company's business relies upon.

i. **Fluctuating Labor Market**

48. Given that the fast-food industry is labor intensive, the fast-food industry remains hyper-sensitive to fluctuations in the labor market. Prior to the COVID-19 Pandemic, the battle for and retention of an increasingly transient labor force had intensified in recent years, with the economy marked by escalating wage pressures and a decreasing number of teens in the workforce—teens historically made up a significant portion of the QSR and fast food restaurants workforce. While the COVID-19 Pandemic has had the unexpected effect of expanding the labor market as many businesses closed and laid off employees, structural challenges to labor costs still exist. For example, many of the employees at the Company's franchise locations begin employment at minimum wage levels, and therefore, the Company's operations are susceptible and highly impacted by federal, state, and local minimum wage rate legislations. Certain states' minimum wage rates are adjusted annually for inflation, and such increases are expected to directly increase the Company's labor expenses. Federal, state, and local initiatives and proposals that seek to further increase minimum wage rates will also materially impact the Company's operations.

49.     Minimum wage rate increases are expected to impact approximately 30 percent of the Company's Wendy's store base and approximately 49 percent of the Company's Pizza Hut store base in 2020.  In addition, pre-COVID-19 Pandemic, historically low levels of unemployment pressured hiring wages in excess of minimum wages in certain markets, further impacting the Company's operations.  To address the burdensome pressure, the Company is targeting reduced turnover, which is significant in the QSR industry, management training, and optimizing the utilization of the labor force.

50.     Specifically with respect to Pizza Hut, the retention of delivery drivers has particularly been challenging due to (i) the expansion of food delivery across the QSR segment, reducing the availability of delivery drivers across the industry, and (ii) the impact of declining sales across the brand, inevitably leading to less tip earnings for delivery drivers.  As a result, the Company has no other option but to increase wages to retain delivery drivers, costs that are difficult to pass on to customers within the constraints of a brand-driven value-oriented menu offering, or risk losing drivers to competing third-party delivery services, where earnings are not tied to one specific brand or restaurant.

ii.     **Uncertainties in Commodity Prices**

51.     Prior to the COVID-19 Pandemic and in recent years, increasing inflationary pressures on commodity prices were burdening the Company's operations, which is heavily dependent on food commodities.  For example, the African Swine Fever has caused, and continues to cause, volatility in the protein markets which affects both Wendy's and Pizza Hut. Specifically, there has been a shifting global demand for beef due to the African Swine Fever, further exasperated by reduced fresh beef supply availability as a result of the COVID-19 Pandemic, and inflation in pork prices that is being driven by the unfavorable impact from the African Swine Fever influence and the COVD-19 Pandemic, leading to a shortage of pork.

Wendy's food inflation is especially impacted by the beef market volatility, and based on estimates provided by the QSCC, the Company has forecasted commodity inflation of approximately 2-3 percent for fiscal year 2020, driven in large part by escalating beef prices. The COVID-19 Pandemic saw a fleeting reversal of some of the inflationary pressures on commodity prices on the Pizza Hut business; however, certain commodity prices have risen again, some in excess of their pre-COVID-19 Pandemic prices, due in part to state and federal government intervention to subsidize cheese, dairy, and other at-risk industries.

### iii.        Decreasing Foot Traffic

52.     Foot traffic in the QSR and fast food industry has decreased as a whole in recent years, coupled with the ever-growing population and variety of restaurant alternatives available to consumers in the QSR and fast food industry.  The Pizza Hut business has especially been impacted by a brand image and product offering that has lagged behind its competitors. Although the Pizza Hut brand has sought in recent years to offset loss in foot traffic with discount promotions to attract more customers, such value-oriented initiatives are not sustainable long term and have resulted in an erosion of store profitability and minimal sales growth, and an increase in the number of unprofitable restaurants.  Further, the significant shift and increasing prevalence and use of third-party delivery services, such as DoorDash and GrubHub, has also increased the competition for delivery traffic and off-premises orders.  The impact of this has been  particularly acute on the Pizza Hut brand as historically pizza was one of the only foods that offered the convenience of delivery and that convenience is now readily available to many other food categories.  Additionally, this has increased the employment and earnings alternatives for drivers, thus compounding the impact by raising wage inflation (and reducing availability) of driver employees.  While the COVID-19 Pandemic has had the unexpected result of increasing

demand for deliveries on the Pizza Hut side, it is likely that sales trends will revert back to pre-COVID-19 levels.

### 2.     Performance of the Brands

53.     While the above trends and uncertainties have generally impacted the industry as a whole, there have also been certain brand-specific challenges and barriers that have impacted the performance of the Pizza Hut and Wendy's brands, both positively and negatively, as discussed further below.

#### i.     Pizza Hut

54.     *Deteriorating Brand Image and Lack of Innovation*.  The Pizza Hut brand has in recent years faced a deteriorating brand image in light of the pervasiveness of pizza restaurants, the success of competing brands to carve out a particular market within the pizza industry, and the reluctance by the Pizza Hut Franchisor to invest in brand development.  The Pizza Hut brand continues year after year to lose market share to its national competitors.  With consumer behavior shifting towards more delivery than dine-in, Pizza Hut's competitors such as Domino's and Papa John's have continued to evolve their respective Delco-like models with better technology or more compelling price and product offerings, whereas Pizza Hut's lack of sales growth and related cash flow creation has prevented many franchisees, including the Company, from transitioning the balance of its dine-in estate from standalone assets that cost more to maintain and are less profitable.  Further, in rural and suburban areas, where a majority of the "red roof" dine-in restaurants are located, the lack of national advertising relevancy has eroded the recognition of the Pizza Hut brand.

55.     Deteriorating brand recognition has been further exacerbated by decreased menu innovation and the lack of a clear, long-term strategy by the Pizza Hut Franchisor to address the brand issues to provide a clear and differentiated identity.  Given the lack of product

variability, the Pizza Hut brand has increasingly utilized and promoted, to the detriment of the franchisees, price discounts to increase sales, which somewhat helped mitigate further traffic loss but eroded profitability to franchisees due to the associated increased food and labor costs. However, recently, Yum! has implemented changes in the executive leadership at the Pizza Hut brand.   The new leadership team has communicated their intent to move away from the EDLP Marketing Strategy (defined below) to improve store-level profitability. These changes are in their infancy but, nonetheless, are strategic shifts that are supported by the Company and the broader franchisee network.

