## Exhibit B

**Restructuring Support Agreement**

EXECUTION VERSION

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of July 1, 2020, is entered into by and among:

(i) NPC Restaurant Holdings I LLC, a Delaware limited liability company ("*NPC Restaurant Holdings I*"), NPC Restaurant Holdings II LLC, a Delaware limited liability company ("*NPC Restaurant Holdings II*"), NPC Holdings, Inc., a Delaware corporation ("*NPC Holdings*"), NPC International Holdings, Inc., a Delaware corporation ("*NPC International Holdings*"), NPC Restaurant Holdings, LLC, a Delaware limited liability company ("*NPC Restaurant Holdings*"), NPC International, Inc., a Kansas corporation ("*NPC International*"), NPC Operating Company B, Inc., a Kansas corporation ("*NPC Operating*"), and NPC Quality Burgers, Inc., a Kansas corporation ("*NPC Quality*" and together with NPC Restaurant Holdings I, NPC Restaurant Holdings II, NPC Holdings, NPC International Holdings, NPC Restaurant Holdings, NPC International, NPC Operating and NPC Quality, each an "*NPC Party*" or "*NPC Entity*" and collectively, the "*Company*");

(ii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain super priority term loan credit facility (the indebtedness incurred thereunder by the NPC Entities party thereto, the "*Priority Term Loan Indebtedness*") pursuant to that certain Super-Priority Term Loan Credit Agreement, dated as of January 21, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Priority Credit Agreement*"), among NPC Restaurant Holdings, as holdings and guarantor, NPC International, NPC Quality and NPC Operating, as borrowers and guarantors, KKR Loan Administration Services LLC ("*KKR*"), as administrative agent, and Deutsche Bank Trust Company Americas, as collateral agent, and the several lenders from time to time parties thereto (the "*Priority Lenders*"); and

(iii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain senior secured first lien term loan credit facility (the indebtedness incurred thereunder by the NPC Entities party thereto, the "*First Lien Term Loan Indebtedness*") and senior secured revolving facility (the indebtedness incurred thereunder by the NPC Entities party thereto, the "*First Lien Revolver Indebtedness*," together with the First Lien Term Loan Indebtedness, the "*First Lien Indebtedness*") pursuant to that certain First Lien Term Loan Facility, dated as of April 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*First Lien Credit Agreement*"), among NPC

Restaurant Holdings, as holdings and guarantor, NPC International, NPC Quality and NPC Operating, as borrowers and guarantors, KKR, as administrative agent (as successor to Antares Capital LP ("***Antares***"), the "***Prepetition Agent***"), Deutsche Bank Trust Company Americas, as collateral agent (as successor to Antares and KKR, the "***Prepetition Collateral Agent***"), and the lenders from time to time party thereto (the "***First Lien Lenders***," and the undersigned First Lien Lenders (the "***Consenting First Lien Lenders***") and Priority Lenders (the "***Consenting Priority Lenders***") (each to the extent identified as "Consenting Creditors" on the signature pages hereto), together with their respective successors and permitted assigns and any subsequent consenting First Lien Lender or consenting Priority Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Creditors***").

The Company, each Consenting Creditor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural also include the plural or singular, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (d) the word "or" shall not be exclusive and shall be read to mean "and/or," and (e) any reference to dollars or "$" shall be to United States dollars. The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations and have agreed to enter into certain transactions (the "***Restructuring Transactions***") in furtherance of a global restructuring of the Company (the "***Restructuring***"), which is anticipated to be effected on terms and subject to the conditions set forth in (a) this Agreement and (b) consistent with the term sheet setting forth the terms of the Restructuring Transactions, attached as **Exhibit A** to this Agreement (the "***Restructuring Term Sheet***");

**WHEREAS**, the Company will implement the Restructuring Transactions in connection with pre-arranged cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

**WHEREAS**, as of the date hereof, the Consenting Creditors hold, in the aggregate, approximately (i) 92.26% of the aggregate outstanding principal amount of the Priority Term Loan Indebtedness; (ii) 85.03% of the aggregate outstanding principal amount of the First Lien Indebtedness; and (iii) 17.13% of the aggregate outstanding principal amount of the Second Lien Indebtedness;

**WHEREAS**, the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code) pursuant to the interim and final orders approving, among other things, the Company's use of Cash Collateral, to be entered by the Bankruptcy Court (respectively, the "***Interim Cash Collateral Order***" and "***Final Cash Collateral Order***" and, together, the "***Cash Collateral Orders***"), subject to Section 6 hereof; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Restructuring Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     <u>**Certain Definitions**</u>.[1]

As used in this Agreement, the following terms have the following meanings:

(a)     "***Back-Up Bidder***" means the bidder, determined pursuant to the applicable Bidding Procedures, whose bid(s) constitute(s) the next highest or otherwise best bid(s) for the applicable interests or assets that are the subject of a Sale Transaction after the applicable Successful Bid.

(b)     "***Bidding Procedures***" means any procedures for the sale of some or all of the assets or equity interests of or in one or more of the NPC Parties, as approved by the Bankruptcy Court.

(c)     "***Common Stock***" means the issued and outstanding shares of common stock of NPC Restaurant Holdings I or any option thereon or any right or interest therein.

(d)     "***Claims***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(e)     "***Closing***" means the consummation of the transactions contemplated by the Plan on the Effective Date.

(f)     "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases, which order will be in form and substance reasonably satisfactory to the Requisite Creditors and the Company.

(g)     "***Consenting Class***" means either the First Lien Lenders or the Priority Lenders, as applicable.

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet.

(h)     "***Consenting Creditor Advisors***" means Creditor Counsel and Houlihan Lokey Capital, Inc., as financial advisor to the Consenting First Lien Lenders and Consenting Priority Lenders.

(i)     "***Creditor Counsel***" means Gibson, Dunn & Crutcher LLP, as counsel to the ad hoc group of Consenting Creditors, and Jackson Walker LLP, as local counsel.

(j)     "***Definitive Documents***" means (i) this Agreement (including the Restructuring Term Sheet), (ii) the Plan (including any ballots, supplements, or other documents directly relating thereto not specified herein), (iii) the Disclosure Statement, (iv) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, and the orders of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan, (v) the Cash Collateral Orders, (vi) the motion seeking approval of the Cash Collateral Orders, (vii) the Backstop Commitment Agreement, (viii) the Rights Offering Procedures and documents relating to the Rights Offering, (ix) the RO Motion and order approving the RO Motion, (x) any Bidding Procedures and any motion seeking approval of any Bidding Procedures and/or of a sale of the interests in or assets of one or more NPC Parties, as well as all agreements, documents, orders, and/or amendments in connection therewith (collectively, the "***Sale Documents***"); (xi) any purchase agreement with any Successful Bidder or Back-Up Bidder; (xii) all exit financing documents (the "***Exit Documents***"), (xiii) all first day pleadings or papers, and (xvi) all second day pleadings or papers, each of which shall be subject to <u>Section 6</u> hereof.

(k)     "***Disclosure Statement***" means the disclosure statement in respect of the Plan, including, without limitation, all exhibits and schedules thereto, as supplemented from time to time.

(l)     "***Effective Date***" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(m)     "***Franchise Document***" means any franchise agreement or other document or agreement to which an NPC Party is a party with The Wendy's Company, Quality Is Our Recipe, LLC, Pizza Hut, LLC, Yum! Brands, Inc. or any affiliate of any of the foregoing entities.

(n)     "***Interest***" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of an NPC Party, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any NPC Party, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in an NPC Party, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

(o)     "***Loan Documents***" means the term "Credit Documents" as defined in each of the Priority Credit Agreement, the First Lien Credit Agreement, and the Second Lien Term Loan Credit Agreement, as applicable.

(p)     "***Outside Date***" means the date that is one hundred and forty-four (144) calendar days after the Petition Date.

(q)　　"**Plan**" means the chapter 11 plan of reorganization of the Company implementing the Restructuring and the Restructuring Term Sheet, which shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable the Requisite Creditors.

(r)　　"**Reorganized NPC Parent**" means the parent entity of the Reorganized Debtors as of the Effective Date, in accordance with the Plan.

(s)　　"**Reorganized Debtors**" means the Debtors, as reorganized on the Effective Date.

(t)　　"**Requisite Creditors**" means, as of the date of determination, (i) Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the First Lien Indebtedness held by all Consenting First Lien Lenders (including any First Lien Indebtedness subject to an assignment pending settlement to which such Consenting First Lien Lender is the assignee thereunder) (the "**Requisite First Lien Lenders**"), and (ii) Consenting Priority Lenders holding at least a majority of the aggregate principal amount outstanding of the Priority Indebtedness held by all Consenting Priority Lenders (including any Priority Indebtedness subject to an assignment pending settlement to which such Consenting Priority Lender is the assignee thereunder) (the "**Requisite Priority Lenders**"); *provided* that the Requisite Creditors must comprise at least two non-affiliated Consenting Creditors.

(u)　　"**Sale Transaction**" means a sale of some or all of the interests in or assets of one or more NPC Parties in accordance with a purchase agreement among the applicable NPC Parties and a Successful Bidder, as approved by the Bankruptcy Court.

(v)　　"**Second Lien Term Loan Facility**" means that certain senior secured second lien credit facility (and, the indebtedness incurred by the Company thereunder, the "**Second Lien Indebtedness**" and, together with the First Lien Indebtedness, the "**Indebtedness**") pursuant to that certain Second Lien Credit Agreement.

(w)　　"**Second Lien Credit Agreement**" means that certain Second Lien Term Loan Credit Agreement, dated as of April 20, 2017, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, among NPC Restaurant Holdings, as holdings and guarantor, NPC International, NPC Quality, and NPC Operating, as borrowers and guarantors, and KKR as administrative agent.

(x)　　"**Second Lien Lenders**" means the lenders from time to time party to the Second Lien Credit Agreement.

(y)　　"**Securities Act**" means the Securities Act of 1933, as amended.

(z)　　"**Solicitation**" means the solicitation of votes to accept or reject the Plan pursuant to Sections 1125 and 1126 of the Bankruptcy Code.

(aa)　　"**Successful Bidder**" means the bidder, determined pursuant to the applicable Bidding Procedures, whose bid(s) constitute(s) the highest or otherwise best bid(s) for the applicable interests or assets that are the subject of a Sale Transaction (such bid, a "**Successful Bid**").

(bb)    "**Support Effective Date**" means the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered by (a) the Company and (b) Consenting Creditors holding (I) at least 66⅔% in aggregate principal amount outstanding of the First Lien Indebtedness (including any First Lien Indebtedness subject to an assignment pending settlement to which such Consenting First Lien Lender is the assignee thereunder) and (II) at least 66⅔% in aggregate principal amount outstanding of the Priority Term Loan Indebtedness (including any Priority Indebtedness subject to an assignment pending settlement to which such Consenting Priority Lender is the assignee thereunder), and (ii) all of the reasonable and documented out-of-pocket fees and expenses of the Consenting Creditor Advisors incurred, outstanding as of the day immediately prior to the Support Effective Date, and invoiced shall have been paid in full in cash (except as otherwise agreed by the applicable Consenting Creditor Advisor).