56.     *Marketing Challenges*.    Rather than investing to evolve the brand to address shifting customer behavior, the Pizza Hut brand has tried to exploit an "Every Day Low Price" marketing strategy over recent years (the "**EDLP Marketing Strategy**"), which was mainly focused on driving gross revenues that would primarily benefit the Pizza Hut Franchisor through increased royalties, rather than creating a stable economic model for franchisees, which are predominately "mom-and-pop" entrepreneurs.    The EDLP Marketing Strategy was unsuccessful in driving enough incremental traffic and essentially eviscerated any potential profitability generated by such strategy with increased food and labor costs.

57.     *Business Model Issues*.    In addition, the Pizza Hut Franchisor's "asset-light" business model creates a misalignment of incentives between the Pizza Hut Franchisor and the franchisees, with the Pizza Hut Franchisor predominantly focused on system revenues and the corresponding collection of royalty fees, while the franchisees predominantly focused on store-level profitability.   This misalignment has resulted in a material reduction in store-level profitability for the Company and other franchisees over the last several years.

58.     In August 2019, the Pizza Hut Franchisor announced that it would temporarily close hundreds of underperforming Pizza Hut locations as the company shifts its traditional Dine-In assets to the Delco format.[5]   In the first quarter 2020, the Pizza Hut brand U.S. sales and same-store sales declined seven (7) percent and seven (7) percent, respectively,[6] which demonstrates that the challenges faced by the Company are not limited to the Company's Pizza Hut business and permeate throughout the Pizza Hut restaurant system.

### ii.      Wendy's

59.     *Positive Brand Performance*.  As one of the top three hamburger fast food brands, the Wendy's brand has seen positive growth as a whole in recent years, bolstered by various initiatives undertaken by the Wendy's Franchisor to develop the brand to address evolving consumer trends.  The Wendy's Franchisor publicly describes its marketing strategy as "One More Visit One More Dollar," which highlights both value and premium offers to increase customer awareness and engagement.   The Made to Crave innovative burger and chicken line-up, launched in 2019, converts customers to higher margin premium menu items, which are rotated with innovative new menu offers that continue to engage customers.  Additionally, while there are a few price pointed value offers that are marketed by the brand, menu pricing is largely determined at the discretion of the franchisee, which allows the Company to respond to localized market pressures and competition in an effective way.  Further, as discussed more fully below, the Wendy's brand has evolved its menu in response to consumer demand, such as the re-

---

[5]   *See* Haley Cawthon, *Pizza Hut to Temporarily Close Hundreds of U.S. Locations*, The Business Journals, August 2, 2019, https://www.bizjournals.com/bizwomen/news/latest-news/2019/08/pizza-hut-to-temporarily-close-hundreds-of-u.html.

[6]   *See* Press Release, Yum! Brands, Yum! Brands Reports First-Quarter System Sales Declines of (3)% with a Same-Store Sales Decline of (7)% Offset by 4% Net-New Unit Growth; GAAP Operating Profit Decline of (42)%; Core Operating Profit Decline of (6)% (April 29, 2020).

introduction of the spicy chicken nuggets and the introduction of a full breakfast menu, which Wendy's estimated would increase system wide sales by 10% once fully implemented.  Overall, these initiatives have strengthened brand awareness and growth, which has had a correspondingly positive influence on NPC's performance of its Wendy's locations.

60.     *Menu Innovation and Digital Initiatives*.  The Wendy's brand has also focused on menu innovation to enhance the brand, including the recent successful reintroduction of the spicy chicken nuggets and launch of the breakfast menu.  There has also been a focus on improving the digital footprint of the Wendy's brand, specifically through a mobile order app.  Starting in 2020, the Wendy's brand expanded to other third-party mobile delivery services, such as GrubHub, Postmates, and UberEats, all of which digital support costs are not passed on to the franchisee.

61.     While these various brand-wide initiatives are expected to improve the performance of the Wendy's brand, success of such initiatives are not guaranteed and may potentially have a material impact on the Company's performance, discussed further below.

**3.     Impacts of the COVID-19 Pandemic**

62.     The global COVID-19 Pandemic, beginning early this year, has severely disrupted the global economy, with the Company's businesses being no exception.  Although the Company was quick to respond and adapt to the "new normal," all the while managing liquidity and negotiating rent deferrals and trade terms, business disruption was inevitable.  The food industry—including QSRs—was particularly impacted, as states issued stay-at-home orders and dine-in prohibition orders (collectively, the "**Quarantine Orders**").  As a result of the Quarantine Orders, the Company closed its dine-in service at all of its locations, reduced its staffing per location, and decreased hours of operation as a result of the reduced demand.

63.     Further, as a result of the COVID-19 Pandemic, state authorities and the Franchisors issued new guidance and requirements for additional safety measures; in addition, the Company has taken incremental steps to ensure the health and safety of employees and customers.  For example, the Company, in coordination with the brands, has provided all of its employees with masks and gloves and also installed Plexiglas shields around the cashier counters to prevent any unnecessary contact.   The post-COVID-19 safety measures have cost the Company an average of approximately $750,000 per month, which is expected to continue through the end of 2020.

64.     The Company has also utilized existing technology and developed novel procedures to provide its customers with cashless payment methods, contactless delivery, and curbside pickup, as well as utilizing third-party delivery services in the Pizza Hut business. Although the Company's dine-in services were shut down, it saw a significant increase in ticket sales, which boosted sales in the Pizza Hut business and helped offset a portion of the loss of traffic on the Wendy's business starting in late March 2020.

### 4.     Performance of NPC

65.     The economic environment, headwinds in the QSR and fast food industry, brand-wide performance, and the COVID-19 Pandemic has impacted the performance and operations of the Company itself.  And as stated above, the performance of the Company's Pizza Hut and Wendy's franchised restaurants is reflective of the respective brand performances— mirroring the respective brand performance.

### i.     Performance of NPC's Pizza Hut Operations

66.     Prior to the COVID-19 Pandemic, the Company anticipated that the negative profitability trends from the past several years would continue in 2020, and 2020 earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") was expected to be

$5.6 million, down approximately $31.9 million or 85 percent from 2019, and down nearly $90 million from 2016.  Although the outlook for 2020 has improved somewhat, with revised EBITDA projected to be approximately $44.1 million due to positive business impact of the COVID-19 Pandemic on the business.  The Company continues to face industry, labor, and brand-wide challenges; however, recent actions and communication from the Pizza Hut Franchisor related to turnaround initiatives is positive.