(cc)    "**Support Period**" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 5 hereof and (ii) Effective Date.

## 2.    **Bankruptcy Process; Plan of Reorganization.**

(a)    The Restructuring Term Sheet.  The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement.  All references to this Agreement shall be deemed to include the Restructuring Term Sheet.  The material terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet; *provided* that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of this Agreement shall govern.

(b)    Commencement of the Chapter 11 Cases.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than July 1, 2020 (the "**Outside Petition Date**") (the date on which such filing occurs, the "**Petition Date**"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(c)    Confirmation of the Plan.  The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(d)    Cash Collateral.  No later than two (2) business days after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking interim and final authority to use Cash Collateral in accordance with the Cash Collateral Orders.

## 3.    **Agreements of the Consenting Creditors.**

(a)    Voting; Support.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall:

(i)      (A) timely vote or cause to be voted its Claims (including, without limitation, all claims arising under the Priority Credit Agreement, the First Lien Credit Agreement, and the Second Lien Credit Agreement, as applicable) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis, and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided*, *however*, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period;

(ii)      timely vote or cause to be voted its Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, assignment for the benefit of creditors, winding up, liquidation, sale or disposition, reorganization, merger, business combination, joint venture, debt or equity financing or re-financing, recapitalization or other restructuring of the Company (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Plan (each, an "***Alternative Restructuring***");

(iii)      not directly or indirectly, through any person or entity (including, without limitation, any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring;

(iv)      not file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement, the Restructuring Term Sheet, the Restructuring or the Restructuring Transactions; *provided* that such Consenting Creditor (and the Requisite Creditors, Requisite Priority Lenders, or the Requisite First Lien Lenders, in their respective capacities) may file motions, pleadings or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement or the Restructuring Term Sheet;

(v)      not initiate, or have initiated on its behalf, any litigation proceeding of any kind with respect to the Chapter 11 Cases, this Agreement or the other Restructuring Transactions contemplated in this Agreement against the Company or the other Parties, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(vi)      agree to provide, and to not opt-out of, the releases substantially in the form set forth in the Restructuring Term Sheet;

(vii)    not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use commercially reasonable efforts to direct and cause such administrative agent or collateral agent to cease and refrain from taking any such action, so long as the Consenting Creditors are not required to incur any material out-of-pocket costs or provide any indemnity in connection therewith;

(viii)    use its commercially reasonable efforts to support and take all actions reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and obtain confirmation and consummation of the Plan and the Restructuring;

(ix)    upon reasonable request by the Debtors and/or their advisors, use its commercially reasonable efforts to promptly provide the Debtors or their advisors, as applicable, the aggregate principal amount of each of such Party's claims, on an issuance-by-issuance basis as of the date of such request;

(x)    without limiting the consent, approval or other rights or obligations contained herein, agrees to (A) (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the applicable Definitive Documents, (2) exercise any and all necessary and appropriate rights, and execute and deliver any and all necessary and appropriate documentation,  and (3) use commercially reasonable efforts to obtain any and all governmental, regulatory, and/or third-party approvals (including, as applicable, Bankruptcy Court approvals), (B) not take any actions, or fail to take any actions that prevent, interfere with, delay or impede the implementation or consummation of, the Restructuring; and (C) not encourage any entity to undertake any action set forth in Section 3(a)(x)(B) hereof;

(xi)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, which additional or alternative provisions shall be reasonably acceptable to the Requisite Creditors; and

(xii)    if any of the Consenting Creditors know of a material breach by any Consenting Creditor of the obligations, representations, warranties, or covenants of any of the Consenting Creditors set forth in this Agreement, furnish prompt written notice (and in any event, furnish such written notice within three (3) business days of such actual knowledge) to the Company (with a copy to Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company)) and promptly take all reasonable and practicable remedial action necessary to cure such material breach by any Consenting Creditor.

(b)    Transfers.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other claims against or interests in the

Company (including the grant of any proxy or the deposit of any Claims against or interests in the Company into a voting trust or the entry into a voting agreement with respect thereto), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (A) Weil, as counsel to the Company, and (B) Creditor Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such Transferred rights and obligations; *provided* that a Consenting Creditor agrees that any Transfer of any Claim, option or interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each Consenting Creditor shall have the right to enforce the voiding of such transfer; *provided* further that a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker execute a Joinder Agreement, *provided* that (I) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such Transfer and (II) the Qualified Marketmaker complies with Section 3(e) hereof.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in such Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or become a Consenting Creditor.

> (i)  Tax Attribute Protection Motions.  Each Consenting Creditor agrees to support the filing of a customary stock trading order that restricts the accumulation and disposition of stock by persons who own, or would own, more than approximately 4.75% of the Common Stock during the pendency of the Chapter 11 Cases.

(c)  Additional Claims or Interests.  This Agreement shall in no way be construed to preclude a Consenting Creditor from acquiring additional Claims; *provided* that each Consenting Creditor hereby acknowledges and agrees that such additional Claims shall automatically and immediately upon acquisition by such Consenting Creditor be subject to the terms of this Agreement.  Each Consenting Creditor shall report the aggregate amount of Claims it holds, by issuance to Weil and Creditor Counsel in no event less than three (3) business days following such acquisition.

(d)  Forbearance.  During the Support Period, each Consenting Creditor agrees, to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under any of the Loan Documents and any agreement contemplated thereby, as applicable, and under

---

[2]  As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or marketmaker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of default or potential defaults by the Company. Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall direct and use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions. For the avoidance of doubt, the forbearance set forth in this <u>Section 3(d)</u> shall not constitute a waiver with respect to any default or event of default under the Priority Credit Agreement or First Lien Credit Agreement and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such claim. Upon rightful termination of this Agreement, the agreement of the Consenting Creditors to forbear from exercising rights and remedies in accordance with this <u>Section 3(d)</u> shall immediately terminate without the requirement of any demand, presentment or protest of any kind, all of which the NPC Parties hereby waive.

(e)　　<u>Obligations of Qualified Marketmaker</u>. If at the time of a proposed Transfer of Claims to a Qualified Marketmaker, such Claims (i) may be voted on the Plan, the proposed transferor Consenting Creditor must first vote such Claims in accordance with <u>Section 3(a)</u> hereof or (ii) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not Transfer such Claims or Interests to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the applicable voting deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (including the obligation to vote in favor of the Plan) and shall vote in favor of the Plan in accordance with the terms hereof; *provided* that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claims at such time that the transferee of such Claims becomes a Consenting Creditor, with respect to such Claims.

(f)　　The Company understands that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditor that principally manage and/or supervise the Consenting Creditor's investment in the Company, and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor. Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Creditor that is a Qualified Marketmaker, before the occurrence of conditions giving rise to the Support Effective Date, such Consenting Creditor shall be a Consenting Creditor hereunder solely with respect to the Claims listed on such signature pages and shall not be required to comply with this Agreement for any other Claims it may hold in its capacity as a Qualified Marketmaker.

(g)　　Nothing in this Agreement shall (i) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring, (ii) prohibit any Consenting Creditor from taking any action that is not inconsistent with this Agreement, (iii) prevent any Consenting Creditor from enforcing this Agreement or

contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement, (iv) be construed to limit any Consenting Creditor's rights under any applicable credit agreement, other loan document, instrument, and/or applicable law, (v) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Debtors, or any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee), (vi) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court, (vii) prohibit any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and any positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Transactions, (viii) prevent any Consenting Creditor from taking any action that is required by applicable law, (ix) require any Consenting Creditor to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege (*provided*, *however*, that if any Consenting Creditor proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable law, such Consenting Creditor shall provide at least three (3) business days' advance notice to the NPC Parties to the extent the provision of notice is practicable under the circumstances), or (x) require any Consenting Creditor to incur any expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

**4.**     <u>**Agreements of the Company**</u>.

(a)     <u>Covenants</u>. The Company agrees that, during the Support Period, the Company shall:

(i)     support, take all steps necessary to consummate and implement, and facilitate the consummation and implementation of the Restructuring and the Restructuring Transactions in accordance with the Milestones (defined below);

(ii)     not file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(iii)     (A) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring set forth in the Plan, if any; and (B) not take any action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each NPC Party; *provided* that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Restructuring Term Sheet;

(iv)     deliver draft copies of all material and substantive motions or applications and other material documents related to the Restructuring (including the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to Creditor Counsel, at least two (2) days prior to the date when the Company intends to file any such document (*provided* that if delivery of such document at least two (2) days in advance is not reasonably practicable under the circumstances, such document shall be delivered as soon as otherwise practicable prior to filing) and shall consult in good faith with Creditor Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)      not, directly or indirectly, through any person or entity, take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede, consummation of the Restructuring, including the Solicitation, approval of the Disclosure Statement, and the confirmation and consummation of the Plan;

(vi)     to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Creditors;

(vii)    maintain its good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(viii)   as soon as reasonably practicable, notify the Consenting Creditors in writing of any governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(ix)     if any of the NPC Parties know of a material breach by any NPC Party of the obligations, representations, warranties, or covenants of any of the NPC Parties set forth in this Agreement, furnish prompt written notice (and in any event, furnish such written notice within three (3) business days of such actual knowledge) to the Consenting Creditors (with a copy to Creditor Counsel) and promptly take all reasonable and practicable remedial action necessary to cure such material breach by any such NPC Party;

(x)      pay in cash (A) prior to the Petition Date, all reasonable and documented fees and out-of-pocket expenses accrued prior to the Petition Date for which invoices or receipts are furnished by Consenting Creditor Advisors, (B) after the Petition Date, in accordance with the Cash Collateral Orders, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors incurred on and after the Petition Date from time to time, but in any event within seven (7) days of delivery to the NPC Parties of any applicable invoice or receipt, and (C) on the Effective Date, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors incurred and outstanding in connection with the Restructuring (including any success or transaction fees payable to Houlihan Lokey Capital, Inc.);

(xi)     subject to professional responsibilities, timely file a formal objection to any motion filed with the Bankruptcy Court by a third party (i) seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, or (ii) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Priority Term Loan Indebtedness or the First Lien Indebtedness, or asserting any other cause of action against and/or with respect or relating to such Claims or the prepetition liens securing such Claims;

(xii)     not seek, solicit, or support any Alternative Restructuring, other than the Restructuring, or cause or allow any of their agents or representatives to solicit any Alternative Restructuring, unless the board of directors of any NPC Party determines, based on the advice of outside legal counsel, in good faith, and consistent with its fiduciary duties, that proceeding with the Restructuring would be inconsistent with the applicable fiduciary duties of such board of directors. Prior to the earlier of (x) making a public announcement regarding their intention to accept an Alternative Restructuring or (y) entering into a definitive agreement with respect to an Alternative Restructuring, the Debtors shall have terminated this Agreement pursuant to Section 5(c) hereof. The Debtors shall, to the extent practicable and consistent with their fiduciary duties, give Creditor Counsel not less than two (2) business days' prior written notice before exercising such termination right in accordance with this Agreement. At all times prior to the date on which the Debtors enter into a definitive agreement in respect of such an Alternative Restructuring or make a public announcement regarding their intention to do so, the Debtors shall promptly (but in no event later than three (3) business days after the Debtors' receipt of such offer or proposal) provide to Creditor Counsel a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring; and

(xiii)     not make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, to the extent such declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of the NPC Entities or any of their subsidiaries (including under section 108 or 382 of the Internal Revenue Code of 1986 (as amended)).