68.     As a result of the 2020 expected minimum wage rates increases, approximately 49 percent of the Company's Pizza Hut store base is anticipated to be impacted in 2020, increased from 38 percent in 2019 and 33 percent in 2018.  Prior to the COVID-19 Pandemic, the Company sought to address the increasing labor pressures by optimizing labor hours and rates at the stores.  However, many of its Pizza Hut locations were already operating with the minimum-level hours necessary to keep the store operating, and therefore the Company does not have the ability for significant labor hour reductions.

### ii.        Performance of NPC's Wendy's Operations

68.     The Company's Wendy's operations have historically performed well. For example, prior to the COVID-19 Pandemic, the 2020 EBITDA was expected to be at $55.2 million or up 14 percent from 2019.  The introduction of the Wendy's breakfast menu is expected to provide significant sales growth and leverage.  However, the COVID-19 Pandemic and its impact on the supply chain and the market volatility is projected to negatively impact 2020 performance, with revised 2020 EBITDA projected to be approximately $48.8 million.

69.     The Company's Wendy's operations is similarly negatively influenced by the labor pressures and increasing minimum wage rates.  As mentioned above, approximately 30 percent of the Company's Wendy's restaurants are expected to be impacted by changes.  The Company has engaged with a third party pricing vendor to conduct ongoing review of competitor

pricing and other demographics in the markets in which it competes.  While there are certain price pointed value offers that are marketed by the Wendy's Franchisor, menu pricing is largely at the discretion of the franchisee.  Therefore, effective pricing is viewed by the Company as a lever to proactively manage against rising wages or other headwinds.  This process is in its preliminary stages but early results are promising.

## B.     Unsustainable Capital Expenditure Requirements

70.     Despite the declining performance of many of its Pizza Hut locations, the Company is required to make certain capital expenditures under the PH Franchise Agreements.  Prior to the COVID-19 Pandemic, due to Pizza Hut's brand-wide struggles, the Pizza Hut Franchisor offered to the franchisees certain deferrals of the remaining 2019 Asset Partner Plan requirements to 2020, which was extended into 2021 as a result of the COVID-19 Pandemic.  However, the Pizza Hut brand denied the Company the ability to participate in the deferral program.  Historically, however, the Company has always complied with its capital expenditure requirements, for both its Pizza Hut and Wendy's locations.

## C.     Prepetition Initiatives

### 1.     Formation of Special Committees and Corporate Governance Changes

71.     In response to the Company's constricting liquidity position and ongoing market headwinds, on August 9, 2019, in connection with the Company's evaluation of strategic alternatives, the boards of managers and directors of NPC RH I, NPC RH, and NPCIH (collectively, the "**Boards**") each approved the formation of a special committee (collectively, the "**Special Committees**").  The Company is currently operating under the direction of the Special Committees, which are mandated with full authority to oversee and, where appropriate, participate in discussions and negotiations related to the Company's restructuring efforts, consider and evaluate strategic alternatives and any action, agreement, or undertaking related to

or in furtherance thereof on behalf of the Company, oversee the documentation, execution, and implementation of any strategic alternatives, and take, direct, and approve any corporate steps or actions as necessary to carry out its mandate.   The Special Committees consist of three independent members, Neal Goldman, Patrick Bartels, and Alan Carr.

         **2.**      **Incremental Term Loan Funding**

        72.     In connection with the Company's review of strategic alternatives and to provide the Company with sufficient liquidity during such efforts, the Sponsors agreed to fund the 2019 Incremental Upsize (the loans thereunder, the "**New Term Loans**") under the First Lien Credit Agreement on August 19, 2019.   The New Term Loans were offered to the entire syndicate of First Lien Lenders (although no First Lien Lenders ultimately participated) and it was issued at 98.25%.   On August 19, 2019, the Special Committees approved the New Term Loans by unanimous written consent.

         **3.**      **Priority Term Loan Financing**

        73.     Starting in mid-December 2019, as discussion towards a consensual restructuring transaction were in their early stages, the Company and its advisors determined that absent a new capital injection, the Company would exhaust its working capital by mid- to late January of 2020.   Accordingly, to avoid a potential value-destructive free-fall chapter 11 filing and support ongoing discussions regarding a potential reorganization transaction to continue, in early January the Company requested that the  Ad Hoc Priority/1L Group provide short term emergency financing to the Company (as amended by Amendment No. 1., Amendment No. 2 and Amendment No. 3, the "**Priority Term Loan Financing**"), and on January 21, 2020, the Priority First Lien Lenders provided the Company with $35 million of super-priority secured term loans pursuant to the Super-Priority Term Loan Credit Agreement.   The Priority Term Loan Financing included terms requiring operational tests and controls and required certain

milestones.  However, it also catalyzed the commencement of engagement with the Pizza Hut Franchisor, resulting in the PH Forbearance Agreement, as discussed further below.  The terms of the Priority Term Loan Financing also provided an ongoing forbearance of all 1L Interest Payments.[7]

74.     Contemporaneously with the Company's discussions with the Ad Hoc Priority/1L Group, the Company and its advisors began limited discussions with an ad hoc group of second lien lenders (the "**Second Lien Ad Hoc Group**") and its advisors.  The Second Lien Ad Hoc Group was given information parity and the Company's advisors engaged in periodic discussions with the advisors to the Second Lien Ad Hoc Group to provide ongoing updates and discuss various developments.

75.     On February 25, 2020, the Company and the Ad Hoc Priority/1L Group amended the terms of the Priority Term Loan Financing through Amendment No. 1, which provided for revised milestone dates, among other things.  As part of Amendment No. 1, the Ad Hoc Priority/1L Group retained an operational consultant and Cypress Associates as a QSR banker to assist with a potential merger and acquisition process for the Company's Wendy's business.

---

[7]   The Company determined it was not in its best interest to make the interest payments on the First Lien Debt Obligations of $10.1 million (the "**1L Interest Payment**") and the Second Lien Term Loans of $3.9 million, respectively, due on January 31, 2020 (together with the 1L Interest Payment and all subsequent interest payments, the "**Interest Payments**").  Pursuant to the First Lien/Second Lien Intercreditor Agreement, the Second Lien Lenders are subject to a 180 standstill, which restricts them from exercising any rights or remedies in respect of collateral until the date that is 180 consecutive days after the occurrence of an event of default and delivery by the Prepetition 2L Agent of notice  to the First Lien Lenders that such event of default is continuing and the Second Lien Term Loans are due and payable in full (the "**2L Standstill**").  The 2L Standstill expires in August 2020.

76.     On April 21, 2020, the Company and the Ad Hoc Priority/1L Group further amended the terms of the Priority Term Loan Financing through Amendment No. 2, which provided for further revised milestone dates, among other things.