(b)     <u>Automatic Stay</u>. The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)     Nothing in this Agreement shall (i) impair or waive the rights of the NPC Parties to assert or raise any objection permitted under this Agreement in connection with the Restructuring,

(ii) prohibit any NPC Party from taking any action that is not inconsistent with this Agreement, (iii) prevent any NPC Party from enforcing this Agreement or contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement, (iv) prevent any NPC Party from taking any action that is required by applicable law, or (v) require any NPC Party to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege (*provided, however*, that if any NPC Party proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable law, such NPC Party shall provide at least two (2) business days' advance notice to the Consenting Creditors to the extent the provision of notice is practicable under the circumstances and permitted under applicable law).

**5.      Termination of Agreement**.

(a)      This Agreement shall terminate three (3) business days following the delivery of notice, delivered in accordance with <u>Section 21</u> hereof, from the Requisite First Lien Lenders or Requisite Priority Lenders, as applicable, to the other Parties at any time after and during the continuance of any Creditor Termination Event (defined below); *provided* that termination by the Requisite First Lien Lenders or Requisite Priority Lenders, as applicable, shall only be effective as to the applicable Consenting Class.  In addition, this Agreement shall terminate in respect of the applicable Consenting Class three (3) business days following the delivery of notice, delivered in accordance with <u>Section 21</u> hereof, from NPC International to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event.  No Party may exercise any of its respective termination rights as set forth herein if (i) such Party is in breach of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), (ii) such breach has caused, or resulted in, the occurrence of a Creditor Termination Event or Company Termination Event (defined below) (as applicable), and (iii) such breach is continuing when such Party seeks to exercise any of its respective termination rights.  In addition, this Agreement shall terminate automatically on the Effective Date.

(b)      A "<u>Creditor Termination Event</u>" shall mean any of the following:

(i)      the breach by any NPC Party of any of the undertakings, representations, warranties or covenants of such NPC Party set forth herein in any material respect which remains uncured for a period of seven (7) business days after the receipt of written notice of such breach pursuant to <u>Sections 5(a)</u> and <u>21</u> hereof (as applicable);

(ii)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(iii)      any Definitive Document not being acceptable or reasonably acceptable (as applicable) to the Requisite Creditors or the Backstop Parties (as applicable);

(iv)      any NPC Party (A) amending, or modifying, or filing a pleading seeking authority to amend or modify, any Definitive Document in a manner that is materially inconsistent with this Agreement without the prior written consent of the Requisite

Creditors; (B) suspending or revoking the Restructuring Transactions; or (C) publicly announcing its intention to take any such action listed in the foregoing clauses (A) and (B) of this subsection;

(v)      the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Restructuring Term Sheet;

(vi)      any NPC Party (A) commences a Chapter 11 Case in a court other than the Bankruptcy Court, (B) files any chapter 11 plan for an Alternative Restructuring or (C) withdraws the Plan or its support for the Plan;

(vii)      the entry of any order authorizing the use of Cash Collateral or postpetition financing that is not in the form of the Cash Collateral Orders or otherwise consented to by the Requisite Creditors;

(viii)      any NPC Party filing a motion, application, or adversary proceeding (or any NPC Party supporting (or failing to object to, as required by Section 4(a)(ix) hereof) any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Indebtedness or Priority Term Loan Indebtedness (including the amount thereof, as applicable) or the liens securing such First Lien Indebtedness or Priority Term Loan Indebtedness, or asserting any other cause of action against any of the Consenting Creditors; *provided* that the Creditor Termination Event set forth in this Section 5(b)(viii) shall be assertable by the Requisite Priority Lenders or the Requisite First Lien Lenders or any Consenting Creditor against which any such motion, application, or adversary proceeding has been filed, asserted or commenced;

(ix)      the occurrence of any Termination Event (as defined in the Cash Collateral Orders) under any of the Cash Collateral Orders and the expiration of any applicable Default Notice Period (as defined in the Cash Collateral Orders);

(x)      the termination of the Backstop Commitment Agreement in accordance with its terms;

(xi)      any NPC Party terminating its obligations under and in accordance with Section 5(c) hereof;

(xii)      entry of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset having a fair market value of at least $500,000 of any of the NPC Entities or that would materially and adversely affect any of the NPC Entities' ability to operate their businesses in the ordinary course;

(xiii)      entry of an order (including any order confirming a chapter 11 plan) assuming or rejecting any Franchise Document, unexpired lease, or material executory contract that is not satisfactory to the Requisite Creditors;

(xiv)    entry into any written agreement or stipulation by any NPC Party with any counterparty to any Franchise Document, unexpired lease, or material executory contract with respect to any cure amount due in connection with the proposed or actual assumption of any such Franchise Document, unexpired lease, or material executory contract under section 365 of the Bankruptcy Code or the entry of an order by the Bankruptcy Court determining any such cure amount, in each case, that is not satisfactory to the Requisite Creditors;

(xv)    entry of an order by any court of competent jurisdiction granting relief sought in an involuntary case against any NPC Party seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such NPC Party, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect; *provided* that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof;

(xvi)    any NPC Party, without the prior consent of the Requisite Creditors, (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consenting to the institution of, or failing to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, or (E) making a general assignment or arrangement for the benefit of creditors;

(xvii)    if (A) any of the Cash Collateral Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Creditors or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the NPC Parties have failed to object timely to such motion;

(xviii)    if (A) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Creditors or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the NPC Parties have failed to timely object to such motion;

(xix)    if any of the following events (collectively, the "***Milestones***") fail to occur by no later than 11:59 pm New York City time on the dates set forth below, *provided* that any such time and date may be extended with the consent of the Requisite Creditors (which consent may be provided by email):[3]

---

[3]    Milestones subject to extension to the extent regulatory approvals are necessary.

**General Restructuring Milestones**:

      A.   on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall have been filed;

      B.   on the date that is three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Cash Collateral Order;

      C.   on the date that is fifty (50) calendar days after the Petition Date, the Company shall file the Plan and Disclosure Statement; the motion to approve the Disclosure Statement; and RO Motion;

      D.   on the date that is forty-two (42) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Cash Collateral Order;

      E.   on the date that is the earlier of (i) the binding bid deadline in the NPCQB Sales Process and (ii) ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Disclosure Statement and the RO Motion;

      F.   on the date that is ninety-five (95) calendar days after the Petition Date, the Debtors shall have commenced Solicitation of votes for the Plan;

      G.   on the date that is one hundred and twenty five (125) calendar days after the Petition Date, the Bankruptcy Court shall have held a hearing to consider confirmation of the Plan;

      H.   on the date that is one hundred and thirty (130) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order;

      I.   on the date that is one hundred and forty-four (144) calendar days after the Petition Date, the Effective Date shall occur;

**NPCQB-Specific Milestones**:

      J.   on the date that is two (2) calendar days after the Petition Date, the Debtors shall commence the marketing for the NPCQB Sale Process, with contact parties to be agreed by the Debtors and the Requisite Creditors;

      K.   on the date that is forty (40) calendar days after the Petition Date, non-binding bids with respect to the NPCQB Sale Process shall be due;

      L.   on the date that is fifty (50) calendar days after the Petition Date, If the NPCQB bids are acceptable to Company and Requisite Creditors, the Company shall file a motion to approve Bidding Procedures for the NPCQB Sale Process (the "***Bid Procedures Motion***");

M.   on the date that is seventy-five (75) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion;

N.   on the date that is ninety (90) calendar days after the Petition Date, binding bids with respect to the NPCQB Sale Process shall be due;

O.   on the date that is ninety-seven (97) calendar days after the Petition Date, the Debtors shall hold an auction for the NPCQB Sale Process;

P.   on the date that is one hundred and two (102) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving one or more sales pursuant to the NPCQB Sale Process;

Q.   on the date that is one hundred and thirty-nine (139) calendar days after the Petition Date, the NPCQB Sale Process shall have closed and been consummated;

**NPCPH-Specific Milestones**:

R.   on the date that is twenty-six (26) calendar days after the Petition Date, the Company shall file the Bid Procedures Motion with respect to the NPCPH Sales Process (if applicable);

S.   on the date that is twenty-eight (28) calendar day after the Petition Date, the Debtors shall commence the marketing for the NPCPH Sale Process, with contact parties to be agreed by the Debtors and the Requisite Creditors;

T.   on the date that is twenty-eight (28) calendar day after the Petition Date, the Debtors shall file a motion to reject the NPCPH leases, franchise agreements, Consent and Amendment Agreement and other related agreements;

U.   on the date that is fifty-three (53) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion with respect to the NPCPH Sales Process;

V.   on the date that is sixty-nine (69) calendar days after the Petition Date, non-binding bids with respect to the NPCPH Sale Process shall be due;

W.   on the date that is one hundred and eleven (111) calendar days after the Petition Date, binding bids with respect to the NPCPH Sale Process shall be due;

X.   on the date that is one hundred and seventeen (117) calendar days after the Petition Date, the Debtors shall hold an auction for the NPCPH Sale Process;

Y.   on the date that is one hundred and twenty-two (122) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving one or more sales pursuant to the NPCPH Sale Process;

Z.   on the date that is one hundred and thirty-nine (139) calendar days after the Petition Date, the NPCPH Sale Process shall have closed and been consummated;

(xx)   *provided* that the failure to occur of any of the Milestones on or within the timeframes contemplated by Section 5(b)(xiv) hereof may be cured at any time prior to delivery of a notice purporting to terminate this agreement on account of such Milestone; and

(xxi)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(c)   A "Company Termination Event" shall mean any of the following:

(i)   the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties or covenants of the applicable Consenting Creditors set forth herein in any material respect, which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 21 hereof (as applicable), but only if the remaining non-breaching Consenting Creditors do not hold at least 66⅔% of the aggregate principal amount of Claims in the applicable Consenting Class;

(ii)   the board of directors, managers, members or partners (or comparable governing body), as applicable, of any NPC Party reasonably determines in good faith based on the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Company provides notice of such determination to the Consenting Creditors within two (2) business days after the date thereof;

(iii)   if, as of 11:59 p.m. New York City time on July 1, 2020, the Support Effective Date shall not have occurred;

(iv)   if, as of 11:59 p.m. New York City time on the Outside Date, the Effective Date shall not have occurred;

(v)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) business days after such issuance;

(vi)    any Consenting Creditor, the Requisite First Lien Lenders, or the Requisite Priority Lenders terminating its obligations under and in accordance with Section 5(b) hereof; or

(vii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(d)    Mutual Termination.  This Agreement may be terminated by mutual written agreement of NPC International and the Requisite Creditors in accordance with Section 21 hereof.