77.     On May 20, 2020, the Company and the Ad Hoc Priority/1L Group further amended the terms of the Priority Term Loan Financing through Amendment No. 3, which upsized the principal amount of the Priority Term Loans to $80 million, $40 million of which was drawn on May 22, 2020 to refinance the Original Priority Term Loans in full and $40 million of which was made available for future draws in the form of a delayed draw term loan, subject to satisfaction of certain conditions.  The upsize of the Priority Term Loans was required under the PH Forbearance Agreement.

### 4.     Pizza Hut Forbearance Agreement

78.     Contemporaneously with the Ad Hoc Priority/1L Group discussions regarding the Priority Term Loan Financing, the Company negotiated a forbearance agreement between the Company and the Pizza Hut Franchisor, dated January 21, 2020 (as amended from time to time, the "**PH Forbearance Agreement**").  The PH Forbearance Agreement provided for an agreement by the Pizza Hut Franchisor to not exercise any remedies with respect to any defaults that may have been alleged to have existed and allowed for the Company to engage in discussion with the Pizza Hut Franchisor regarding a consensual resolution on a go-forward business plan and potential operating partnership.  The forbearance period under the PH Forbearance Agreement was extended multiple times, last extended to June 30, 2020.

### 5.     Restructuring Support Agreement with the Ad Hoc Priority/1L Group

79.     The RSA confers significant benefits on the Debtors' estates.  In addition to providing the framework for the Debtors' emergence from chapter 11 with (i) a substantially deleveraged capital structure, (ii) a potential substantial exit capital infusion to revitalize the

Debtors' Pizza Hut restaurants, (iii) the potential to realize a value-maximizing sale of some or all of the Debtors' Wendy's restaurants, and (iv) a smaller, more profitable footprint of restaurants, the RSA provides that the Consenting Creditors (as defined in the RSA), which I understand currently represent 92.26 percent of the Priority First Lien Lenders, 85.03 percent of the First Lien Lenders, and 17.13 percent of the Second Lien Lenders, must support confirmation of the Pre-Negotiated Plan.

80.    Shortly after the commencement of these chapter 11 cases, in accordance with the milestones set forth in the RSA, , the Company intends to solicit indications of interest for the potential sale of the Wendy's business.  As part of the chapter 11 process, the Company intends to market the Wendy's business as a sale on a single, going-concern basis as well as individual, market-based transactions.

81.    The RSA commits the Ad Hoc Priority/1L Group to support the restructuring as set forth in the Plan Term Sheet by, among other things:

- voting to accept the Pre-Negotiated Plan;

- refraining from taking any action that would delay or impede consummation of the Pre-Negotiated Plan or is inconsistent with the RSA and Plan Term Sheet;

- supporting and effectuating the documentation within the timeframes contemplated by the RSA and Plan Term Sheet; and

- agreeing to grant and not opt-out of the releases of third-party claims, substantially in the form set forth in the Plan Term Sheet.

82.    The RSA provides for certain milestones that contemplate a sale process for the Company's Wendy's business as well as a potential sale of the Company's Pizza Hut business, while also providing for the flexibility to effectuate a standalone restructuring around the two businesses.  The Plan Term Sheet sets forth the terms of the Pre-Negotiated Plan, which contemplates a new money rights offering (the "**Rights Offering**") and a new first lien term loan

credit facility in the event that certain assets of the Wendy's business are retained by the Reorganized Parent (as defined in the Plan Term Sheet).  Pursuant to the Rights Offering, the First Lien Lenders will be distributed subscription rights to purchase newly issued shares of convertible participating preferred stock issued by the Reorganized Parent.  The Rights Offering will be fully backstopped by certain members of the Ad Hoc Priority/1L Group, which will be memorialized in a backstop commitment agreement.

83.     The agreement itself is the product of extensive arm's length, good-faith negotiations among the Debtors and the Ad Hoc Priority/1L Group.  Furthermore, the signing of the RSA was undertaken only after careful consideration by the Debtors' management and Special Committees in consultation with their experienced financial and legal advisors. Importantly, the Debtors' obligations under the RSA remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates.

84.     The restructuring made possible by the RSA presents the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise rather than litigation.  Based on the foregoing, the Debtors believe they have exercised reasonable business judgment in their decision to execute the RSA and that such execution was in the best interest all of parties in interest.

## V.     Debtors' Need for Use of Cash Collateral

85.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final*

*Hearing, and (V) Granting Related Relief* ("**Cash Collateral Motion**"),[8] the Debtors request, among other things, (i) authority to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), and all other Prepetition Collateral, solely in accordance with the terms of the proposed orders authorizing the relief requested in the Cash Collateral Motion and the Approved Budget, (ii) authority to provide adequate protection to the Prepetition Secured Parties, (iii) subject to entry of the Final Order, subject to the Carve-Out, the waiver of the Debtors to all rights to surcharge any Prepetition Collateral or Replacement Collateral, (iv) modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the proposed orders granting the relief requested in the Cash Collateral Motion, (v) schedule a final hearing, (vi) waiver of any applicable stay with respect to the effectiveness and enforceability of the interim order, and (vii) granting related relief.

### A.    Cash Collateral Motion

86.    I am familiar with and was actively involved in, along with the Debtors' advisors, the negotiation of the terms of the Debtors' use of Cash Collateral and the adequate protection proposed to be provided by the Debtors to the Prepetition Priority/1L Secured Parties and the Prepetition Second Lien Secured Parties in exchange for such use.  The proposed use of Cash Collateral is the product of arm's-length and good faith negotiations between the Debtors and the Prepetition Secured Parties.  During negotiations with the Prepetition Priority/1L Secured Parties regarding the consensual use of Cash Collateral, the Prepetition Priority/1L Secured Parties indicated that their consent would be contingent upon entry into the RSA. The

---

[8]    Capitalized terms used in this <u>Part V</u> of the Declaration and not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

proposed use of Cash Collateral pursuant to the terms of the proposed Interim Cash Collateral Order is in the best interest of the Debtors, their estates, and stakeholders. The Prepetition Secured Parties have consented to (or not opposed) or are deemed under the applicable intercreditor agreement to have consented to the Debtors' use of Cash Collateral in accordance with the terms and conditions provided for in the Proposed Interim Order (and as will be incorporated in a Proposed Final Order). Pursuant to the First Lien/Second Lien Intercreditor Agreement, the Prepetition Second Lien Agent, on behalf of itself and other Second Lien Secured Parties agreed that: (i) it will raise no objection to or will not otherwise contest the Debtors' consensual use of Cash Collateral, and (ii) it will not contest, or support any other person contesting, any request by any of the First Lien Secured Parties for adequate protection in any form.