(e)    Effect of Termination.  Subject to the provisos contained in Section 5(a) hereof, upon the termination of this Agreement in accordance with this Section 5, and except as provided in Section 13 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, and each Consenting Creditor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.  If this Agreement has been terminated as to any Consenting Creditor in accordance with Section 5 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal of (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time.

(f)    If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**6.    Definitive Documents; Good Faith Cooperation; Further Assurances**.

(a)    Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, which will, after the Support Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules)

and be in form and substance reasonably satisfactory to the Company and the Requisite Creditors; *provided* that the (i) the Backstop Commitment Agreement, the Shareholders Agreement, the Rights Offering Procedures and any documents related thereto, and the RO Motion and any order related thereto shall be acceptable to the Backstop Parties and (ii) the Plan, the Confirmation Order, the Cash Collateral Orders, the Exit Documents, and any assumption or rejection of any Franchise Document, unexpired lease, or material executory contract pursuant to the Plan or motion, any such motion and related order, and the settlement or determination of the amount and terms of any cure associated with any such Franchise Document, unexpired lease, or material executory contract shall be acceptable to the Requisite Creditors.  Notwithstanding the foregoing, the express terms set forth in the Restructuring Term Sheet with respect to any of the following matters are agreed by the Parties, and any amendment or modification thereof (including the finalization of the amount of the Base Offering Amount) shall each be acceptable to the Debtors and holders of Consenting First Lien Lenders holding at least 62.5% of the aggregate principal amount outstanding of the First Lien Indebtedness held by all Consenting First Lien Lenders (including any First Lien Indebtedness subject to an assignment pending settlement to which such Consenting First Lien Lender is the assignee thereunder):  (i) the fixing of the Base Offering Amount; (ii) the final economic terms and structure of the Rights Offering (including the economics terms in respect of the Backstop Commitment Agreement), the Rights Offering Shares, the Convertible Participating Preferred Stock, and the Cash Funded New QB First Lien Take-Back Term Loans and New QB First Lien Take-Back Term Loans; and (iii) the consent threshold with respect to a sale transaction(s) in respect of NPCQB's Wendy's units.

(b)     Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall, subject to the Company's "fiduciary out" pursuant to Section 5(c)(ii) hereof, refrain from taking any action that would frustrate the purposes and intent of this Agreement.

(c)     The Parties agree, consistent with clause (a) of this Section 6, to negotiate in good faith the Definitive Documents that are subject to negotiation and completion on the Support Effective Date and that, notwithstanding anything herein to the contrary, the Definitive Documents, including any motions or orders related thereto, shall not be inconsistent with this Agreement and otherwise subject to the applicable consent rights of the Parties set forth herein. The NPC Parties shall provide to the Consenting Creditor Advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Consenting Creditor Advisors, (i) reasonable access (without any material disruption to the conduct of the NPC Parties' businesses) during normal business hours to the NPC Parties' books and records; (ii) reasonable access during normal business hours to the management and advisors of the NPC Parties; and (iii) reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the NPC Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring Transactions.

7.     **Representations and Warranties**.

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)        such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)        the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)        the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

(iv)        this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)        Each Consenting Creditor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is or, after taking into account the settlement of any pending assignments of Indebtedness to which such Consenting Creditor is a party as of the date of this Agreement, will be the owner of the aggregate principal amount of Indebtedness set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other Indebtedness, except Indebtedness beneficially owned by such Consenting Creditor that is managed by personnel subject to an internal ethical wall prohibiting communications regarding the Company with the personnel managing the Indebtedness set forth on such Consenting Creditor's signature page hereto (or on a signature page to a Joinder Agreement), and/or (ii) has, or after taking into account the settlement of any pending assignments of Indebtedness to which such Consenting Creditor is a party as of the date of this Agreement, will have, with respect to the beneficial owners of such Indebtedness, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Indebtedness or to exchange, assign and transfer such Indebtedness, and (C) full power and authority to bind or act on the behalf of, such beneficial owners; *provided* that, to the extent there are any discrepancies between the amounts set forth on a signature page hereto (or on

a signature page to a Joinder Agreement) and the amounts set forth on the official registers maintained by the respective administrative agents for such Indebtedness, such Consenting Creditor and the Company shall work together in good faith to resolve such discrepancies with the administrative agents and to update, if necessary, the amounts set forth on the underlying signature page(s) at issue.

8.      **Disclosure; Publicity**.

The Company shall deliver drafts to Creditor Counsel of any press releases that constitute disclosure of the existence or terms of the Restructuring, this Agreement or any amendment to the terms of the Restructuring or this Agreement at least thirty-six (36) hours prior to making any such disclosure; *provided* that if delivery of such document is not reasonably practicable under the circumstances the drafts shall be delivered as soon as otherwise practicable.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Indebtedness or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Indebtedness or Priority Term Loan Indebtedness held by all the Consenting Creditors, collectively, on a facility by facility basis.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, and any version of this Agreement shared with Consenting Creditors generally shall omit the Indebtedness holdings of each individual Consenting Creditor as set forth on such Consenting Creditor's signature page hereto or shall include such signature page only in redacted form with respect to the Indebtedness holdings of each Consenting Creditor (*provided* that the Indebtedness holdings on such signature page(s) may be filed in unredacted form with the Bankruptcy Court under seal).

9.      **Amendments and Waivers**.

(a)      Other than as set forth in Section 9(b) hereof, this Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented or the performance of any obligation thereunder waived except with the written consent of NPC International and the Requisite Creditors;

(b)      Notwithstanding Section 9(a):

(i)      any waiver, modification, amendment or supplement to this Section 9 shall require the written consent of all of the Parties;

(ii)      any modification, amendment or change to the definition of "Requisite Creditors" shall require the written consent of each Consenting Creditor, as applicable, included in such definition;

(iii)    any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and Interests and the recoveries contemplated by the Plan (as in effect on the date hereof)), or that requires any Consenting Creditor to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Consenting Creditor; and

(c)    In the event that a Consenting Creditor ("***Non-Consenting Creditor***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of such Non-Consenting Creditor pursuant to Section 9(b)(iii) hereof, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 50% of the outstanding Priority Term Loan Indebtedness or First Lien Indebtedness (as applicable), this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors.

## 10.    Effectiveness.

(a)    This Agreement shall become effective and binding upon each Party on the Support Effective Date; *provided*, *however*, that (i) signature pages executed by Consenting Creditors shall be delivered to other Consenting Creditors, and (ii) the amount of Priority Term Loan Indebtedness, First Lien Indebtedness, and Second Lien Indebtedness held by each Consenting Creditor shall be as set forth on such Consenting Creditor's signature page hereto, which shall be delivered to Weil on behalf of the Company and kept strictly confidential by the Company; *provided*, *however*, that the Company may disclose publicly the aggregate principal amounts of Priority Term Loan Indebtedness, First Lien Indebtedness and Second Lien Indebtedness, set forth on the signature pages hereto.

(b)    Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

## 11.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    Governing Law; Submission to Jurisdiction; Selection of Forum.  This agreement is to be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in the chosen state, without giving effect to its conflict of laws principles.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a)

irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

(b)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.    **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

## 13.    **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13, and Sections 4(a), 5(e), 5(f), 8, 10(b), 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 14.    **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 15.    **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that, during the Support Period, nothing contained in this Section 15 shall be

deemed to permit Transfers of the Indebtedness or claims arising under the Indebtedness other than in accordance with the express terms of this Agreement.  If any provision of this Agreement (excluding Exhibits and Schedules), or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

16. **Relationship Among Parties**.

Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint and several; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the NPC Entities and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) none of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the NPC Entities or any of the NPC Entities' other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated herein or in any exhibit hereto; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as a "group."

17. **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

18. **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect solely with respect to any then-continuing obligations thereunder.

19. **Reservation of Rights**.

(a)     Except as expressly provided in this Agreement or the Restructuring Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of

any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)        Without limiting clause (a) of this <u>Section 19</u> in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

(c)        Except as otherwise set forth in this Agreement, the Plan, and any related document, this Agreement shall in no event be construed to amend, alter, or waive or override any rights, remedies, obligations, claims, or defenses under (i) that certain First Lien Intercreditor Agreement dated as of January 21, 2020 by and among the NPC Restaurant Holdings, NPC International, NPC Operating, NPC Quality, Deutsche Bank Trust Company Americas, Prepetition Collateral Agent, KKR, as the Authorized Representative (as defined therein) for the Initial Additional First Lien Secured Parties (as defined therein) and each additional Authorized Representative from time to time party thereto for the other Additional First Lien Secured Parties of the Series (as defined therein) with respect to which it is acting in such capacity or (ii) that certain First Lien/Second Lien Intercreditor Agreement dated as of April 20, 2017 by and among the NPC Restaurant Holdings, NPC International, NPC Operating, NPC Quality, Deutsche Bank Trust Company Americas, Prepetition Collateral Agent, Antares, as the Senior Representative (as defined therein) for the Credit Agreement Secured Parties (as defined therein) and as the Initial Second Priority Representative (as defined therein) and each additional Representative (as defined therein) from time to time party thereto for the other Additional First Lien Secured Parties of the Series (as defined therein) with respect to which it is acting in such capacity.

## 20.  **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

## 21.  **Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)        If to the Company, to:

NPC Restaurant Holdings I LLC
4200 W. 115th Street, Suite 200
Leawood, KS 66211

Attention:  Eric Koza
     ekoza@alixpartners.com


With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Ray C. Schrock, P.C.
     (ray.schrock@weil.com)
     Kevin Bostel, Esq.
     (kevin.bostel@weil.com)
     Natasha Hwangpo, Esq.
     (natasha.hwangpo@weil.com)


(2)  If to a Consenting First Lien Lender, Consenting Priority Lender, or a transferee thereof, to the addresses set forth below following the Consenting First Lien Lender or Consenting Priority Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg, Esq.
     (sgreenberg@gibsondunn.com)
     Michael J. Cohen, Esq.
     (mcohen@gibsondunn.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**22.**  **No Solicitation; Representation by Counsel; Adequate Information**.

(a)  This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Consenting Creditors. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditors have received the Disclosure Statement and related ballots and solicitation materials.