87.     As adequate protection to the Prepetition Priority/1L Secured Parties for the Debtors' use of Cash Collateral, Prepetition Collateral, and Adequate Protection Collateral, the Prepetition Priority/1L Secured Parties will receive Prepetition Priority/1L Adequate Protection Liens and Prepetition Priority/1L Adequate Protection Claims, as well as a commitment by the Debtors to comply with certain operational covenants, provide certain reporting, and to pay the reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Priority/1L Group and their advisors. The Debtors will also make certain postpetition interest payments under the Prepetition Priority Credit Documents. And as further adequate protection for the Prepetition First Lien Secured Parties, the Debtors will cash collateralize all undrawn letters of credit (other than any letters of credit issued to the Pizza Hut Franchisor (or any of its affiliates), as beneficiary, which as of the Petition Date totaled approximately $10,000,000) outstanding under the Prepetition First Lien Credit Agreement. As adequate

protection to the Prepetition Second Lien Secured Parties for the Debtors' use of Cash Collateral and other Prepetition Collateral and Adequate Protection Collateral, the Prepetition Second Lien Secured Parties will receive Prepetition Second Lien Adequate Protection Liens—which shall be junior in priority to the Prepetition Priority/1L Adequate Protection Liens and Prepetition Second Lien Adequate Protection Claims—which shall be junior in priority to the Prepetition Priority/1L Adequate Protection Claims.  In addition, the Debtors agreed to certain stipulations regarding the amount, validity, enforceability, perfection, and priority of the claims and liens of the Prepetition Priority/1L Secured Parties and Prepetition Second Lien Secured Parties.

88.     The Debtors are permitted to use Cash Collateral in compliance with the Approved Budget subject to Permitted Variances.  I worked with the Debtors and their advisors to formulate the Approved Budget, which was shared with and agreed upon by the Ad Hoc Priority/1L Group and its advisors, and represents a reasonable forecast of available cash and expenses to be incurred during the applicable period.  The Debtors' right to use the Cash Collateral is subject to certain Termination Events (as defined in the Proposed Interim Order). This includes, among other things, compliance with certain milestones (as also reflected the Restructuring Support Agreement), which I understand are reasonable and achievable.

89.     In addition, the Debtors negotiated a Carve-Out for professional fees during these Chapter 11 Cases to be used to pay the fees of the Clerk of the Court, the United States Trustee, professionals retained by any statutory committee of unsecured creditors, and professionals retained by the Debtors in these cases.

**B.     Need for Access to Cash Collateral**

90.     Based on my general experience in the restructuring industry and my experience with the Debtors' business, approval of the Debtors' requested access to Cash Collateral is necessary and appropriate to provide the Debtors with immediate access to liquidity.

The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business without authorized use of Cash Collateral.

91.     Based on the Company's Approved Budget, continued access to this Cash Collateral is necessary to maintain operations in the ordinary course, ensure the viability of the Company, and maintain the going concern value without significant deterioration to the detriment of all stakeholders.  The Debtors have also determined that existing cash, together with cash generated from operations, will be sufficient to fund the chapter 11 process.  In addition, having access to Cash Collateral will allow the Debtors to instill confidence in their critical customer base, employees, suppliers, and business partners by assuring them that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date.

**C.     Need for Immediate Relief**

92.     An immediate and critical need exists for the Debtors to use Cash Collateral, consistent with the terms of the Budget.  Inability to use Cash Collateral, even for a short period of time, would cause immediate and irreparable harm to the Debtors' estates.  The Debtors' ability to continue to use Cash Collateral is essential for the continued funding of operational and administrative costs of these Chapter 11 Cases.  Absent the use of Cash Collateral for these Chapter 11 Cases, the Debtors will be forced to completely halt their business operations, resulting in a significant deterioration in the value.  The relief requested in the Cash Collateral Motion preserves the value of the Debtors' estates for the benefits of their stakeholders.

93.     I have reviewed the Debtors' requests included in the Cash Collateral Motion, including the terms of the Approved Budget and, based on my experience, they are fair and reasonable and reflect the Debtors' exercise of prudent business judgment.

## VI.    First Day Pleadings[9]

94.    Contemporaneously herewith, the Debtors have filed First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization.  The First Day Pleadings include the following:

- *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases* ("**Joint Admin Motion**");

- *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors, and (B) Redact Certain Personal Identification Information; (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information; and (III) Granting Related Relief* ("**Creditor Matrix Motion**");

- *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue (A) Using Existing Cash Management System, Bank Accounts, and Business Forms and (B) Funding Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief* (the "**Cash Management Motion**");

- *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs, and (II) Granting Related Relief* (the "**Wages Motion**");

- *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) 503(b)(9) Claimants, and (D) PACA Claimants; (II) Granting Administrative Expense Priority Status for Outstanding Prepetition Purchase Orders; and (III) Granting Related Relief* (the "**Vendors Motion**");

- *Emergency Motion of Debtors for Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments, and (II) Granting Related Relief*  (the "**Taxes Motion**");

---

[9]    Capitalized terms used in this <u>Part VI</u> of the Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

- *Emergency Motion of Debtors for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors and (B) Claims of Certain Worthless Stock Deductions* (the "**NOL Motion**");

- *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations With Respect Thereto, (II) Modifying Automatic Stay With Respect to Workers' Compensation Programs, and (III) Granting Related Relief* (the "**Insurance and Surety Bond Motion**");

- *Emergency Motion of Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections By Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Service, and (IV) Granting Related Relief* (the "**Utilities Motion**");

- *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Customer Programs in Ordinary Course of Business and Pay Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "**Customer Programs Motion**");

- *Emergency Motion of Debtors for Order Extending Time to File Schedules and Statements* (the "**Schedules and SOFAs Motion**"); and

- *Emergency Application of Debtors for Entry of An Order Authorizing Appointment of Epiq Corporate Restructuring, LLC as Claims, Noticing and Solicitation Agent* (the "**Epiq Retention Application**")*.*

95.     As described in detail below, the First Day Pleadings seek authority to, among other things, use cash collateral, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.  Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.   The following table summarizes the

aggregate amount of prepetition claims that the Debtors are seeking to pay pursuant to the First

Day Pleadings:

| Motion | Interim Relief (Amounts due and payable pending final hearing on Motion) | Final Relief |
|---|---|---|
| **Wages Motion** | N/A | $41.5 million |
| **Vendors Motion** | $13.8 million | $18.8 million |
| **Taxes Motion** | N/A | $17.9 million |
| **Insurance and Surety Bond Motion** | $1.8 million | $19.8 million |
| **Utilities Motion** | N/A | $1.8 million |

96.    I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure

provides, in relevant part, that the Court shall not consider motions to pay prepetition claims

during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the

extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement,

the Debtors have narrowly tailored their requests for immediate authority to pay certain

prepetition claims to those circumstances where the failure to pay such claims would cause

immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking

other relief to subsequent hearings before the Court.