(b)  Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)      Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment, (ii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) is either (A) a "qualified institutional buyer" (as such term is defined in Rule 144A of the Securities Act) or (B) an institutional "accredited investor" (as such term is defined in Rule 501(a)(1), (2), (3), (7) or (8) of Regulation D under the Securities Act).

## 23.    Other Support Agreements.

During the Support Period, no NPC Party shall enter into any other restructuring support agreement related to a partial or total restructuring of the NPC Entities unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is reasonably acceptable to the Requisite Creditors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**NPC PARTIES**

NPC Restaurant Holdings I LLC

By: _____
      Name: Eric Koza
      Title: CRO

NPC Restaurant Holdings II LLC

By: _____
      Name: Eric Koza
      Title: CRO

NPC Holdings, Inc.

By: _____
      Name: Eric Koza
      Title: CRO

NPC International Holdings, LLC

By: _____
      Name: Eric Koza
      Title: CRO

NPC Restaurants Holdings, LLC

By: _____
      Name: Eric Koza
      Title: CRO

NPC International, Inc.

By: _____
  Name: Eric Koza
  Title: CRO


NPC Operating Company B, Inc.

By: _____
  Name: Eric Koza
  Title: CRO


NPC Quality Burgers, Inc.

By: _____
  Name: Eric Koza
  Title: CRO

## **EXHIBIT A**

**Restructuring Term Sheet**

**NPC International, Inc.**

**Restructuring Term Sheet**
**Summary of Terms and Conditions**

July 1, 2020

This restructuring term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the proposed restructuring and certain related transactions (the "Restructuring") concerning NPC International, Inc. and its direct and indirect affiliates (collectively, the "Company" or the "Debtors"), each of which anticipate filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to commence cases (the "Chapter 11 Cases") in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

Without limiting the generality of the foregoing, this Restructuring Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documents,[1] as provided in the Restructuring Support Agreement.  This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions.  Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.  Until publicly disclosed in accordance with those certain confidentiality agreements by and between the Company and each of the members of the Ad Hoc Priority/1L Group (defined below), as applicable, this Restructuring Term Sheet shall remain strictly confidential and may not be shared with any other party or person (other than in accordance with such confidentiality agreements) without the consent of the Company and the Ad Hoc Priority/1L Group.

The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring or any related restructuring or similar transaction have not, as of the date hereof, been fully evaluated, and such evaluation may affect the terms and structure of the Restructuring.  Any such evaluation may affect the terms and structure of the Restructuring and/or certain related transactions.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE LAW.

| Parties | |
|---|---|
| **Debtors** | NPC International, Inc. ("NPCPH"); NPC Restaurant Holdings I LLC; NPC Restaurant Holdings II LLC; NPC Holdings, Inc.; NPC International Holdings, LLC; NPC Restaurant Holdings, LLC; NPC Operating Company B, Inc.; and NPC Quality Burgers, Inc. ("NPCQB"). |
| **Ad Hoc Priority/1L Group** | "Ad Hoc Priority/1L Group" means the ad hoc group of Consenting Creditors represented by Gibson, Dunn & Crutcher LLP and Houlihan Lokey Capital, Inc. |
| **Summary of Prepetition Obligations and Interests** | |
| **Priority Term Loan Facility** | "Priority Term Loan Credit Facility" means the super priority term loan facility provided under the Priority Credit Agreement. |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement to which this term sheet is affixed (the "Restructuring Support Agreement").

WEIL:\97524852\13\65961.0003

| | As of July 1, 2020, the principal obligations outstanding under the Priority Term Loan Credit Facility totaled approximately $40,482,222.22 (collectively, the "<u>Priority Term Loan Indebtedness</u>"). |
|---|---|
| | "<u>Priority Term Loan Secured Claims</u>" refers to all secured claims (including any accrued and unpaid interest, fees, and/or charges) arising from the Priority Term Loan Credit Facility as of the Petition Date. |
| **First Lien Credit Facility** | "<u>First Lien Credit Facility</u>" means the revolving credit and term loan facility provided under the First Lien Credit Agreement. |
| | As of July 1, 2020, (i) the principal revolving obligations outstanding under the First Lien Credit Facility totaled approximately $62,511,834.89 and (ii) the principal term loan obligations outstanding under the First Lien Credit Facility totaled approximately $639,809,193.97 (collectively, the amounts described in clauses (i) and (ii) and any reimbursement obligation in respect of any drawn letters of credit issued under the First Lien Credit Facility, the "<u>First Lien Indebtedness</u>"). |
| | Pursuant to the Cash Collateral Orders, the Debtors shall cash collateralize any letters of credit pursuant to arrangements reasonably satisfactory to the Prepetition Agent and the "Required Lenders" (as defined in the First Lien Credit Agreement (at an amount equal to 100% of the face amount thereof) (other than any letters of credit issued to PHLLC (or its any of its affiliates), as beneficiary (the "<u>PHLLC Letters of Credit</u>"), which as of the date hereof totaled approximately $10,000,000). |
| | "<u>First Lien Secured Claims</u>" refers to all secured claims (including any accrued and unpaid interest, fees, and/or charges) arising from the First Lien Credit Facility as of the Petition Date. |
| **Second Lien Term Loan Facility** | "<u>Second Lien Term Loan Facility</u>" means the term loan facility provided under the Second Lien Credit Agreement. |
| | As of July 1, 2020, the principal obligations outstanding under the Second Lien Term Loan Facility totaled approximately $160,000,000 (collectively, the "<u>Second Lien Indebtedness</u>"). |
| | "<u>Second Lien Claims</u>" refers to all claims (including any accrued and unpaid interest, fees, charges, and/or deficiency claims) arising from the Second Lien Term Loan Facility as of the Petition Date. |
| **Critical Trade Claims** | "<u>Critical Trade Claims</u>" means any prepetition claim held by a creditor that provides goods necessary for the continued operation of the Debtors and Reorganized Debtors; *provided* that the holder of such Critical Trade Claim has agreed to continue to provide goods and services to the Debtors and the Reorganized Debtors on terms and conditions reasonably acceptable to the Debtors and the Ad Hoc Priority/1L Group. |
| **General Unsecured Claims** | "<u>General Unsecured Claims</u>" means any prepetition, general unsecured claim against one or more Debtors, including the Second Lien Claims and any deficiency claims arising from the First Lien Credit Facility (the "<u>First Lien Deficiency Claims</u>"), but excluding the Administrative Expense Claims, any priority unsecured claims, the Professional Fee Claims, the Priority Term Loan Secured Claims, the First Lien Secured Claims, the Critical Trade Claims, the Intercompany Claims, the Subordinated Claims. |
| **Intercompany Claims** | "<u>Intercompany Claims</u>" means any prepetition claim held by a Debtor against another Debtor. |

2

| Intercompany Interests | "Intercompany Interests" means any interest in a Debtor held by another Debtor. |
|---|---|
| Subordinated Claims | "Subordinated Claims" means any claim subject to subordination under section 510(b) of the Bankruptcy Code. |
| Existing Equity Interests | "Existing Equity Interests" means any interest in a Debtor held by a non-Debtor, including any common stock, preferred stock, warrants, or other ownership interest. |
| Holdco Debtor Plan Treatment | For the avoidance of doubt, the treatment under the Plan described in this Restructuring Term Sheet govern only claims against and interests in the Debtors other than NPC Restaurant Holdings I LLC, NPC Restaurant Holdings II LLC, NPC Holdings, Inc., and NPC International Holdings, LLC (the "Holdco Debtors"). Any terms under the Plan (or under separate plans or other forms of case disposition) concerning claims against and interests in the Holdco Debtors shall be agreed to among the Debtors and the Requisite Creditors. |
| **Overview of Restructuring** | |
| Restructuring Summary | The Restructuring shall be implemented with the support of the Ad Hoc Priority/1L Group through the Debtors' (i) commencement of the Chapter 11 Cases on July 1, 2020 (the "Petition Date"); (ii) pursuit of the following processes and relief; and (iii) pursuit of such other additional relief as reasonably agreed among the Debtors and the Ad Hoc Priority/1L Group, including:<br><br>i.    The NPCQB Sale Process (defined below);<br><br>ii.    The NPCPH Sale Process (defined below) in the event the NPCPH Sale Trigger Event occurs and, subject to the prior written consent of the Ad Hoc Priority/1L Group, the closure of any Specified PH Store (defined below) not sold in the NPCPH Sale Process;<br><br>iii.    Subject to the outcome of (1) the NPCPH Sale Process and (2) the NPCQB Sale Process, the Debtors shall propose a standalone restructuring to be implemented pursuant to the Plan, pursuant to which (x) those of the Debtors' remaining Pizza Hut and Wendy's assets that are consented to be included in the Plan by the Requisite Creditors will be vested in the Reorganized Debtors (defined below); (y) only such unexpired leases and material executory contracts (including any Franchise Documents) consented to in writing by the Requisite Creditors shall be assumed under the Plan and any cure amounts related to arising from such assumed executory contracts and unexpired leases shall be consented to in writing by the Requisite Creditors; and (z) any unexpired lease or material executory contract (including any Franchise Documents) not expressly assumed pursuant to the Plan, subject to the prior written consent of the Ad Hoc Priority/1L Group, shall be deemed rejected pursuant to the Plan; and<br><br>iv.    In the event the Restructuring results in a reorganization around both NPCPH and NPCQB, each entity shall have a separate capital structure and be directly owned by the Reorganized NPC Parent. |
| NPCPH Sale Process | The "NPCPH Sale Trigger Event" shall occur in the event that the Debtors, the Requisite Creditors, and Pizza Hut, LLC ("PHLLC") have not agreed on the terms of a |

| | |
|---|---|
| | comprehensive agreement with respect to the Debtors' Pizza Hut restaurants by July 24, 2020. |
| | In the event the NPCPH Sale Trigger Event occurs, the Debtors shall file a motion by no later than July 26, 2020 seeking authorization for entry of an order approving bidding procedures and the sale of certain Pizza Hut restaurants identified on a list to be agreed by the Debtors and the Ad Hoc Priority/1L Group (the "Specified PH Stores") pursuant to a § 363 sale process (the "NPCPH Sale Process"); such motion and orders shall be in form and substance reasonably acceptable to the Requisite Creditors. |
| **NPCQB Sale Process** | "NPCQB Sale Process" means the sale of (i) all or (ii) a portion of NPCQB restaurants pursuant to a § 363 sale process, as determined by the Debtors and the Requisite Creditors. |
| **Milestones** | The Debtors will implement the Restructuring in accordance with the following milestones (the "Milestones"), with each document, motion or order described below to be subject to the consent rights set forth in the Restructuring Support Agreement and, if such consent rights are unspecified in the Restructuring Support Agreement, such document shall be in form and substance reasonably acceptable to the Requisite Creditors: **General Restructuring Milestones**:[2] 1. <u>Entry of the Interim Cash Collateral Order</u>:  Petition Date + 3 days 2. <u>Entry of the Final Cash Collateral Order</u>:  Petition Date + 42 days 3. <u>File Plan and Disclosure Statement; motion to approve Disclosure Statement; and motion to approve Rights Offering Procedures and authorize entry into the Backstop Commitment Agreement (each defined below) (such motion, the "RO Motion")</u>:  Petition Date + 50 days 4. <u>Disclosure Statement hearing and entry of order approving Disclosure Statement and entry of order approving RO Motion</u>:  Earlier of binding bid deadline in NPCQB Sales Process and Petition Date + 90 days 5. <u>Commence Plan solicitation</u>:  Petition Date + 95 days 6. <u>Confirmation hearing</u>:  Petition Date + 125 days 7. <u>Entry of Confirmation Order</u>:  Petition Date + 130 days 8. <u>Effective Date</u>:  Petition Date + 144 days **NPCQB-Specific Milestones**: 9. <u>Commence NPCQB sale and marketing process, with contact parties to be agreed by the Debtors and the Ad Hoc Priority/1L Group</u>:  Petition Date + 2 day 10. <u>Non-binding bids due for NPCQB</u>:  Petition Date + 40 days 11. <u>If NPCQB bids acceptable to Company and Requisite Creditors, file Bid Procedures Motion for NPCQB</u>:  Petition Date + 50 days 12. <u>Entry of the Bid Procedures Order for NPCQB Bid Procedures</u>:  Petition Date + 75 days |

---

[2]   Milestones shall be subject to extension to the extent regulatory approvals are necessary.