97.    I am familiar with the content and substance of each of the First Day

Pleadings.  As described below, I believe approval of the relief sought in each of the First Day

Pleadings is critical to the Debtors' ability to utilize chapter 11 successfully to implement a

value-maximizing reorganization, with minimal disruption to their business operations.

**A.    Joint Administration Motion**

98.    By the Joint Administration Motion, the Debtors are requesting entry of an

order directing joint administration of their chapter 11 cases for procedural purposes.  The

Debtors are all under common ownership under NPC Restaurant Holding I LLC.  I believe joint

administration of the Debtors' chapter 11 cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.

**B.      Creditor Matrix Motion**

99.     By the Creditor Matrix Motion, the Debtors are requesting entry of an order (i) authorizing Debtors to (a) file a consolidated creditor matrix and a consolidated list of the Debtors' 30 largest unsecured creditors, and (b) redact certain personal identification information; (ii) approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information; and (iii) granting related relief.

100.     I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix because the preparation of separate lists of creditors for each Debtor would be unduly expensive, time consuming, and administratively burdensome.  The Debtors request authority to file a single consolidated creditor matrix for all Debtors.  Further, the Debtors request approval to redact address information of the Debtors' current and former employees, current and former directors, and the Debtors' individual creditors, given that such information could be used to perpetrate identity theft.  The Debtors propose providing, upon request, an unredacted version of the consolidated creditor matrix to the Court, the Office of the United States Trustee for the Southern District of Texas and to counsel to the official committee of unsecured creditors should one be appointed in these chapter 11 cases.

101.     Because a large number of potential creditors may have claims against multiple Debtors, the Debtors request authority to file a single, consolidated list of the top 30 unsecured creditors for all Debtors collectively.  The consolidated top 30 creditors list will help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

102.     I believe that serving a single notice of commencement on the consolidated creditor matrix will preserve judicial resources and prevent creditor confusion. Additionally, I believe that publishing a notice in the *New York Times* is the most practical method by which to notify creditors and other parties in interest who do not receive the notice of commencement by mail of these chapter 11 cases.

## C.     Cash Management Motion

103.     By the Cash Management Motion, the Debtors are requesting authority to continue their existing cash management system, implement changes to the cash management system in the ordinary course of business, continue entering into intercompany transactions in the ordinary course of business, grant administrative expense priority for postpetition intercompany claims, honor and pay all prepetition and postpetition bank fees payable by the Debtors in the ordinary course of business, including by paying amounts due and owing thereunder and continue and pay any obligations in connection with the Employee Credit Card Program.

104.     The Debtors use an integrated cash management system to collect, transfer, and disburse funds generated by its operations.  A diagram of the cash management system is attached to the Cash Management Motion as <u>Exhibit C</u>.  I understand that the cash management system facilitates cash monitoring, forecasting, and reporting and enables the Company to maintain control over the administration of approximately 1,232 bank accounts. The bank accounts held by the Debtors are maintained by various banking institutions due to the vast geographical diversity of the Company's store locations.  The significant majority of the bank accounts comply with section 345(b) of the Bankruptcy Code, but approximately 214 bank accounts do not comply with Section 345(b) (the "**Noncompliant Bank Accounts**").  I understand that the funds held in the Noncompliant Bank Accounts remain in such accounts for

no more than a week, if not swept daily, before being swept into the Debtors' main concentration accounts that are compliant with 345(b).  By the Cash Management Motion, the Debtors are seeking a forty-five (45) day extension of time from the entry of the Interim Order to comply with the requirements of section 345(b) of the Bankruptcy Code while they discuss the issue with the U.S. Trustee and any statutory committee appointed in these cases.

105.    I understand that the Debtors' treasury and accounting departments, both located at the Company's shared service center in Pittsburg, Kansas, maintain daily oversight over the cash management system and implement cash management controls for entering, processing, and releasing funds.

106.    The Debtors' cash management system is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  I believe that any disruption of the Debtors' cash management system would be materially detrimental to the Debtors' operations because their businesses requires prompt access to cash and accurate cash tracking.

107.    I understand that the Debtors' cash management system is tailored to meet the Debtors' operating needs, thereby enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

108.    I believe the Debtors' cash management system constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors.  The Debtors' cash management system has historically reduced the Debtors' expenses by enabling

them to use funds in an optimal and efficient manner.  Accordingly, I believe the Debtors'
continued use of their cash management system without interruption is vital to the Debtors'
business operations and the success of these chapter 11 cases.

109.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief
requested in the Cash Management Motion is in the best interests of the Debtors' estates, and
should be granted.

**D.      Wages Motion**

110.    By the Wages Motion, the Debtors are requesting authority to (i) pay
prepetition wages, salaries, reimbursable expenses, and other obligations on account of the
Compensation and Benefits Programs in the ordinary course of business and (ii) continue the
Compensation and Benefits Programs.

111.    As discussed above, the Debtors employ approximately 36,000 employees
(the "**Workforce**").  The Debtors' Workforce performs a wide variety of functions that I believe
are critical to the Debtors' operations, and the Debtors' franchise locations cannot operate
without the Workforce.  The staffing at many of the Debtors' franchise locations has already
been reduced to the bare minimum, and any further reduction would force the Debtors to close
such locations, which would further exacerbate the Debtors' challenges in this crucial time.  I
believe that failure to maintain the continued, uninterrupted services of their Workforce could
upend the Debtors' reorganization efforts and jeopardize the value of their businesses as a going
concern.

112.    The Debtors also maintain various programs for compensation and
benefits, including payroll processing, withholding obligations, reimbursable expenses, health
insurance programs, life insurance and disability programs, retirement plans, paid time off,
non-insider incentive or retention-based programs, and severance (the "**Compensation and**

**Benefits Programs**"), and pay various administrative fees and premiums in connection therewith.  I believe that the vast majority of their employees rely primarily on the Compensation and Benefits Programs to pay their daily living expenses and support their families.  I believe that the Debtors' employees would face significant financial hardships if the Debtors are not permitted to continue administering the Compensation and Benefits Programs in the ordinary course of business.  Furthermore, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs could result in attrition of at a time when the Debtors need their Workforce to perform at peak efficiency, and it would be difficult, if not impossible, to replace in a timely fashion.  The various components of the Compensation and Benefits Programs are described in further detail in the Wages Motion and are incorporated herein by reference.