4

|  | 13. <u>Binding bids due for NPCQB</u>:  Petition Date + 90 days |
|---|---|
|  | 14. <u>NPCQB auction</u>:  Petition Date + 97 days |
|  | 15. <u>Entry of NPCQB sale order</u>:  Petition Date + 102 days |
|  | 16. <u>NPCQB sale closing</u>:  Petition Date + 139 days |
|  | **NPCPH-Specific Milestones**: |
|  | 17. <u>File Bid Procedures Motion for NPCPH</u>:  Petition Date + 26 days |
|  | 18. <u>Commence NPCPH sale and marketing process, with contact parties to be agreed by the Debtors and the Ad Hoc Priority/1L Group</u>:  Petition Date + 28 days |
|  | 19. <u>File motion to reject NPCPH leases, franchise agreements, Consent and Amendment Agreement and other related agreements</u>:[3] Petition Date + 28 days |
|  | 20. <u>Entry of the Bid Procedures Order for NPCPH Bid Procedures</u>:  Petition Date + 53 days |
|  | 21. <u>Non-binding bids due for NPCPH</u>:  Petition Date + 69 days |
|  | 22. <u>Binding bids due for NPCPH</u>:  Petition Date + 111 days |
|  | 23. <u>NPCPH auction</u>:  Petition Date + 117 days |
|  | 24. <u>Entry of NPCPH sale order</u>:  Petition Date + 122 days |
|  | 25. <u>NPCPH sale closing</u>:  Petition Date + 139 days |
| **Consideration for Plan Distribution** | The aggregate consideration that will be distributed pursuant to the Plan on the Effective Date will include, as and to the extent applicable: |
|  | i.      Any undistributed cash from the Sale Proceeds (defined below); |
|  | ii.     The New QB First Lien Take-Back Term Loans, if applicable; |
|  | iii.    Reorganized Equity; |
|  | iv.     Shares of Convertible Participating Preferred Stock (defined below) (acquired pursuant to the Subscription Rights, the Backstop Tranche or the Backstop Commitment Agreement); and |
|  | v.      Cash Funded New QB First Lien Take-Back Term Loans (defined below), if applicable. |
| **Use of Cash Collateral** | The Restructuring will be financed by the consensual use of cash collateral.  The Cash Collateral Orders shall provide for, among other things, adequate protection in favor of the administrative agents under the Priority Credit Agreement and First Lien Credit Agreement for the benefit of the Priority Lenders and the First Lien Lenders, respectively, to the extent of the diminution in value, if any, of their respective interests in the "Collateral" (as defined in the Priority Credit Agreement and First Lien Credit Agreement), which forms of adequate protection shall include the Adequate Protection Liens (as defined in the Cash Collateral Orders)  on all property of the Debtors (including for the avoidance of doubt any securities or other assets that were set aside in one or more rabbi trusts before the Petition Date in connection with the DCP and POWR plans (the "<u>Specified Assets</u>")), the Adequate Protection Claims (as defined in the Cash Collateral Orders),, adequate protection payments in respect of Priority Term Loan Indebtedness, |

---

[3]    The specific agreements that will be subject to the motion shall be subject to the consent of Requisite Creditors.

| | |
|---|---|
| | and payment of reasonable fees and expenses of the Consenting Creditor Advisors. In respect of the Adequate Protection Liens and Adequate Protection Claims, the Priority Lenders and First Lien Lenders, as applicable, shall be entitled to recover first from the Specified Assets securing the Adequate Protection Liens before being required to seek recourse from any other assets securing the Adequate Protection Liens. |
| **Definitive Documents** | Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the Support Effective Date shall be subject to the rights and obligations set forth in Section 6 of the Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet does not impair such rights and obligations. |
| **New QB First Lien Take-Back Term Loan Facility** | In the event certain NPCQB units are retained under the Plan and vested in NPC Quality Burgers, as reorganized ("Reorganized QB"; such event, the "QB Standalone Event"), Reorganized QB shall enter into a new first lien term loan credit facility ("New QB First Lien Take-Back Term Loan Facility" and the loans thereunder, the "New QB First Lien Take-Back Term Loans") in the aggregate principal amount of $150,000,000 (the "Base Take-Back Term Loan Amount"), subject to reduction as described in the next paragraph, with a 5 year tenor, a maximum rate of L+475 bps (with a 1% LIBOR floor), and 1% per annum amortization payments (payable on a quarterly basis), secured by substantially all the assets of Reorganized QB as well as the pledge of 100% of the equity in Reorganized QB owned by its direct post-reorganization parent; additional terms and conditions to be agreed by the Debtors and the Requisite Creditors.

The Base Take-Back Term Loan Amount shall be reduced by an amount equal to the Reduction Amount, if any, and holders of allowed First Lien Secured Claims will be permitted to commit to fund an amount of New QB First Lien Take-Back Term Loans ("Cash Funded New QB First Lien Take-Back Term Loans"), on a pro rata basis based on the amount of such party's allowed First Lien Secured Claim, in an aggregate principal amount equal to the Reduction Amount. |
| **Post-Emergence Letters of Credit** | It shall be a condition precedent to the Effective Date that any Letters of Credit (as defined in the First Lien Credit Agreement) that remain outstanding on the Effective Date (including, for the avoidance of doubt, any PHLLC Letters of Credit), shall be (A) cash collateralized by the Debtors pursuant to arrangements reasonably satisfactory to the Prepetition Agent (at an amount equal to 100% of the face amount thereof), (B) terminated, cancelled and returned undrawn to the applicable letter of credit issuer under the First Lien Credit Facility; or (C) otherwise addressed through arrangements acceptable to the Prepetition Agent, the applicable letter of credit issuer under the First Lien Credit Facility, the Debtors and the Requisite Creditors.. |
| **Reorganized Equity** | "Reorganized Equity" shall mean common shares of the parent of the Reorganized Debtors ("Reorganized NPC Parent") to be issued on the Effective Date to holders of First Lien Secured Claims and holders of First Lien Secured Claims that subscribe for Rights Offering Shares upon conversion thereof. |
| **Rights Offering** | The Plan shall provide for a new money rights offering (the "Rights Offering") pursuant to which holders of allowed First Lien Secured Claims will be distributed subscription rights (the "Subscription Rights") to purchase a number of newly issued shares of convertible participating preferred stock issued by the Reorganized NPC Parent ("Convertible Participating Preferred Stock"). The Convertible Participating Preferred Stock issuable pursuant to the Plan (whether pursuant to the Rights Offering, the Backstop Tranche, or the Backstop Commitment Agreement (in connection with the Backstop Premium or otherwise)) shall have an aggregate investment amount of no less |

than $100.0 million and no greater than $200.0 million (the "Base Offering Amount"), will be offered at a 35.0% discount to plan equity value ("Plan Equity Value"), and shall have a maximum initial liquidation preference of no less than $153.8 million and no greater than $307.7 million, excluding premiums and fees.

The Convertible Participating Preferred Stock:

- shall initially be convertible into [●]%[4] of the Reorganized Equity, at the option of each holder thereof at any time;

- shall bear a preferred dividend at a rate of 10% per annum on its liquidation preference (inclusive of all premiums and additional Convertible Participating Preferred Stock issued as part of the Restructuring), which shall be paid quarterly and in kind in additional shares of Convertible Participating Preferred Stock;

- shall be convertible at the option of the holder into shares of Reorganized Equity at the then current conversion rate, which conversion rate shall be fixed at issuance, as described below, subject to reasonable and customary anti-dilution adjustments (which, for the avoidance of doubt, shall not include any "ratchet" anti-dilution adjustments);

- upon a liquidation (as is customarily defined), shall be entitled to receive liquidating distributions out of the assets of Reorganized NPC Parent legally available for distribution to its stockholders, before any payment or distribution of any assets of Reorganized NPC Parent shall be made or set apart for holders of any junior securities, including Reorganized Equity, equal to the greater of (i) the aggregate liquidation preference as of the date of the liquidation and (ii) the amount such Holder would have received had such shares of Convertible Participating Preferred Stock, immediately prior to such liquidation, been converted into shares of Reorganized Equity;

- shall have an early redemption premium (the "Convertible Preferred Redemption Premium") owed and payable upon a change of control, merger, sale of all or substantially all assets, an acceleration, default, bankruptcy, insolvency, redemption or prepayment whether mandatory or at the option of Reorganized NPC Parent; "Convertible Preferred Redemption Premium" means, as of any date on which Convertible Participating Preferred Stock is redeemed, the greater of (i) 1.0% of the liquidation preference of such Convertible Participating Preferred Stock (inclusive of all fees, premiums and additional Convertible Participating Preferred Stock issued as part of the Restructuring) and (ii) the excess of (A) the present value at such date of redemption of (1) the liquidation preference of such Convertible Participating Preferred Stock (inclusive of all fees, premiums and additional Convertible Participating Preferred Stock issued as part of the Restructuring), plus (2) all remaining required dividends due on the such Convertible Participating Preferred Stock through the seventh (7th) anniversary of the Effective Date, assuming such dividends were paid in cash, computed using a discount rate equal to the applicable treasury rate plus 50 basis points, over (B) the liquidation preference of such Convertible Participating

---

[4]   To be equal to (a) the total initial liquidation preference of the Convertible Participating Preferred Stock, including the Backstop Premium (as defined below) (the "Aggregate New Preferred Stock Initial Liquidation Preference"), divided by (b) the sum of: (i) such Aggregate New Preferred Stock Initial Liquidation Preference, plus (ii) the value of the Reorganized Equity based on the total enterprise value set forth in the Plan.