113.    Additionally, the Debtors historically provided two non-qualified deferred compensation and retirement plans that were terminated on October 13, 2019, the DCP and POWR Plan (collectively, the "**Deferred Comp Plans**").    There are approximately 76 participants in the DCP and approximately 200 participants in the POWR Plan.  Under the DCP, eligible Employees could defer compensation, which the Debtors would match up to certain limits, and the Debtors would then hold such funds in trust.  The POWR Plan, on the other hand, was a performance-based profit-sharing plan with employer contributions.  The Deferred Comp Plans are fully funded in an amount of approximately $12 million and, in accordance with applicable tax law, payments to all plan participants on account of the terminated Deferred Comp Plans are currently scheduled to be made on October 2020.  Prior to the termination of the Deferred Comp Plans, NPC RH I, the ultimate parent, provided a guarantee with respect to the obligations under the Deferred Comp Plans.  The Plan Term Sheet

provides for the assumption of the obligations under the Deferred Comp Plans upon certain conditions.

114.    I believe that the Debtors have substantial business justification for continuing to administer the Compensation and Benefit Programs and honoring their obligations in connection therewith, including the need to maintain employee morale and reassure employees that the Debtors intend to honor their obligations to employees—both during and after their tenure with the Debtors.

115.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, and should be granted.

**E.    Vendors Motion**

116.    By the Vendors Motion, the Debtors are requesting authority to pay the prepetition claims of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to maintaining the going concern value of the Debtors' business (the "**Critical Vendors**").

117.    I understand that the Debtors, as the largest franchisee of any restaurant concept in the United States, rely heavily on the Critical Vendors to provide them with the necessary goods and services to operate over 1,600 franchise locations.  I believe that any disruption in the supply of these Critical Vendors' goods or services would jeopardize the Debtors' ability to generate revenue.  I believe that many of these Vendors cannot be replaced and without them the Company would suffer insurmountable operational and financial challenges.

118.    In identifying the Critical Vendors, the Debtors and their advisors spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting

operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships which, if lost, could materially harm the Debtors' businesses or impair their restructuring process.

119.    I understand that certain of the Critical Vendors may be party to a contract with the Debtors, but may threaten to repudiate the contract unless the Debtors first pay such vendor's claim.  I believe that the disruption attendant to resolving a dispute with such repudiating Critical Vendor would likely exceed the payment to such vendor on account of its prepetition claim.

120.    Further, the Debtor are requesting authority to timely and fully pay, in the ordinary course of business and consistent with their historical practices, (i) third party service providers (collectively, the "**Lien Claimants**"), that may be able to assert and perfect liens against the property of the Debtors, (ii) certain vendors whose prepetition claims are entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, and (iii) vendors (the "**PACA Vendors**") that supply fresh fruits and vegetables to the Debtors' Pizza Hut and Wendy's restaurants under the Perishable Agricultural Commodities Act of 1930.

121.    The Debtors contract with certain service providers to perform repairs and make improvements related to refrigeration equipment, electrical systems, plumbing, and various types of food service equipment.  The Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens (the "**Miscellaneous Lien Claims**") against the Debtors' property for amounts the Debtors owe to those third parties. If the Debtors are unable to pay the Miscellaneous Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of the Debtors' Pizza Hut and Wendy's

restaurants.  In addition, prior to the Petition Date, in the ordinary course of business, the Debtors ordered goods and supplies necessary to operate their business, the delivery of which occurred within 20 days of the Petition Date (the "**503(b)(9) Orders**").  To prevent any disruption to the Debtors' retail operations, the Debtors seek an order (i) confirming administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of merchandise subject to the 503(b)(9) Orders and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

122.    Further, the fruits and fresh vegetables purchased by certain of the Debtors from the PACA Vendors are a critical component of the Debtors' restaurant business.  Without uninterrupted access to these perishable agricultural commodities, the Debtors would not be able to meet the demands of their restaurant and consumer products customers.  In order to avoid disruption to the Debtors' businesses, and because it is my understanding that PACA Vendors that adhere to certain statutory notice requirements (including putting statutorily-mandated language on the face of their invoices) are entitled to prompt payment from the Debtors as beneficiaries of trust assets, it is essential that the Debtors be able to continue to pay these claims in the ordinary course of business, as required by PACA.

123.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Vendors Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and should be granted.

**F.      Taxes Motion**

124.    By the Taxes Motion, the Debtors are requesting authority to pay certain prepetition taxes and fees (the "**Taxes and Fees**").  The descriptions of the Taxes and Fees are described in further detail in the Taxes Motion and are incorporated herein by reference.

125.     I understand that the Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because certain governmental authorities may assert liens on the Debtors' property, assert penalties, or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the Taxes and Fees, thus distracting the Debtors' management and employees from their important reorganization efforts, and potentially causing immediate and irreparable harm to the Debtors.

126.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, and should be granted.

**G.     NOL Motion**

127.     By the NOL Motion, the Debtors are seeking to establish procedures to protect the potential value of the NOLs and other Tax Attributes for use during the pendency of the chapter 11 cases and in connection with the Debtors' reorganization or a sale transaction, as the case may be, pursuant to a chapter 11 plan.  The Debtors possess certain Tax Attributes, including, as of December 31, 2019, (i) estimated NOLs of approximately $65 million, (ii) estimated carryforwards of disallowed business interest expense of approximately $43 million, and (iii) certain general business credits of approximately $60 million.  The procedures allow the Debtors to monitor the transfer of, and the claiming of a Worthless Stock Deduction by any Majority Stockholder with respect to, beneficial ownership of Common Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) or claim(s) may jeopardize the Debtors' ability to utilize their Tax Attributes.

**H.      Insurance and Surety Bond Motion**

128.      By the Insurance and Surety Bond Motion, the Debtors are requesting authority to (i) maintain their Insurance Policies and Programs (including the Workers' Compensation Program) and the Surety Bond Program (each as defined in the motion), (ii) continue honoring their Insurance and Surety Obligations in the ordinary course of business, and (iii) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the workers' compensation programs.  In furtherance of the foregoing, the Debtors are also seeking authority to increase, renew, or extend (subject to certain notice requirements) their insurance coverage if they determine, in their business judgment, that such action is necessary or appropriate.