7

Preferred Stock (inclusive of all fees, premiums and additional Convertible Participating Preferred Stock issued as part of the Restructuring); and

- shall contain such other terms which are customary and reasonably acceptable to each of the Debtors and the Backstop Parties.

"Rights Offering Shares" shall mean the shares of Convertible Participating Preferred Stock that are offered in the Rights Offering, including any shares reserved for the Backstop Tranche which are not purchased pursuant thereto.

In the event that the QB Standalone Event occurs, the Base Offering Amount shall be reduced by up to 33.3% (the total U.S. dollar amount of such percentage reduction, the "Reduction Amount") (which shall reduce the amount of shares available for purchase in the Backstop Tranche ratably with all other Rights Offering Shares).

The offering of Rights Offering Shares will be fully backstopped by certain members of the Ad Hoc Priority/1L Group (the "Backstop Parties") and any other parties agreed to by the Backstop Parties, and the Rights Offering will be conducted pursuant to customary and reasonable procedures agreed to by the Debtors and the Backstop Parties (the "Rights Offering Procedures") and a Backstop Commitment Agreement (the "Backstop Commitment Agreement"), which shall (x) provide for, among other things, a backstop commitment premium equal to 8.0% of the Base Offering Amount (the "Backstop Premium") payable in Rights Offering Shares (calculated to reflect a 35% discount to Plan Equity Value) to the Backstop Parties on the Effective Date (or, as set forth in the Backstop Commitment Agreement, in cash if the Effective Date does not occur) and (y) be in form and substance acceptable to the Debtors and the Backstop Parties (to be filed as part of the Plan Supplement).[5]  The Backstop Commitment Agreement shall provide that, in the event that the QB Standalone Event occurs and the Base Offering Amount is reduced, the Backstop Parties shall be committed to fund in cash, on the terms set forth in the Backstop Commitment Agreement, an amount of Cash Funded New QB First Lien Take-Back Term Loans equal to Reduction Amount, provided that no additional Backstop Premium shall be payable in respect thereof.[6]

The Backstop Commitment Agreement shall permit any Backstop Party to fund its backstop commitment, and the Rights Offering Procedures shall provide that any recipient of Subscription Rights may elect to fund the exercise of its Subscription Rights, in each case, in an cashless manner from any distributions of cash such Backstop Party (or its designee) or recipient (as applicable) is entitled to receive pursuant to the Plan. In addition, the Backstop Commitment Agreement shall provide that assignments of backstop commitments by any Backstop Party (other than to an affiliate) shall be subject to a right of first refusal in favor of the other Backstop Parties.

In addition, without limiting the obligations of the Backstop Parties to fund the full Base Offering Amount, the Backstop Parties will have the option to purchase a number of shares of Convertible Participating Preferred Stock such that the aggregate purchase price therefor would be equal to 50% of the Base Offering Amount (the "Backstop Tranche") on a pro rata basis based on their backstop commitments. Any rights not exercised by the Backstop Parties with respect to the Backstop Tranche shall be added

---

[5]   "Plan Supplement" means a supplemental appendix to the Plan to be filed with the Bankruptcy Court containing, among other things, forms of applicable documents, schedules, and exhibits to the Plan.

[6]   The Backstop Parties shall be entitled to allocate additional Convertible Participating Preferred Stock to Backstop Parties who commit to backstop the Cash Funded New QB First Lien Take-Back Term Loans.

| | to the participation rights in the Rights Offering distributed to holders of First Lien Secured Claims as set forth in this Restructuring Term Sheet. |
| --- | --- |
| | In accordance with the Restructuring Support Agreement, the express terms set forth in this Restructuring Term Sheet with respect to any of the following matters are agreed by the Parties, and any amendment or modification thereof (including the finalization of the amount of the Base Offering Amount) shall each be acceptable to the Debtors and holders of Consenting First Lien Lenders holding at least 62.5% of the aggregate principal amount outstanding of the First Lien Indebtedness held by all Consenting First Lien Lenders (including any First Lien Indebtedness subject to an assignment pending settlement to which such Consenting First Lien Lender is the assignee thereunder): (i) the fixing of the Base Offering Amount; (ii) the final economic terms and structure of the Rights Offering (including the economics terms in respect of the Backstop Commitment Agreement), the Rights Offering Shares, the Convertible Participating Preferred Stock, and the Cash Funded New QB First Lien Take-Back Term Loans and New QB First Lien Take-Back Term Loans; and (iii) the consent threshold with respect to a sale transaction(s) in respect of NPCQB's Wendy's units. |
| **Treatment of Claims** | |
| **Administrative, Adequate Protection and Priority Claims**<br><br>Unimpaired – Unclassified and Non-Voting | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed [7] Administrative Expense Claim, [8] Allowed Adequate Protection Claim, Allowed priority tax claim, or Allowed other priority claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim, Allowed Adequate Protection Claim, Allowed priority tax claim, or Allowed other priority claim will receive, in full and final satisfaction of such Claim, cash in an amount equal to such Allowed claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code (including delivery to a holder of an Adequate Protection Claim of property securing Adequate Protection Liens securing such Adequate Protection Claim, solely to such holder agrees to such treatment and the specific property to be delivered in connection therewith). |
| **Fee Claims**<br><br>Unimpaired – | All estate-retained professionals shall (i) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered, and reimbursement of expenses incurred, |

---

[7] "Allowed" means with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan, or (b) as to which any objection has been determined by a final order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under the Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; provided, that, notwithstanding the foregoing, the Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

[8] "Administrative Expense Claim" means any Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Commencement Date and through the Effective Date of preserving the Debtors' estates and operating the Debtors' businesses (such as wages, salaries, or commissions for service rendered after the Commencement Date, and payments for goods and other services), (ii) Fee Claims, (iii) all fees and charges assessed against the Debtors' estates pursuant to sections 1911 through 1930 of chapter 123 of the title 28 of the United States Code, 28 U.S.C. §§1-1401, and (iv) all Allowed Claims that are to be treated as Administrative Expense Claims pursuant to a final order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

| | |
|---|---|
| Unclassified and Non-Voting | postpetition and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) allowing any such postpetition, estate-retained professional fee and expense claim (each, a "<u>Fee Claim</u>"); *provided, however*, that any payment in respect of a final fee application shall be made after the entry of a final order approving such application and delineating the unpaid portion of fees and expenses with respect to such estate-retained professional. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval. |
| | After the entry of the Confirmation Order and on or before the Effective Date, the Debtors shall establish an escrow account to pay fees and expenses of estate-retained professionals (the "<u>Fee Escrow Account</u>"). On the Effective Date, the Debtors shall fund the Fee Escrow Account with cash equal to the estate-retained professionals' good faith estimates of their actual, unpaid Fee Claims as of the Effective Date. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for estate-retained professionals and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. To the extent surplus funds remain in the Fee Escrow Account after all Fee Claims have been resolved by the Court or settled, such funds shall be returned to the Reorganized Debtors. |
| **Priority Term Loan Facility Claims**<br><br>Unimpaired, Non-Voting | To the extent Priority Term Loan Facility Claims remain outstanding on the Effective Date, except to the extent that a holder of an Allowed Priority Term Loan Facility Claim agrees to less favorable treatment, the principal amount outstanding of loans extended under the Priority Term Loan Facility shall be repaid in full in cash, including cash from Sale Proceeds. Accrued interest and other obligations under the Priority Term Loan Facility shall also be paid in full in cash on the Effective Date. |
| **First Lien Secured Claims**<br><br>Impaired, Voting | On and from the Effective Date, in full and final satisfaction, release, and discharge of the First Lien Secured Claims, except to the extent that a holder of an Allowed First Lien Secured Claim agrees to less favorable treatment, the holders of First Lien Secured Claims (or the permitted assigns and designees of such holders) shall receive their pro rata share of:<br><br>i.   New QB First Lien Take-Back Term Loans (in the event the QB Standalone Event occurs);<br><br>ii.   100% of the Reorganized Equity, subject to dilution by the Rights Offering Shares, the Backstop Premium,  and the Management Incentive Plan; <u>provided</u> that any such holder that is deemed ineligible to hold such Reorganized Equity pursuant to the Debtors' franchise documents due to competitive considerations shall receive, in lieu of such Reorganized Equity, an additional amount of other forms of Plan consideration  distributed to holders of First Lien Secured Claims that is reasonably equivalent to the value of such Reorganized Equity that such holder would have been entitled to receive, as determined by the Debtors, subject to the consent of the Requisite Creditors;<br><br>iii.   Participation rights in the Rights Offering (if applicable); and<br><br>iv.   Cash in an amount equal to any net sale proceeds (the "<u>Sale Proceeds</u>") received by the applicable Debtor from the NPCPH and/or NPCQB asset sales (if |

10

| | applicable) not previously distributed pursuant to one or more orders of the Bankruptcy Court. |
|---|---|
| **General Unsecured Claims**<br><br>Impaired, Voting | On the Effective Date, General Unsecured Claims shall be entitled to a treatment to be determined as between the Debtors and the Requisite Creditors. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, each Intercompany Claim will either be reinstated or cancelled and released at the option of the Debtors with the reasonable consent of the Requisite Creditors; *provided*, that no distributions shall be made on account of such Intercompany Claims on the Effective Date. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary. |
| **Subordinated Claims** | Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. |
| **Existing Equity Interests**<br><br>Impaired, Non-Voting, and Deemed to Reject | All Existing Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Equity Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. |
| **Miscellaneous** | |
| **Key Employee Incentive Plan** | The Debtors, with the support of the Ad Hoc Priority/1L Group, shall file a motion to approve a key employee incentive plan ("KEIP") for the benefit of certain key employees of the Company (the "KEIP Participants"). The maximum amount available to be paid as awards to the KEIP Participants shall be $3.5 million. Such awards shall be subject to the achievement of performance metrics and sale proceeds targets (as applicable), which targets and other KEIP terms shall be determined by the Debtors and subject to the reasonable consent of the Requisite Creditors. |
| **Key Employee Retention Plan** | The Debtors, with the support of the Ad Hoc Priority/1L Group, shall file a motion to approve the key employee retention plan ("KERP") for the benefit of certain key employees of the Company, in an amount not to exceed $2 million. Terms of the KERP shall be determined by the Debtors and subject to the reasonable consent of the Requisite Creditors. |
| **Management Incentive Plan** | Following the Effective Date, the Board of Directors of Reorganized NPC Parent (the "New Board") will adopt a post-Restructuring equity incentive plan (the "Management Incentive Plan"), under which up to 10% of the Reorganized Equity will be reserved for issuance as awards thereunder; the terms and conditions of such Management Incentive Plan shall be determined by the New Board. |
| **Compensation and Benefit Plans** | All material employee compensation and benefit plans (including all management employment agreements and all qualified and non-qualified plans (DCP/POWR) in effect as of the Petition Date shall be assumed under the Plan; *provided* that obligations arising under the non-qualified plans (DCP/POWR) shall be satisfied in an amount equal to any Allowed Adequate Protection Claim solely in the event the Adequate Protection Liens are secured by the Specified Assets and are subject to the terms described above in "Use of Cash Collateral." |