129.      I understand that in connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain various insurance policies and workers' compensation programs, including the Insurance Policies and Programs listed on <u>Exhibit C</u> annexed to the Insurance and Surety Bond Motion, through several different insurers.

130.      The Debtors maintain various liability, property, and other insurance policies that provide the Debtors with coverage related to, among other things, general liability, aviation liability, excess liability, directors' and officers' liability, fiduciary liability, property damage, and automobile liability.  Additionally, the Debtors maintain an umbrella insurance policy and excess coverage policies that supplement the coverage provided under various policies, including their general liability and automobile liability policies.  The Debtors maintain their insurance policies to help manage and limit the various risks associated with operating their businesses, which I believe is essential to the preservation of the value of the Debtors' estates. Furthermore, I understand that some of the insurance policies are required by regulations, laws,

and contracts that govern the Debtors' commercial activities.  Pursuant to the insurance policies, the Debtors pay certain deductibles and retentions in the ordinary course as claims are settled by the applicable insurance service providers and brokers.  Additionally, the Debtors pay insurance premiums based upon fixed rates established and invoiced directly or indirectly by each insurer.

131.    The Debtors maintain required workers' compensation programs in each of the states in which they operate.  The workers' compensation programs have a deductible of $750,000 per loss event, with the exception of the Workers' Compensation Program in Minnesota, which has a deductible of $1,000,000 per loss event.  Additionally, the Debtors maintain an imprest account with their claims agent, Gallagher Bassett, to fund asserted workers' compensation claims.  The imprest account maintains a balance of approximately $160,000 that is regularly replenished by the Debtors as distributions are made on account of Workers' Compensation Claims.

132.    Additionally, the Debtors maintain a surety bond program (the "**Surety Bond Program**"), pursuant to which the Debtors are required to provide surety bonds to certain third parties (the "**Surety Obligees**"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with utility deposits, and other miscellaneous items.  The Debtors estimate that as of the Petition Date, the total principal amount on all Surety Bonds is approximately $4.6 million.  As a condition to issuing the bonds, the sureties, including Fidelity and Deposit Company of Maryland, Travelers Casualty and Surety Company of America, and Arch Insurance Company (each, a "**Surety**"), require that the Debtors enter into indemnity agreements (collectively, the "**Indemnity Agreements**"), pursuant to which the Sureties are indemnified from any loss, cost, or expense that the Sureties may incur on account of the issuance of any bonds on behalf of the Debtors.  As

of the Petition Date, the Debtors have posted approximately $4.6 million in letters of credit pursuant to such indemnification. The Debtors pay premiums upon a fixed rate established by each Surety Obligee, and remit such premium payments as the bonds are issued or renewed on an annual basis.

133.    I believe that the Insurance and Surety Obligations are necessary costs of preserving the Debtors' estates. The Debtors operate over 1,600 franchise locations in a highly-regulated environment, which exposes them to various potential liabilities related to their business operations. Accordingly, I believe the Insurance Policies and Programs and the Surety Bond Program are essential to minimizing risks and disruptions, which otherwise could have a materially adverse impact on the Debtors' chapter 11 operations, financial stability  and their ability to maximize value for their stakeholders.

134.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors' estates, and should be granted.

## I.    Utilities Motion

135.    By the Utilities Motion, the Debtors are requesting approval of their proposed form of adequate assurance of payment to utility providers, approval of certain procedures for determining adequate assurance of payment for future utility services (the "**Adequate Assurance Procedures**"), and a prohibition on utility providers from altering, refusing, or discontinuing utility service on account of the commencement of these chapter 11 cases or outstanding prepetition invoices.

136.    In the ordinary course of business, the Debtors incur expenses, for among other things, electricity, natural gas, water, sewage, telecommunications, waste services, and other utilities.  I believe that preserving utility services on an uninterrupted basis is essential to

the Debtors' ongoing operations.  As previously mentioned, the Debtors operate over 1,600 franchise locations, and any interruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.

137.    Furthermore, I believe the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services.  If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their businesses.  I understand that the Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether.  Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

138.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, and should be granted.

## J.      Customer Programs Motion

139.    By the Customer Programs Motion, the Debtors are requesting authority, but not direction, to (i) pay, perform, and honor their prepetition obligations related to their Customer Programs (as defined below) as they deem appropriate and (ii) continue, renew, replace, implement, or terminate the Customer Programs as they deem appropriate, in each case in the ordinary course of business.

140.    The Debtors' business depends upon the loyalty of their customers. To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of

business, various practices and programs (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' restaurants.  The Debtors' Customer Programs include (i) a refund policy, (ii) sales promotions, (iii) a gift card program, (iv) charitable programs, (v) credit card and other payment processor policies, (vi) third-party delivery service partnerships, and (vii) loyalty programs.  Such programs are standard in the quick-service restaurant industry and several of these programs are implemented and mandated on a franchise-wide basis pursuant to the Franchise Agreements. Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share and value of their business.  In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their customers, the Debtors must maintain their Customer Programs and honor their obligations thereunder.

## K.      Schedules and SOFAs Motion

141.    By the Schedules and SOFAs Motion, the Debtors are requesting additional time to file their schedules of asset and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**").  As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely involved in these chapter 11 cases, and the numerous critical operational matters that the Debtors' management and employees must address, a 30-day extension (without prejudice to further extensions) is necessary and appropriate.

142.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Schedules and SOFAs Motion is in the best interests of the Debtors' estates, and should be granted.

L.      **Epiq Retention Application**

143.    Pursuant to the Epiq Retention Application, the Debtors are requesting authority to retain and appoint Epiq Corporate Restructuring, LLC ("**Epiq**") as the Debtors' claims, noticing, and solicitation agent (the "**Claims and Noticing Agent**") in accordance with the terms and conditions specified in the Engagement Agreement by and between NPC and Epiq, effective as of the Petition Date.  Epiq's duties will include the responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claims, filed in the Debtors' chapter 11 cases.

144.    I believe the Company's selection of Epiq to serve as Claims and Noticing Agent has satisfied the Bankruptcy Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c).  Specifically, Weil, Gotshal & Manges LLP, on behalf of the Company, solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.  I believe that Epiq's rates are competitive and reasonable given Epiq's quality of service and expertise.  The terms of Epiq's retention are set forth in the Standard Services Agreement attached to, and filed contemporaneously therewith, the Epiq Retention Application.  Accordingly, on behalf of the Debtors, I respectfully submit that appointing Epiq as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 1st day of July, 2020.

*/s/ Eric Koza*
Eric Koza
Chief Restructuring Officer
NPC International Inc., and its debtor affiliates