11

| Tax Attributes | To the extent reasonably practicable, the Restructuring shall be structured in a manner which minimizes any current cash taxes payable by the Debtors and the Consenting Creditors, if any, as a result of the consummation of the Restructuring.  To the extent reasonably practicable, the terms of the Plan shall be structured to maximize the favorable tax attributes of the Reorganized Debtors going forward.  Any corporate restructuring of the Reorganized Debtors (including any separate entity providing shared services to the other Reorganized Debtors) or similar transactions not in the ordinary course and not otherwise contemplated by this term sheet may not be implemented in a manner that would materially adversely affect the Requisite Creditors without their consent. |
|---|---|
| Indemnification | The Company's indemnification provisions currently in place (whether in the bylaws, certificates of incorporation (or other equivalent governing documents), or employment contracts) for current and former directors, officers, employees, managing agents, and professionals and their respective affiliates will be assumed by the Company and not modified in any way by the Restructuring through the Plan or the transactions contemplated thereby and will continue as obligations of the Reorganized Debtors.  For the avoidance of doubt, the Reorganized Debtors shall not retain any ongoing obligations or liabilities arising from or related to any agreements or arrangements to which the Sponsor (as defined in the First Lien Credit Agreement) or their principals or affiliates are a party with any other party. |
| Transfer Restrictions | No restrictions on the transfer of any Reorganized Equity or Convertible Participating Preferred Stock, subject to applicable law (including securities laws), any restrictions in the Shareholders Agreement (as defined below), and to maintain the Reorganized NPC Parent's status as a company not required to prepare and file reports under the Securities Exchange Act of 1934, as amended. |
| Exemption from SEC Registration | The Reorganized Equity, Subscription Rights and the shares of Convertible Participating Preferred Stock shall be exempt from registration under the Securities Act of 1933, as amended. [9] |
| Treatment of Executory Contracts and Unexpired Leases | On the Effective Date, except as otherwise determined by the Debtors, each of the Debtors' executory contracts and unexpired leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected in accordance with the provisions of Bankruptcy Code sections 365 and 1123.  Any executory contracts and unexpired leases proposed to be assumed or rejected by the Debtors or Reorganized Debtors during the Chapter 11 Cases or pursuant to the Plan (as applicable), including any associated cure amounts, shall be subject to the consent of the Requisite Creditors, and the Debtors and the Requisite Creditors shall agree prior to solicitation of the Plan on proposed cure amounts with respect to executory contracts and unexpired leases that may be subject to assumption  under the Plan and on the specific proposed cure amounts that must be agreed with the applicable contract or lease counterparty or determined by the Bankruptcy Court before confirmation of the Plan (such cure amounts, the "Specified Cure Amounts").  For the avoidance of doubt, cure costs may be paid in installments following the Effective Date in a manner consistent with the Bankruptcy Code. |

---

[9]   It is expected that the securities issuances will be exempt from registration on the basis of §1145, Reg D and/or §4(a). Available exemptions to be determined once plan equity value range is available.

WEIL:\97524852\13\65961.0003

| | |
|---|---|
| **Restructuring Fees and Expenses** | The Debtors shall pay, or cause to be paid, all reasonable and documented fees and out-of-pocket expenses (including estimated fees and expenses, as applicable) for which invoices are furnished by the Consenting Creditor Advisors, in each case, in accordance with the terms of their applicable engagement or reimbursement letters (the "<u>Restructuring Fees and Expenses</u>") (i) at least one (1) Business Day prior to the Petition Date, (ii) in accordance with the Restructuring Support Agreement, and (iii) on or prior to the Effective Date.<br><br>As a condition precedent to the occurrence of the Effective Date, the Debtors shall pay, or cause to be paid, all Restructuring Fees and Expenses, including those fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least one (1) Business Days before the Effective Date.<br><br>The Consenting Creditors agree that they shall not object to the reasonable fees and expenses of the Debtors' advisors. |
| **Conditions Precedent to the Effective Date** | The following shall be conditions to the Effective Date (collectively, the "<u>Conditions Precedent</u>"):<br><br>(a)  the Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>    (i)  be in form and substance acceptable to the Requisite Creditors and consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;<br><br>    (ii)  authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan;<br><br>    (iii) decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>    (iv) authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering; (b) issue the Reorganized Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; [10] (c) make all distributions and issuances as required under the Plan, including any undistributed cash from the Sale Proceeds, the New QB First Lien Take-Back Term Loans, if applicable, Reorganized Equity, and Subscription Rights to participate in the Rights Offering for Rights Offering Shares; (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement; and (e) assume or reject (as applicable) any Franchise Documents, unexpired leases, or material executory contracts that have been consented to in writing by the Requisite Creditors, and provide for the payment of such cure amounts related to or arising from such Franchise Document, unexpired lease or material executory contract , which cure amounts have been consented to in writing by the Requisite Creditors;<br><br>    (v)  authorize the implementation of the Plan in accordance with its terms; and |

---

[10]   Exemption to be determined.

WEIL:\97524852\13\65961.0003

(vi) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan;

(d) the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated;

(e) the Final Cash Collateral Order shall be in full force and effect and shall not have been terminated;

(f) the Bankruptcy Court shall have entered the RO Order and the RO Order shall not have been terminated;

(g) the Backstop Commitment Agreement shall be in full force and effect and shall have not been terminated;

(h) the Rights Offering shall have been consummated and shall have been conducted in accordance with the Rights Offering Procedures and the Plan;

(i) all Letters of Credit outstanding under the First Lien Credit Agreement shall have been treated in a manner consistent with this Restructuring Term Sheet;

(j) the documentation related to the New QB First Lien Take-Back Term Loan Facility, if applicable, shall have been duly executed and delivered by all of the entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New QB First Lien Take-Back Term Loan Facility shall have been satisfied or duly waived in writing in accordance with the terms of each of the New QB First Lien Take-Back Term Loan Facility and the closing of the New QB First Lien Take-Back Term Loan Facility shall have occurred;

(k) all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws and shall comply with the consent rights set forth in the Restructuring Support Agreement and this Restructuring Term Sheet;

(l) all Specified Cure Amounts shall have been agreed with the applicable Franchise Document, unexpired lease or material contract counterparty or determined by the Bankruptcy Court and such agreed or determined Specified Cure Amount shall be acceptable to the Requisite Creditors;

14

| | |
|---|---|
| | (m) the Debtors shall have paid, caused to be paid, or funded into escrow for payment all Restructuring Fees and Expenses, including those fees and expenses estimated to be incurred through and following the Effective Date, as applicable; and |
| | (n) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent to the Effective Date** | The Debtors, with the prior consent of the Requisite Creditors and the Backstop Parties, as applicable, may waive any one or more of the Conditions Precedent to the Effective Date. |
| **Governance (Board Composition & Voting)** | The New Board shall be comprised of five (or seven in the event the QB Standalone Event occurs) individuals; the allocation of designation rights with respect to the selection of such individuals to be determined by the Ad Hoc Priority/1L Group in its sole discretion.  On the Effective Date, holders of the Reorganized Equity and the Rights Offering Shares will become party to the shareholders agreement, which shall be in form and substance acceptable to the Requisite Creditors (the "Shareholders Agreement"). |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (e) other purposes. |
| **Releases and Exculpations** | |
| **Releases by Debtors** | As of the Plan Effective Date, except for the rights and remedies that remain in effect from and after the Plan Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents and the documents in the Plan Supplement or as otherwise provided in any order of the Bankruptcy Court, on and after the Plan Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the |

| | |
|---|---|
| | Plan, the Restructuring Support Agreement, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date (such Claims and Causes of Action, the "Debtor Claims").  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or entity under the Plan, any transaction thereunder, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted a criminal act, intentional fraud, gross negligence or willful misconduct.  Notwithstanding anything else herein, the holders of First Lien Secured Claims shall not pursue, prosecute or assert any of the Debtor Claims, but shall not waive any entitlement, on account of any First Lien Deficiency Claims, to any recovery resulting from of any party's pursuit, prosecution, resolution, settlement or adjudication of any Debtor Claims retained by any entity under or pursuant to the Plan, if any. |
| **Released Parties** | Means collectively, in each case, solely in their capacities as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Creditors; (iv) the Sponsors,[11] and (v) with respect to each of the foregoing entities in clauses (i) through (iv), all Related Parties. |
| **Releases by Holders of Claims and Interests** | As of the Plan Effective Date, except for the rights that remain in effect from and after the Plan Effective Date to enforce the Plan, the Definitive Documents, and the documents in the Plan Supplement and the obligations contemplated by the Restructuring, on and after the Plan Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates; such Claims or Causes of Action, the "Additional Debtor Claims")), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or |

---

[11] "Sponsors" means Delaware Life Holdings Parent II, LLC, WPH Holdings II Parent LLC, Eldridge Industries, LLC, and Eldridge NPC Holdings LLC and any affiliates of the foregoing, so long as such parties do not object to or interfere with the Plan.

|  | during the Chapter 11 Cases, the Definitive Documents and the documents in the Plan Supplement, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission related to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or entity under the Plan, any transaction thereunder, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted a criminal act, intentional fraud, gross negligence or willful misconduct.  Notwithstanding anything else herein, the holders of First Lien Secured Claims shall not pursue, prosecute or assert any of the Additional Debtor Claims, but shall not waive any entitlement, on account of any First Lien Deficiency Claims, to any recovery resulting from of any party's pursuit, prosecution, resolution, settlement or adjudication of any Additional Debtor Claims retained by any entity under or pursuant to the Plan, if any. |
|---|---|
| **Exculpation** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the New QB First Lien Take-Back Term Loan, the NPCPH Sale Process, the NPCQB Sale Process, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring, the Rights Offering, and the Plan (including the Definitive Documents and the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Plan Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Injunction** | The Plan will contain customary injunction provisions. |

## EXHIBIT B

### FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of July 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "*Agreement*"), by and among the Company and the Consenting Creditors is executed and delivered by [●] (the "*Joining Party*") as of [●].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate principal amount of First Lien Indebtedness and Second Lien Indebtedness, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 7 of the Agreement to each other Party to the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to the Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under the Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to the Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**

[•]

By:

Name: _____

Title: _____

Principal Amount of Priority Term Loan Indebtedness:  $_____

Principal Amount of First Lien Term Loan Indebtedness:  $_____

Principal Amount of First Lien Revolver Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Interests (please describe):  _____

Notice Address:

Attention:
Email: