**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re | § | **Chapter 11** |
| | § | |
| **NPC INTERNATIONAL, INC.,** | § | **Case No. 20–33353 (DRJ)** |
| ***et al.*,** | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF
NPC INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Natasha Hwangpo (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors
and Debtors in Possession*

Dated:  January 18, 2021
        Houston, Texas

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are NPC International, Inc. (7298); NPC Restaurant Holdings I LLC (0595); NPC Restaurant Holdings II LLC (0595); NPC Holdings, Inc. (6451); NPC International Holdings, LLC (8234); NPC Restaurant Holdings, LLC (9045); NPC Operating Company B, Inc. (6498); and NPC Quality Burgers, Inc. (6457).  The Debtors' corporate headquarters and service address is 4200 W. 115th Street, Suite 200, Leawood, KS 66211.

**TABLE OF CONTENTS**

**Page**

ARTICLE I.      DEFINITIONS AND INTERPRETATION. ....................................1

    A.    Definitions. ............................................................................1
    B.    Interpretation; Application of Definitions; Rules of Construction. ................22
    C.    Reference to Monetary Figures. ..................................................23
    D.    Consent Rights. ....................................................................23
    E.    Controlling Document. ............................................................23

ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS. ..................................................23

    2.1    Treatment of Administrative Expense Claims. ................................23
    2.2    Treatment of Fee Claims. ........................................................24
    2.3    Treatment of Priority Tax Claims. ..............................................25
    2.4    Restructuring Expenses. ..........................................................25

ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS. ...................25

    3.1    Classification in General. ........................................................25
    3.2    Formation of Debtor Groups for Convenience Only. ........................25
    3.3    Summary of Classification of Claims and Interests. ..........................26
    3.4    Special Provision Governing Unimpaired Claims. ...........................26
    3.5    Separate Classification of Other Secured Claims. ...........................26
    3.6    Elimination of Vacant Classes. ..................................................26
    3.7    Voting Classes; Presumed Acceptance by Non-Voting Classes.....................27
    3.8    Voting; Presumptions; Solicitation. ............................................27
    3.9    Cramdown. ..........................................................................27
    3.10   No Waiver. ..........................................................................27

ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS. ...........................27

    4.1    Class 1:  Other Secured Claims. ................................................27
    4.2    Class 2:  Other Priority Claims. ................................................28
    4.3    Class 2A:  Driver Claimant Priority T1 Claims. ..............................28
    4.4    Class 2B:  Driver Claimant Priority T2 Claims. ..............................29
    4.5    Class 3:  Priority Term Loan Secured Claims. ...............................29
    4.6    Class 4:  First Lien Secured Claims. ..........................................29
    4.7    Class 5: Second Lien Secured Claims. ........................................31
    4.8    Class 6:  General Unsecured Claims. ..........................................31
    4.9    Class 7:  Intercompany Claims. ................................................32
    4.10   Class 8:  Subordinated Claims. ................................................33
    4.11   Class 9:  Existing Equity Interests. ............................................33
    4.12   Class 10:  Intercompany Interests. ............................................34

ARTICLE V.        MEANS FOR IMPLEMENTATION. ...................................................34
    5.1     No Substantive Consolidation. ..................................................................34
    5.2     Compromise and Settlement of Claims, Interests, and Controversies............34
    5.3     Sources of Consideration for Plan Distributions. .....................................38
    5.4     Sale Transaction:  Wind Down and Dissolution of the Debtors......................38
    5.5     Reorganization Transaction. ........................................................................40
    5.6     Employee Matters. .......................................................................................44
    5.7     Effectuating Documents; Further Transactions. ............................................44
    5.8     Exception from Securities Laws. ..................................................................46
    5.9     Cancellation of Existing Securities and Agreements......................................47
    5.10    Letters of Credit. .........................................................................................48
    5.11    Cancellation of Liens....................................................................................48
    5.12    Intercompany Interests; Corporate Reorganization. ......................................48
    5.13    Preservation of Causes of Action................................................................48
    5.14    Subordination Agreements..........................................................................49
    5.15    Nonconsensual Confirmation.......................................................................49
    5.16    Closing of Chapter 11 Cases.......................................................................49
    5.17    Notice of Effective Date. .............................................................................50
    5.18    GUC Trust....................................................................................................50

ARTICLE VI.       DISTRIBUTIONS. ....................................................................................52
    6.1     Distributions Generally.................................................................................52
    6.2     No Postpetition Interest on Claims. .............................................................52
    6.3     Date of Distributions.....................................................................................53
    6.4     Distribution Record Date..............................................................................53
    6.5     Distributions after Effective Date.................................................................54
    6.6     Disbursing Agent. .........................................................................................54
    6.7     Rights and Powers of Disbursing Agent.......................................................54
    6.8     Delivery of Distributions. .............................................................................54
    6.9     Unclaimed Property. .....................................................................................55
    6.10    Satisfaction of Claims...................................................................................56
    6.11    Manner of Payment under Plan.....................................................................56
    6.12    Fractional Shares and De Minimis Cash Distributions...................................56
    6.13    No Distribution in Excess of Amount of Allowed Claim...............................56
    6.14    Allocation of Distributions Between Principal and Interest. ..........................57
    6.15    Setoffs and Recoupments.............................................................................57
    6.16    Withholding and Reporting Requirements. ...................................................57

ARTICLE VII.      PROCEDURES FOR DISPUTED CLAIMS. .............................................58
    7.1     Allowance of Claims.....................................................................................58
    7.2     Objections to Claims.....................................................................................58
    7.3     Estimation of Claims.....................................................................................59
    7.4     Adjustment to Claims Register Without Objection. ......................................59
    7.5     Time to File Objections to Claims. ...............................................................59
    7.6     Disallowance of Claims. ...............................................................................59

|       | 7.7   | Amendments to Claims. | 60 |
|       | 7.8   | No Distributions Pending Allowance. | 60 |
|       | 7.9   | Distributions After Allowance. | 60 |
|       | 7.10  | Claims Resolution Procedures Cumulative. | 60 |

ARTICLE VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 60

|       | 8.1   | General Treatment. | 60 |
|       | 8.2   | Determination of Cure Amounts and Deemed Consent. | 61 |
|       | 8.3   | Payments Related to Assumption of Contracts and Leases. | 62 |
|       | 8.4   | Rejection Damages Claims. | 63 |
|       | 8.5   | Survival of the Debtors' Indemnification Obligations | 63 |
|       | 8.6   | Insurance Policies. | 64 |
|       | 8.7   | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 65 |
|       | 8.8   | Reservation of Rights. | 65 |

ARTICLE IX.   CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE. ...... 65

|       | 9.1   | Conditions Precedent to Effective Date. | 65 |
|       | 9.2   | Waiver of Conditions Precedent. | 68 |
|       | 9.3   | Effect of Failure of a Condition. | 68 |
|       | 9.4   | Substantial Consummation. | 68 |

ARTICLE X.   EFFECT OF CONFIRMATION. ...... 68

|       | 10.1  | Binding Effect. | 68 |
|       | 10.2  | Vesting of Assets. | 68 |
|       | 10.3  | Discharge of Claims Against and Interests in Debtors. | 69 |
|       | 10.4  | Pre-Confirmation Injunctions and Stays. | 69 |
|       | 10.5  | Injunction Against Interference With Plan. | 69 |
|       | 10.6  | Plan Injunction. | 70 |
|       | 10.7  | Releases. | 70 |
|       | 10.8  | Exculpation. | 73 |
|       | 10.9  | Injunction Related to Releases and Exculpation. | 73 |
|       | 10.10 | Subordinated Claims. | 73 |
|       | 10.11 | Retention of Causes of Action and Reservation of Rights. | 74 |
|       | 10.12 | Ipso Facto and Similar Provisions Ineffective. | 74 |

ARTICLE XI.   RETENTION OF JURISDICTION. ...... 74

|       | 11.1  | Retention of Jurisdiction. | 74 |

ARTICLE XII.   MISCELLANEOUS PROVISIONS. ...... 76

|       | 12.1  | Statutory Fees. | 76 |
|       | 12.2  | Exemption from Certain Transfer Taxes. | 76 |
|       | 12.3  | Request for Expedited Determination of Taxes. | 77 |
|       | 12.4  | Dates of Actions to Implement Plan. | 77 |

12.5   Amendments. ...........................................................................................77
12.6   Revocation or Withdrawal of Plan..............................................................77
12.7   Severability. .............................................................................................78
12.8   Governing Law. ........................................................................................78
12.9   Immediate Binding Effect..........................................................................78
12.10  Successors and Assigns.............................................................................78
12.11  Entire Agreement. ....................................................................................78
12.12  Computing Time. ......................................................................................79
12.13  Exhibits to Plan. .......................................................................................79
12.14  Notices. ....................................................................................................79
12.15  Reservation of Rights................................................................................82
12.16  Waiver or Estoppel. ..................................................................................82
12.17  Dissolution of Creditors' Committee..........................................................82

Each of NPC International, Inc.; NPC Restaurant Holdings I LLC; NPC Restaurant Holdings II LLC; NPC Holdings, Inc.; NPC International Holdings, LLC; NPC Restaurant Holdings, LLC; NPC Operating Company B, Inc.; and NPC Quality Burgers, Inc. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A below.

The Debtors shall pursue on a parallel path both the Reorganization Transaction and a Sale Transaction to the extent one or more Successful Bidders are designated in accordance with the Bidding Procedures. If the Sale Transaction is terminated, is no longer in full force and effect, is not consummated, or is not capable of being consummated, in each case, by the applicable outside sale date in accordance with the terms of the applicable Sale Transaction Documents, then the Debtors and Requisite Creditors shall seek to consummate the Reorganization Transaction in accordance with this Plan.  If the Sale Transaction is consummated, the Sale Proceeds therefrom shall be distributed in accordance with this Plan.

For the avoidance of doubt, notwithstanding anything to the contrary herein, the Debtors are at this time seeking confirmation of this Plan *solely* with respect to the Sale Transaction with the Successful Bidders and in the event the Debtors seek confirmation of this Plan with respect to the Reorganization Transaction, the Debtors will seek separate Court approval and all parties in interests' rights with respect to the Reorganization Transaction are reserved.  This Plan is consistent with the Restructuring Support Agreement, and all Consenting Creditors shall be bound to support the Plan in accordance with the Restructuring Support Agreement.

## ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### A.        Definitions.

The following terms shall have the respective meanings specified below:

*1.1*        "***1L/2L Intercreditor Agreement***" means that certain First Lien/Second Lien Intercreditor Agreement, dated as of April 20, 2017 (as supplemented by that certain Representative Supplement No. 1, dated as of January 21, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among NPC RH, the Debtor Borrowers, the Prepetition 1L Agent, and the Prepetition 2L Agent, among others.

*1.2*        "***Ad Hoc Priority/1L Group***" means the ad hoc group of Consenting Creditors represented by the Consenting Creditor Advisors.

*1.3*        "***Adequate Protection Claim***" means, subject to the Carve-Out (as defined in the Cash Collateral Order), any right to payment constituting a superpriority Administrative Expense Claim against each of the Debtors on a joint and several basis with priority over any and all other Administrative Expense Claims against the Debtors now existing or hereafter arising in the Chapter 11 Cases granted pursuant to the Cash Collateral Order.

*1.4*        "***Administrative Expense Claim***" means any Claim, other than a Driver Claimant Admin Claim, for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) Adequate Protection Claims, (iii) Fee Claims, and (iv) Restructuring Expenses.

**1.5**     *"Administrative Expense Claims Bar Date"* means forty-five (45) days from the date of the filing of notice of the Effective Date as the deadline to file Administrative Expense Claims and Driver Claimant Admin Claims in these Chapter 11 Cases.

**1.6**     *"Affiliate"* means any "affiliate" as defined in section 101(2) of the Bankruptcy Code.

**1.7**     *"Agents"* means, collectively, the Prepetition Priority/1L Agents and the Prepetition 2L Agents.

**1.8**     *"Allowed"* means, with respect to any Claim against or Interest in a Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan, or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under this Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; *provided*, *that*, notwithstanding the foregoing, the Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to this Plan.

**1.9**     *"Amended/New Organizational Documents"* means, with respect to the Reorganization Transaction, the forms of certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, and the operating agreements or other similar organizational or formation documents, as applicable, of the Reorganized Debtors, which shall in each case be in form and substance acceptable to the Requisite Creditors and otherwise consistent with the Restructuring Support Agreement.

**1.10**     *"Asset"* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

**1.11**     *"Assumption Dispute"* means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of an executory contract or unexpired lease.

**1.12**     *"Avoidance Actions"* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and applicable non-bankruptcy law.

**1.13**     *"Backstop Commitment"* shall have the meaning ascribed to such term in the Backstop Commitment Agreement.

**1.14**     *"Backstop Commitment Agreement"* means that certain backstop commitment agreement, dated as of September 30, 2020, by and among the Debtors and the Backstop Parties (as may be amended, restated, or supplemented from time to time), which shall be consistent in all respect with the Restructuring Support Agreement.

**1.15**     *"Backstop Parties"* means the Consenting Creditors that are signatories to the Backstop Commitment Agreement.

**1.16**     *"Backstop Put Premium"* shall have the meaning ascribed to such term in the Backstop Commitment Agreement.

**1.17** **"Ballot"** means a ballot providing for the acceptance or rejection of this Plan and to make an election with respect to the releases by holders of Claims and Interests provided by <u>Section 10.7</u> of this Plan.

**1.18** **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**1.19** **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**1.20** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**1.21** **"Benefit Plans"** means each (i) "employee benefit plan," as defined in section 3(3) of ERISA and (ii) all other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests or consideration based on the value of Interests, in the Debtors.

**1.22** **"Bidding Procedures"** means the procedures governing the PH Sale Process, the Wendy's Sale Process, and WholeCo Sale Process, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise in accordance with the Restructuring Support Agreement.

**1.23** **"Business Day"** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**1.24** **"Cash"** means legal tender of the United States of America.

**1.25** **"Cash Collateral Order"** means, together, the interim and final orders entered by the Bankruptcy Court [Docket Nos. 112 and 373] authorizing the Debtors' use of cash collateral during the Chapter 11 Cases.

**1.26** **"Cash Management Order"** means, together, the interim and final orders entered by the Bankruptcy Court [Docket Nos. 106 and 367] granting the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue (A) Using Existing Cash Management System, Bank Accounts, and Business Forms and (B) Funding Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief* [Docket No. 8].

**1.27** **"Cause of Action"** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in

contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

*1.28* ***"Chapter 11 Case"*** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*1.29* ***"Claim"*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

*1.30* ***"Claims and Noticing Agent"*** means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*1.31* ***"Claims Objection Deadline"*** means the deadline for objecting to a Claim, which shall be on the date that is the later of (i) one-hundred and eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, Plan Administrator, or the GUC Trustee (solely with respect to the General Unsecured Claims) filed before the day that is one-hundred and eighty (180) days after the Effective Date.

*1.32* ***"Claims Register"*** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*1.33* ***"Class"*** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*1.34* ***"Class A GUC Trust Beneficiaries"*** means the holders of Allowed General Unsecured Claims that are not First Lien Deficiency Claims or Second Lien Deficiency Claims.

*1.35* ***"Class A GUC Trust Interests"*** means the non-certificated and non-transferable beneficial interests in the GUC Trust to be distributed on a Pro Rata basis to holders of Allowed General Unsecured Claims that are not First Lien Deficiency Claims or Second Lien Deficiency Claims which shall entitle each such holder to its Pro Rata share, after deducting the expenses of the GUC Trust, of (i) the UCC Settlement Amount, and (ii) the proceeds, if any, from the GUC Trust Causes of Action.

*1.36* ***"Class B GUC Trust Beneficiaries"*** means the holders of Allowed Second Lien Deficiency Claims that are not Crossholder Claim Holders.

*1.37* ***"Class B GUC Trust Interests"*** means the non-certificated and non-transferable beneficial interests in the GUC Trust to be distributed in accordance with <u>Section 6.8(b)</u> of this Plan on a Pro Rata basis to holders of Allowed Second Lien Deficiency Claims that are not Crossholder Claim Holders which shall entitle such holder to its Pro Rata share, after deducting the expenses of the GUC Trust, of the proceeds, if any, from the GUC Trust Causes of Action.

*1.38* ***"Closing Date(s)"*** mean the date(s) of consummation of the Sale Transaction contemplated in this Plan to the Successful Bidders.

1.39     *"Collins* **Action***"* means the prepetition lawsuit filed by certain members of the Driver Claimants Group in the United States District Court for the Southern District of Illinois, titled *Collins et al. v. NPC International, Inc.*, 3:17-cv-00312-NJR-RJD (S.D. Ill.).

1.40     *"Confirmation Date"* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.41     *"Confirmation Hearing"* means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.42     *"Confirmation Order"* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Requisite Creditors and otherwise consistent with the Restructuring Support Agreement.

1.43     *"Consenting Creditors"* means the Consenting First Lien Lenders, Consenting Priority Lenders, and Consenting Second Lien Lenders.

1.44     *"Consenting Creditor Advisors"* means (i) Consenting Creditor Counsel, (ii) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting First Lien Lenders and Consenting Priority Lenders, (iii) The Cypress Group, as QSR advisor to the Consenting First Lien Lenders and Consenting Priority Lenders, (iv) Beyond Development Group, as QSR development advisor to the Consenting First Lien Lenders and Consenting Priority Lenders; and (v) Trinity Capital (a division of Citizens Capital Markets).

1.45     *"Consenting First Lien Lenders"* means the First Lien Lenders party to the Restructuring Support Agreement and any other First Lien Lender that subsequently becomes a party to the Restructuring Support Agreement in accordance with the terms thereof.

1.46     *"Consenting Priority Lenders"* means the Priority Lenders party to the Restructuring Support Agreement and any other Priority Lenders that subsequently becomes a party to the Restructuring Support Agreement in accordance with the terms thereof.

1.47     *"Consenting Creditor Counsel"* means Gibson, Dunn & Crutcher LLP, as counsel and Jackson Walker LLP, as local counsel to the Ad Hoc Priority/1L Group.

1.48     *"Consenting Second Lien Advisors"* means Milbank LLP, as counsel to the ad hoc group of Second Lien Lenders, and Ducera Partners LLC, as financial advisors to the ad hoc group of Second Lien Lenders.

1.49     *"Consenting Second Lien Lenders"* means the Second Lien Lenders party to the Restructuring Support Agreement and any other Second Lien Lender that subsequently becomes a party to the Restructuring Support Agreement in accordance with the terms thereof.

1.50     *"Covered Persons"* means all current and former directors, officers, employees, managing agents, and professionals and their respective affiliates of the Debtors, whenever serving.

1.51     *"Creditors' Committee"* means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be constituted from time to time [Docket No. 193].

*1.52* *"Crossholder Claim"* means any Second Lien Secured Claim and any Second Lien Deficiency Claim held by a Consenting Creditor under the Restructuring Support Agreement that is also a First Lien Lender or Priority Lender.

*1.53* *"Crossholder Claim Holder"* means a holder of a Crossholder Claim.

*1.54* *"Cure Amount"* means the payment of Cash or the distribution of other property (as the Debtors or the Reorganized Debtors, as applicable (subject to the consent of the Requisite Creditors), or, in the event of a Sale Transaction, the applicable Successful Bidder, and the counterparty to an executory contract or unexpired lease of the Debtors may agree or the Bankruptcy Court may order) necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*1.55* *"Cure Notice"* means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease of the Debtors that may be assumed under this Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be subject to the consent of the Requisite Creditors and shall include (a) procedures for objecting to proposed assumptions of executory contracts and unexpired leases, (b) any Cure Amount to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

*1.56* *"D&O Policy"* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

*1.57* *"DBTCA"* means Deutsche Bank Trust Company Americas.

*1.58* *"Debtor(s)"* has the meaning set forth in the introductory paragraph of this Plan.

*1.59* *"Debtor Borrowers"* means NPCI, NPC QB, and NPC Operating Company B, Inc.

*1.60* *"Debtor in Possession"* means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*1.61* *"Definitive Documents"* means the documents (including any related agreements, instruments, schedules, or exhibits) that are necessary to implement the Reorganization Transaction or the Sale Transaction, as applicable, including, but not limited to:  (i) the Restructuring Support Agreement, (ii) the Cash Collateral Order, (iii) the Solicitation materials, (iv) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, (v) this Plan (including the Plan Supplement and all material documents, annexes, schedules, exhibits, amendments, modifications or supplements thereto, or other documents contained therein), (vi) the Disclosure Statement Order and any pleadings in support of entry of the Disclosure Statement Order, (vii) the Backstop Commitment Agreement and the documents relating to the Backstop Commitment Agreement (including a motion seek approval of the Backstop Commitment Agreement), (viii) the Rights Offering Procedures and the documents relating to the Rights Offering (including a motion seek approval of the Rights Offering), (ix) the Rights Offering Procedures Order, (x) the Sale Documents, (xi) the Confirmation Order and any pleadings in support of entry of the Confirmation Order, (xii) the New QB First Lien Term Loan Credit Documents, if any, (xiii) the Amended/New Organizational Documents, (xiv) any and all conveyance instruments required to issue and distribute the Reorganized Equity Interests, (xv) the New Warrant Agreement, and (xvi) any order, or amendment or modification of any order, entered by the Bankruptcy Court related to the foregoing items; which shall in each case be in form and substance acceptable to the Requisite Creditors and the Requisite

6

Second Lien Lenders (solely to the extent provided in the Restructuring Support Agreement) and otherwise consistent in all respects with the Restructuring Support Agreement.

**1.62** *"Disbursing Agent"* means (i) solely with respect to the Reorganization Transaction, the Reorganized Debtors; and (ii) solely with respect to the Sale Transaction, the Plan Administrator and the GUC Trustee (solely with respect to the GUC Trust Assets), or any Person engaged by the Wind Down Co, Plan Administrator, the GUC Trust, or the GUC Trustee.

**1.63** *"Disclosure Statement"* means the Disclosure Statement for this Plan, which shall be in form and substance acceptable to the Requisite Creditors, as supplemented from time to time (and any changes thereto shall be reasonably acceptable to the Requisite Creditors), which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**1.64** *"Disclosure Statement Order"* means the order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation materials and procedures, and the Solicitation of this Plan, which shall be in form and substance acceptable to the Requisite Creditors.

**1.65** *"Disputed"* means, with respect to a Claim, (i) any Claim, which Claim is disputed under Section 7.1 of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (iv) any Claim that is otherwise disputed by any of the Debtors, the Reorganized Debtors, the Plan Administrator (on behalf of the Wind Down Co), or the GUC Trustee (on behalf of the GUC Trust) in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, do not dispute, if any, and Disputed as to the balance of such Claim.

**1.66** *"Distribution Record Date"* means, except as otherwise provided in this Plan, the Effective Date.

**1.67** *"Driver Claimant"* means a delivery driver who was employed by the Debtors in the PH Business after (i) January 1, 2014 or (ii) January 1, 2007 solely in the States of Illinois, Kentucky, Oklahoma, Oregon, or Florida.

**1.68** *"Driver Claimant 7023 Motion"* means the *Motion for Driver Class Claimants for leave to File Class Proofs of Claim* filed by the Driver Claimants Group on August 25, 2020 [Docket No. 507].

**1.69** *"Driver Claimant Admin Cap"* means $1,200,000 in the aggregate held in the Driver Claimants Recovery Reserve.

**1.70** *"Driver Claimant Admin Claim"* means a Driver Reimbursement Claim arising during the period commencing on the Petition Date and terminating on the Effective Date that is timely filed by a Driver Claimant no later than the Administrative Expense Claims Bar Date, and which is solely in respect of costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), or 507(a)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses of preserving the Estates

and operating the Debtors' businesses incurred during the period commencing on the Petition Date and terminating on the Effective Date.

**1.71** **"Driver Claimants Certified Class"** means the class of Driver Claimants (including, for the avoidance of doubt, the Driver Claimants Group and Driver Claimants Settlement Participants) that is deemed certified hereunder pursuant to Rule 7023 of the Bankruptcy Code and Rule 23 of the Federal Rule of Civil Procedure pursuant to the Driver Claimants 7023 Motion, solely for purposes of implementing the Driver Claimants Settlement and no other purpose.

**1.72** **"Driver Claimant Admin/Priority Claims"** means collectively, the Driver Claimant Admin Claims, the Driver Claimant Priority T1 Claims, and the Driver Claimant Priority T2 Claims.

**1.73** **"Driver Claimant General Unsecured Claims"** means, collectively, the Driver Claimants Group General Unsecured Claims and the Driver Claimants Settlement Participant General Unsecured Claims, if any, which amount shall be reconciled by the Debtors or the Plan Administrator, as applicable.

**1.74** **"Driver Claimants Group"** means the group comprised of Driver Claimants who (i) are represented by the Driver Claimants Group Counsel and (ii) filed timely Proofs of Claim, in each case, in these Chapter 11 Cases.

**1.75** **"Driver Claimants Group Counsel"** means collectively, Keller Lenkner LLC, Morgan & Morgan PA, Stevens & Lee, P.C., and Finkelstein, Blankship, Frei-Pearson & Garber, LLP.

**1.76** **"Driver Claimants Group Counsel Settlement Fee Amount"** means $2,250,000 on account of fees and expenses incurred by the Driver Claimants Group Counsel.

**1.77** **"Driver Claimants Group General Unsecured Claim"** means a General Unsecured Claim held by a member of the Driver Claimants Group, calculated as set forth in Section 5.2(c) of this Plan.

**1.78** **"Driver Claimants GUC Cap"** means in the aggregate $5,000,000.

**1.79** **"Driver Claimant Priority T1 Cap"** means $1,450,000 in the aggregate held in the Driver Claimants Recovery Reserve, *plus* any amounts remaining under the Driver Claimant Admin Cap after all Allowed Driver Claimant Admin Claims are paid in accordance with the Plan, if any.

**1.80** **"Driver Claimant Priority T1 Claim"** means a Driver Reimbursement Claim, other than a Driver Claimant Admin Claim, held by a member of the Driver Claimant Group, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code (solely as a result of the Driver Claimants Settlement).

**1.81** **"Driver Claimant Priority T2 Cap"** means $1,150,000 in the aggregate held in the Driver Claimants Recovery Reserve, *plus* any amounts remaining under (i) the Driver Claimant Admin Cap after all Allowed Driver Claimant Admin Claims are paid in accordance with Plan and (ii) Driver Claimant Priority T1 Cap after all Allowed Driver Claimant Priority T1 Claims are paid in accordance with Plan, if any.

**1.82** **"Driver Claimant Priority T2 Claim"** means a Driver Reimbursement Claim, other than a Driver Claimant Admin Claim, held by a Driver Claimants Settlement Participant, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code (solely as a result of the Driver Claimants Settlement).

**1.83** *"Driver Claimants Recovery Reserve"* means amounts, held on account of applicable Driver Claimants, up to the Driver Claimant Admin Cap, the Driver Claimant Priority T1 Cap, and the Driver Claimant Priority T2 Cap, collectively, held by the Debtors or the Wind Down Co, as applicable, to be distributed in accordance with this Plan and the Driver Claimants Settlement.

**1.84** *"Driver Claimants Settlement"* shall have the meaning ascribed to such term in Section 5.2(c) of this Plan.

**1.85** *"Driver Claimants Settlement Participant"* means a Driver Claimant, excluding the Driver Claimants Group, who submits a timely executed Driver Claimants Settlement Distribution Form by the Driver Claimants Settlement Distribution Form Submission Deadline in accordance with the instructions set forth in the Settlement Distribution Form.

**1.86** *"Driver Claimants Settlement Participant General Unsecured Claim"* means a General Unsecured Claim held by a Driver Claimants Settlement Participant calculated as set forth in Section 5.2(c) of this Plan.

**1.87** *"Driver Claimants Settlement Distribution Form"* means the form and accompanying notice, in a form to be reasonably agreed upon by the Debtors and the Driver Claimants Group Counsel and approved by the Bankruptcy Court, to be sent by the Debtors or the Plan Administrator, as applicable, to the members of the Driver Claimants Certified Class, allowing such members to (i) submit sufficient information to allow for distribution of amounts under this Plan pursuant to the Driver Claimants Settlement, or (ii) decline to participate in the Driver Claimants Settlement, including opting out of the third party releases in Section 10.7(c) of this Plan. Such form and notice shall include a summary of the material terms of the Driver Claimants Settlement, including the hypothetical mileage reimbursement rate agreed to pursuant to the Driver Claimants Settlement, the treatment of the Driver Claimants Settlement Participants as provided in Sections 1.82, 2.1(b), and 4.4 of this Plan, and the releases that Driver Claimants would be providing under Section 10.7(c) of this Plan if the Driver Claimant participates in the Driver Claimants Settlement. For the avoidance of doubt, any Driver Claimant who affirmatively declines to participate in the Driver Claimants Settlement shall not be deemed to hold any allowed Driver Reimbursement Claims under this Plan and will receive no consideration pursuant to the Driver Claimants Settlement.

**1.88** *"Driver Claimants Settlement Distribution Form Deadline"* means a date set by the Debtors not less than one hundred and twenty (120) days from the date of service of the Driver Claimants Settlement Distribution Form.

**1.89** *"Driver Reimbursement Claim"* means an Allowed Claim held by a Driver Claimant only for the purposes of receiving Plan Distributions under this Plan pursuant to the Driver Claimants Settlement.

**1.90** *"DTC"* means The Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**1.91** *"Effective Date"* means the date which is the first Business Day on which (i) all conditions to the effectiveness of this Plan set forth in Section 9.2 of this Plan have been satisfied or waived in accordance with the terms of this Plan, (ii) no stay of the Confirmation Order is in effect, and (iii) the substantial consummation of this Plan occurs pursuant to 11 U.S.C. § 1101(2).

**1.92** *"Employee Arrangements"* means all employment and severance arrangements, programs, and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans,

incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.  For the avoidance of doubt, the Deferred Comp Plans (as defined in the *Declaration of Eric Koza in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 4]) and the Management Incentive Plan are not Employee Arrangements.

**1.93** **"*Entity*"** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

**1.94** **"*Estate(s)*"** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**1.95** **"*Estimation Motion*"** means the *Debtors' (I) Emergency Motion to Establish Scheduling and Estimation Protocol and (II) Motion to Estimate the Driver Claimants' Claims* filed on October 28, 2020 [Docket No. 912].

**1.96** **"*Exchange Act*"** means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

**1.97** **"*Exculpated Fiduciaries*"** means, collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Creditors' Committee and each of its members in their capacity as such, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' Related Persons and their respective heirs, executors, estates, and nominees, in each case in their capacity as such.

**1.98** **"*Exculpated Parties*"** means, collectively, the (i) Exculpated Fiduciaries the (ii) Section 1125(e) Parties, and (iii) the Successful Bidders and their Related Persons.

**1.99** **"*Existing Equity Interests*"** means any interest in a Debtor held by a non-Debtor, including any common stock, preferred stock, warrants, or other ownership interest.

**1.100** **"*Fee Claim*"** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

**1.101** **"*Fee Escrow Account*"** means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on or before the Effective Date.

**1.102** **"*Final Order*"** means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that:  (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, *however,* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

**1.103** **"*First Lien Credit Agreement*"** means that certain First Lien Credit Agreement, dated as of April 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among the Debtor Borrowers, NPC RH, as guarantor, the Prepetition 1L Agent, the Prepetition 1L Collateral Agent, and the First Lien Lenders.

**1.104** **"First Lien Credit Documents"** means the "Credit Documents" as defined in the First Lien Credit Agreement.

**1.105** **"First Lien Credit Agreement Secured Parties"** means, collectively, the First Lien Lenders, the Prepetition 1L Agent, the Prepetition 1L Collateral Agent, and the Hedge Banks (as defined in the First Lien Credit Agreement), and with respect to each of the foregoing Entities, solely as to the release, exculpation, and injunction provisions of this Plan or to the extent such obligations otherwise exists under the First Lien Credit Documents, such Persons' Related Persons, and their respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

**1.106** **"First Lien Deficiency Claims"** means all Claims arising from the First Lien Credit Documents and all documents related thereto that are not Secured Claims, if any.

**1.107** **"First Lien Intercreditor Agreement"** means that certain First Lien Intercreditor Agreement, dated January 21, 2020 (as amended, restated, amended and restated, supplemented, or modified from time to time), by and among NPC RH, the Debtor Borrowers, the Prepetition Priority Agent, the Prepetition 1L Agent, and the Prepetition 1L Collateral Agent, among others.

**1.108** **"First Lien Lenders"** means the lenders from time to time party to the First Lien Credit Agreement, as lenders thereunder.

**1.109** **"First Lien Secured Claims"** means all Secured Claims of the First Lien Credit Agreement Secured Parties arising under or in connection with the First Lien Credit Documents and all documents related thereto.

**1.110** **"Franchise Document"** means any franchise agreement or other document or agreement to which a Debtor is a party with the Wendy's Franchisor or Pizza Hut Franchisor.

**1.111** **"General Unsecured Claim"** means any general unsecured Claim, including any First Lien Deficiency Claim, any Second Lien Deficiency Claim, and any Driver Claimant General Unsecured Claim (up to the Driver Claimants GUC Cap), against the Debtors that is not (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) an Other Priority Claim, (iv) a Fee Claim, (v) a Priority Term Loan Secured Claim, (vi) an Other Secured Claim, (vii) a First Lien Secured Claim, (viii) a Second Lien Secured Claim, if any, (ix) an Intercompany Claim, (x) a Subordinated Claim, (xi) a Driver Claimant Admin Claim, (xii) a Driver Claimant Priority T1 Claim, (xiii) a Driver Claimant Priority T2 Claim, or (xiv) a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code.

**1.112** **"Governmental Entity"** means U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

**1.113** **"GUC Trust"** means the trust established pursuant to the GUC Trust Agreement.

**1.114** **"GUC Trust Agreement"** means the agreement by and among the Debtors and the GUC Trustee, substantially in the form included in the Plan Supplement and consistent with Section 5.2(b) of the Plan, which shall govern, among other things, the administration and distribution of the GUC Trust Assets; provided, that the GUC Trust Agreement shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, and the Requisite Creditors.

*1.115* *"GUC Trust Assets"* shall, pursuant to the UCC Settlement, consist of (i) the GUC Trust Causes of Action and any proceeds from the GUC Trust Causes of Action, (ii) the Sale Proceeds in the form of Cash in the amount of $3,000,000, which constitutes proceeds of the collateral securing the Priority Term Loan Secured Claims and First Lien Secured Claims, and (iii) the GUC Trust Reserve.

*1.116* *"GUC Trust Beneficiaries"* means collectively, the Class A GUC Trust Beneficiaries and the Class B GUC Trust Beneficiaries.

*1.117* *"GUC Trust Causes of Action"* means all (i) Retained Causes of Action of the Debtors, including, without limitation, Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, and all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, and commercial tort law and (ii) rights of the Debtors or their Estates with respect to General Unsecured Claims filed in these Chapter 11 Cases; *provided*, however, that notwithstanding anything else contained in this Plan, the following shall not be included in GUC Trust Causes of Action: Causes of Action against any (i) Released Party that is released pursuant to this Plan; (ii) counterparties to executory contracts and unexpired leases that are assumed and assigned to the Successful Bidders pursuant to the Sale Transaction; and (iii) third party vendors providing services or goods to the Successful Bidders in the ordinary course of business, a list of which shall be provided to the Creditors' Committee or GUC Trustee, as applicable, within a certain number of days to be agreed to by the Debtors and the Creditors' Committee from the Closing Date(s) of the Sale Transaction, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person. For the avoidance of doubt, GUC Trust Causes of Action shall not include any right, Claim, or Cause of Action that is to be transferred or assigned to the Successful Bidders under the terms of the Sale Documents.

*1.118* *"GUC Trust Interests"* means collectively, the Class A GUC Trust Interests and Class B GUC Trust Interests.

*1.119* *"GUC Trust Reserve"* means $500,000 solely for the funding of the administration of the GUC Trust, which amount shall be transferred to the GUC Trust on the Effective Date.

*1.120* *"GUC Trustee"* means the Person selected by the Creditors' Committee to serve as the trustee of the GUC Trust, and any successor thereto in accordance with the GUC Trust Agreement.

*1.121* *"Impaired"* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*1.122* *"Indemnification Obligation"* means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

*1.123* *"Intercompany Claim"* means any pre- or postpetition Claim against a Debtor held by another Debtor.

*1.124*   *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

*1.125*   *"Intercreditor Agreements"* means, collectively, the (i) First Lien Intercreditor Agreement and (ii) 1L/2L Intercreditor Agreement.

*1.126*   *"Interest"* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards.

*1.127*   *"IRS"* means the Internal Revenue Service.

*1.128*   *"KKR"* means KKR Loan Administration Services LLC.

*1.129*   *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.130*   *"Letters of Credit"* means the outstanding letters of credit issued pursuant to the First Lien Credit Agreement.

*1.131*   *"Management Incentive Plan"* means, solely with respect to the Reorganization Transaction, the equity incentive plan to be implemented pursuant to Section 5.6(b) of this Plan, the terms and conditions of which shall be determined by the New Board.

*1.132*   *"Marshall* **Action"** means the lawsuit filed by certain members of the Driver Claimants Group on September 23, 2020 in the United States District Court for the Western District of Missouri, titled *Marshall v. Weber et al.*, No. 4:20-cv-00757-NKL (W.D. Mo. Sept. 23, 2020).

*1.133*   *"McLane"* means McLane Foodservice, Inc.

*1.134*   *"MIP Equity"* means up to 10% of the Reorganized Equity Interests on a fully diluted basis issued in connection with the Management Incentive Plan to directors, officers, or other management and employees of the Reorganized Debtors, based on the terms and conditions of the Management Incentive Plan.

*1.135*   *"New Board"* means, solely with respect to the Reorganization Transaction, the new board of directors of New NPC Parent.

*1.136*   *"New NPC Parent"* means, solely with respect to the Reorganization Transaction, the direct or indirect parent entity holding (directly or indirectly) substantially all of the assets and/or stock of the Reorganized Debtors as of the Effective Date, in accordance with this Plan.

*1.137*   *"New QB First Lien Term Loan Facility"* means, solely to the extent a Wendy's Standalone Event occurs, the new first lien term loan credit facility to be entered into by Reorganized NPC QB.

*1.138    "New QB First Lien Term Loan Credit Agreement"* that certain credit agreement pursuant to which the New QB First Lien Term Loan Facility shall be provided, to be dated as of the Effective Date, by and among Reorganized NPC QB, as borrower, New NPC Parent, as guarantor, an administrative agent, a collateral agent, or other similar agents, solely in such Entity's capacity as such, the New QB First Lien Term Loan Lenders, and other parties thereto.

*1.139    "New QB First Lien Term Loan Credit Documents"* means, collectively, the New QB First Lien Term Loan Credit Agreement and all related amendments, supplements, agreements or ancillary agreements, assignments, notes, pledges, collateral agreements, loan and security agreements, guarantees, intercreditor agreements, instruments, mortgages or extension of mortgages, certificates, control agreements, insurance documents, opinions, deeds of trust, and other documents or instruments to be executed, delivered, or continued in force and effect in connection with the New QB First Lien Term Loan Credit Agreement.

*1.140    "New QB First Lien Term Loan Lenders"* means the holders of First Lien Secured Claims receiving the New QB First Lien Term Loan in accordance with Section 4.6 of this Plan that are party to the New QB First Lien Term Loan Credit Agreement as lenders thereunder as of the Effective Date.

*1.141    "New Shareholders Agreement"* means, solely with respect to the Reorganization Transaction, that certain shareholders agreement to be entered into by the New NPC Parent and the holders of the Reorganized Equity Interests and the Rights Offering Shares, which shall be in form and substance acceptable to the Requisite Creditors.

*1.142    "New Warrants"* means, solely with respect to the Reorganization Transaction, the new warrants to be issued under, and subject to the terms and conditions of, the New Warrant Agreement.

*1.143    "New Warrant Agreement"* means that certain warrant agreement to be entered into by the New NPC Parent and Second Lien Lenders, which shall be consistent with the New Warrant Term Sheet and in form substance acceptable to the Debtors, the Requisite Creditors, and the Requisite Second Lien Lenders.

*1.144    "New Warrant Term Sheet"* means that certain new warrant term sheet attached to the RSA Amendment as Exhibit 1.

*1.145    "Notice of Successful Bids"* means the *Notice of Designation of Successful Bids* filed on January 7, 2021 [Docket No. 1366].

*1.146    "NPC QB"* means NPC Quality Burgers, Inc.

*1.147    "NPC RH"* means NPC Restaurant Holdings, LLC.

*1.148    "NPCI"* means NPC International, Inc.

*1.149    "Other Secured Claim"* means any Secured Claim against a Debtor other than a Priority Tax Claim, an Other Priority Claim, a Priority Term Loan Secured Claim, a First Lien Secured Claim, or a Second Lien Secured Claim, if any.  For the avoidance of doubt, First Lien Deficiency Claims and Second Lien Deficiency Claims are not Secured Claims or Other Secured Claims.

*1.150    "Other Priority Claim"* means any Claim other than an Administrative Expense Claim, an Adequate Protection Claim, a Fee Claim, a Priority Tax Claim, a Driver Claimant Admin Claim, a Driver

Claimant Priority T1 Claim, or a Driver Claimant Priority T2 Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*1.151*   *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code, including any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Entity, or other Entity.

*1.152*   *"Petition Date"* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*1.153*   *"PH Business"* means the Debtors' Pizza Hut business.

*1.154*   *"PH Franchisor"* means, together, Pizza Hut, LLC, or any affiliate of the foregoing Entity.

*1.155*   *"PH Sale Process"* means the auction and sale process of the Debtors' PH Business.

*1.156*   *"Plan"* means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

*1.157*   *"Plan Administrator"* means, solely in the event the Sale Transaction is consummated, Redan Advisors LLC solely in its capacity as Plan Administrator, or any successor appointed in accordance with the Wind Down Co Organizational Documents.

*1.158*   *"Plan Distribution"* means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

*1.159*   *"Plan Supplement"* means a supplement or supplements to this Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of this Plan, to be filed with the Bankruptcy Court no later than December 4, 2020, as amended, modified or supplemented from time to time in accordance with the terms hereof and the terms of the Restructuring Support Agreement and in accordance with the Bankruptcy Code and the Bankruptcy Rules, which shall include, but not be limited to (i) the Amended/New Organizational Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the New QB First Lien Term Loan Credit Documents, if applicable, (v) the Schedule of Retained Causes of Action, (vi) the Schedule of Assumed Contracts, (vii) the New Shareholders Agreement, (viii) the Wind Down Co Organization Documents (if applicable), (ix) the Wind Down Budget (if applicable), (x) the New Warrant Agreement, (xi) the GUC Trust Agreement, and (xii) the identity of the GUC Trustee, in each case which shall be in form and substance acceptable to the Requisite Creditors and the Requisite Second Lien Lenders (solely to the extent provided in the Restructuring Support Agreement), and otherwise consistent with the Restructuring Support Agreement and the UCC Settlement.

*1.160*   *"Prepetition 1L Agent"* means KKR, as administrative agent, solely in its capacity as administrative agent under the First Lien Credit Agreement.

*1.161*   *"Prepetition 1L Collateral Agent"* means DBTCA, as collateral agent, solely in its capacity as collateral agent under the Priority Term Loan Credit Agreement.

15

*1.162* ***"Prepetition 2L Agent"*** means Wilmington Savings Fund Society, FSB, as administrative agent, solely in its capacity as administrative agent under the Second Lien Credit Agreement.

*1.163* ***"Prepetition 2L Agents"*** means the Prepetition 2L Agent and the Prepetition 2L Collateral Agent.

*1.164* ***"Prepetition 2L Collateral Agent"*** means DBTCA, as collateral agent, solely in its capacity as collateral agent under the Second Lien Credit Agreement.

*1.165* ***"Prepetition Priority Agent"*** means KKR, as administrative agent, solely in its capacity as administrative agent under the Priority Term Loan Credit Agreement.

*1.166* ***"Prepetition Priority/1L Adequate Protection Liens"*** shall have the meaning ascribed to such term in the Cash Collateral Order.

*1.167* ***"Prepetition Priority/1L Agents"*** means, collectively, the Prepetition Priority Agent, the Prepetition Priority Collateral Agent, the Prepetition 1L Agent, and the Prepetition 1L Collateral Agent.

*1.168* ***"Prepetition Priority Collateral Agent"*** means DBTCA, as collateral agent, solely in its capacity as collateral agent under the Priority Term Loan Credit Agreement.

*1.169* ***"Priority Tax Claim"*** means any Secured Claim or unsecured Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*1.170* ***"Priority Term Loan Credit Agreement"*** means that certain Super-Priority Term Loan Credit Agreement, dated as of January 21, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by among the Debtor Borrowers, NPC RH, as guarantor, the Prepetition Priority Agent, the Prepetition Priority Collateral Agent, and the Priority Lenders.

*1.171* ***"Priority Term Loan Credit Documents"*** means the "Credit Documents" as defined in the Priority Term Loan Credit Agreement.

*1.172* ***"Priority Term Loan Credit Agreement Secured Parties"*** means, collectively, the Priority Lenders, the Prepetition Priority Agent, and the Prepetition Priority Collateral Agent, and with respect to each of the foregoing Entities, solely as to the release, exculpation, and injunction provisions of this Plan or to the extent such obligations otherwise exists under the Priority Term Loan Credit Documents, such Persons' Related Persons, and their respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

*1.173* ***"Priority Term Loan Secured Claims"*** means all Secured Claims of the Priority Term Loan Credit Agreement Secured Parties arising under or in connection with the Priority Term Loan Credit Documents and all documents related thereto.

*1.174* ***"Priority Lenders"*** means the lenders from time to time party to the Priority Term Loan Credit Agreement, as lenders thereunder.

*1.175* ***"Pro Rata"*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

*1.176* **"Professional Person"** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.  For the avoidance of doubt, the Consenting Creditor Advisors are not Professional Persons.

*1.177* **"Proof of Claim"** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*1.178* **"Purchase Agreements"** means (i) that certain *Amended and Restated Purchase Agreement* by and between the Debtors and the Stalking Horse Purchaser, dated as of January 7, 2021, and (ii) that certain *Purchase Agreement* by and between the Debtors and the Wendy's Purchaser, dated as of January 7, 2021.

*1.179* **"Related Parties"** means with respect to a Person, that Person's current and former Affiliates, and such Persons' and their current and former Affiliates' predecessors, successors, assigns, and current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investment vehicles, and Representatives.

*1.180* **"Released Parties"** means, collectively, each in their respective capacities as such, (i) the Debtors, (ii) the Reorganized Debtors (if applicable), (iii) the Wind Down Co and Plan Administrator, (iv) Priority Lenders, First Lien Lenders, and Second Lien Lenders, in each case, which comprise Consenting Creditors, (v) the Sponsors, (vi) the Agents, (vii) the Creditors Committee and each of its members in their capacity as such, (viii) in the event of a consummated Sale Transaction, the Successful Bidders, (ix) the GUC Trust and GUC Trustee, and (x) with respect to each of the foregoing Persons, in clauses (i) through (ix), all Related Parties.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in Section 10.7(b) of this Plan shall not be deemed a Released Party thereunder.

*1.181* **"Releasing Parties"** means, collectively, each in their respective capacities as such, (i) the holders of all Claims or Interests that vote to accept this Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject this Plan is solicited but that do not vote either to accept or to reject this Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject this Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (v) the Released Parties.

*1.182* **"Reorganization Transaction"** means, in the event the Sale Transaction is not consummated, collectively, (i) issuance of the Reorganized Equity Interests and New Warrants; (ii) entry into the New QB First Lien Term Loan Credit Documents, if applicable; (iii) execution of the Amended/New Organizational Documents; (iv) issuance of Rights Offering Shares (including as payment of the Backstop Put Premium); (v) vesting of the Debtors' Assets, as applicable, in the Reorganized Debtors, in each case, in accordance with this Plan; and (vi) the other transactions contemplated by the Plan or the Restructuring Support Agreement or that the Debtors and the Requisite Creditors reasonably determine are necessary or appropriate to implement any of the foregoing, in each case, in accordance with this Plan and the Restructuring Support Agreement.

*1.183* **"Reorganized Debtors"** means the Debtors, or any successor(s) thereto, by merger, consolidation, acquisition of assets, or otherwise, as reorganized as of the Effective Date in accordance with this Plan.

**1.184** **"Reorganized Equity Interests"** means, solely with respect to the Reorganization Transaction, common shares of New NPC Parent to be issued (i) on the Effective Date, (ii) upon implementation of the Management Incentive Plan, and/or (iii) as otherwise permitted pursuant to this Plan.

**1.185** **"Reorganized NPC QB"** means, solely to the extent the Wendy's Standalone Event occurs, NPC QB or any successor(s) thereto, by merger, consolidation, acquisition of assets, or otherwise, as reorganized on the Effective Date in accordance with this Plan.

**1.186** **"Reorganized NPCI"** means, solely with respect to the Reorganization Transaction, NPCI, or any successor(s) thereto, by merger, consolidation, acquisition of assets, or otherwise, as reorganized on the Effective Date in accordance with this Plan.

**1.187** **"Representative"** means any Persons' attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, agents, Affiliates, fund advisors, investment managers, investment advisors, sub-advisors, and sub-managers, service providers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**1.188** **"Required First Lien Lenders"** shall have the meaning ascribed to the term "Required Lenders" in the First Lien Credit Agreement.

**1.189** **"Requisite Creditors"** means, (i) Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding under the First Lien Credit Agreement held by all Consenting First Lien Lenders (including any First Lien Secured Claims subject to an assignment pending settlement to which such Consenting First Lien Lender is the assignee thereunder), and (ii) Consenting Priority Lenders holding at least a majority of the aggregate principal amount outstanding under the Priority Term Loan Credit Agreement held by all Consenting Priority Lenders (including any Priority Term Loan Secured Claims subject to an assignment pending settlement to which such Consenting Priority Lender is the assignee thereunder).

**1.190** **"Requisite Second Lien Lenders"** has the meaning set forth in the RSA Amendment.

**1.191** **"Restructuring"** has the meaning set forth in the Restructuring Support Agreement.

**1.192** **"Restructuring Expenses"** means (i) the reasonable and documented fees and out-of-pocket expenses incurred by the Consenting Creditor Advisors in connection with the Restructuring, whether incurred before, on, or after the Petition Date, as provided by the Restructuring Support Agreement, payable in accordance with the terms of the applicable fee letters executed with such parties, and any applicable law or orders of the Bankruptcy Court, and any fees and expenses required to be paid pursuant to the terms of the Cash Collateral Order, and (ii) (x) $1 million on account of reasonable and documented fees and out-of-pocket expenses incurred by the Consenting Second Lien Advisors in connection with the Restructuring, and (y) the reasonable and documented fees and out-of-pocket expenses incurred by the Prepetition 2L Agents and their advisors in connection with the Restructuring, as provided by the Restructuring Support Agreement.

**1.193** **"Restructuring Support Agreement"** means that certain Restructuring Support Agreement, as amended by the RSA Amendment, and all exhibits thereto (including, without limitation, the Restructuring Term Sheet), dated as of July 1, 2020, by and among the Debtors and the Consenting

Creditors, as the same may be amended, restated, or otherwise modified in accordance with its terms, by and among the Debtors and the Requisite Creditors.

*1.194 "RSA Amendment"* means that certain Amendment No. 1 to the Restructuring Support Agreement and all exhibits thereto (including, without limitation, the New Warrant Term Sheet), dated as of October 29, 2020, by and among the Debtors and the Consenting Creditors, as the same may be amended, restated, or otherwise modified in accordance with its terms, by and among the Debtors, the Requisite Creditors, and the Requisite Second Lien Lenders.

*1.195 "Retained Causes of Action"* means the Causes of Action identified on the Schedule of Retained Causes of Action. For the avoidance of doubt, the Causes of Action released in Article X of this Plan are not Retained Causes of Action. For the avoidance of doubt, Retained Causes of Action shall not include any right, Claim, or Cause of Action that is to be transferred or assigned to the Successful Bidders under the terms of the Sale Documents.

*1.196 "Rights Offering"* means that certain offering of rights pursuant to the Rights Offering Procedures.

*1.197 "Rights Offering Procedures"* means, collectively, the procedures governing and for the implementation of the new money rights offering, as may be amended, modified, or supplemented in accordance with the Rights Offering Procedures Order, which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Creditors.

*1.198 "Rights Offering Procedures Order"* means the order of the Bankruptcy Court approving the Rights Offering Procedures and the Debtors' entry into the Backstop Commitment Agreement, which shall be in form and substance acceptable to the Requisite Creditors and otherwise consistent with the Restructuring Support Agreement.

*1.199 "Rights Offering Shares"* means, solely with respect to the Reorganization Transaction, the shares of convertible participating preferred stock issued by New NPC Parent and offered pursuant to the Rights Offering or arising from or related to the Backstop Commitment Agreement.

*1.200 "Sale Documents"* means, collectively, all agreements, documents, orders, and/or amendments in connection with the Sale Transaction, including the Bidding Procedures and the Sale Orders, which shall be in form and substance reasonably acceptable or acceptable to the Requisite Creditors as provided in the Restructuring Support Agreement.

*1.201 "Sale Orders"* mean the orders of the Bankruptcy Court approving the sale of all or substantially all of the Debtors' Assets to the Successful Bidders under sections 105, 363, and 365 of the Bankruptcy Code, which shall be in form and substance acceptable to the Requisite Creditors and the Successful Bidders and otherwise consistent with the Restructuring Support Agreement and the Purchase Agreements.

*1.202 "Sale Proceeds"* means the net proceeds of a Sale Transaction.

*1.203 "Sale Transaction"* means the sale of all or substantially all of the Debtors' Assets to the Successful Bidders.

*1.204 "Schedules"* means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

*1.205* **"Schedule of Assumed Contracts"** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time, which schedule shall be subject to the consent of the Requisite Creditors.

*1.206* **"Schedule of Retained Causes of Action"** means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, which schedule shall be included in the Plan Supplement; *provided that* in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party be retained.

*1.207* **"Second Lien Credit Agreement"** means that certain Second Lien Term Loan Credit Agreement, dated as of April 20, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among the Debtor Borrowers, NPC RH, as guarantor, the Prepetition 2L Agent, the Prepetition 2L Collateral Agent, and the Second Lien Lenders.

*1.208* **"Second Lien Credit Agreement Parties"** means, collectively, the Second Lien Lenders, the Prepetition 2L Agent, and the Prepetition 2L Collateral Agent.

*1.209* **"Second Lien Credit Documents"** means the "Credit Documents" as defined in the Second Lien Credit Agreement.

*1.210* **"Second Lien Deficiency Claims"** means all Claims arising from the Second Lien Credit Documents and all documents related thereto that are not Secured Claims, if any.

*1.211* **"Second Lien Lenders"** means the lenders from time to time party to the Second Lien Credit Agreement, as lenders thereunder.

*1.212* **"Second Lien Secured Claims"** means all Claims of the Second Lien Credit Agreement Parties arising under or in connection with the Second Lien Credit Documents and all documents related thereto.

*1.213* **"Second Lien Settlement"** means that certain settlement among the Debtors, the Consenting Creditors, and the Consenting Second Lien Lenders as set forth in the RSA Amendment and incorporated in this Plan.

*1.214* **"Section 1125(e) Parties"** means, collectively, (i) the Consenting Creditors, (ii) each of the Agents (solely in their capacity as such), and (iii) with respect to each of the foregoing Persons in clauses (i) and (ii), such Persons' Related Persons, and their respective heirs, executors, estates, and nominees, each in their capacity as such.

*1.215* **"Secured Claim"** means a Claim to the extent (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (i) set forth in this Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*1.216* **"Securities Act"** means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

*1.217* **"Security"** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

    ***1.218***   ***"Solicitation"*** means the solicitation of votes to accept or reject this Plan pursuant to, and in compliance with, the Bankruptcy Code.

    ***1.219***   ***"Sponsor"*** means, collectively, Delaware Life Holdings Parent II, LLC, WPH Holdings II Parent LLC, Eldridge Industries, LLC, and Eldridge NPC Holdings LLC and any Affiliates of the foregoing.

    ***1.220***   ***"Stalking Horse Purchaser"*** means collectively, Wend American Group LLC and Hut American Group LLC, led by Flynn Restaurant Group LP, as designated pursuant to the Notice of Successful Bids.

    ***1.221***   ***"Standing Motion"*** means the *Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims on Behalf of the Debtors' Estates* filed on October 29, 2020 [Docket Nos. 928 (redacted) and 931 (sealed)].

    ***1.222***   ***"Statutory Fees"*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

    ***1.223***   ***"Subordinated Claim"*** means a Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

    ***1.224***   ***"Subscription Record Date"*** shall have the meaning ascribed to such term in the Rights Offering Procedures.

    ***1.225***   ***"Subscription Rights"*** means subscription rights to participate in the Rights Offering.

    ***1.226***   ***"Successful Bidders"*** means the (i) Stalking Horse Purchaser and (ii) Wendy's Purchaser.

    ***1.227***   ***"Successful Bids"*** shall have the meaning set forth in the Notice of Successful Bids.

    ***1.228***   ***"Tax Code"*** means the Internal Revenue Code of 1986, as amended from time to time.

    ***1.229***   ***"UCC Settlement"*** shall have the meaning ascribed to such term in <u>Section 5.2(b)</u> of this Plan

    ***1.230***   ***"UCC Settlement Amount"*** means the Sale Proceeds in the form of Cash in the amount of $3,000,000, which constitutes proceeds of the collateral securing the Priority Term Loan Secured Claims and First Lien Secured Claims.

    ***1.231***   ***"Unimpaired"*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

    ***1.232***   ***"U.S. Trustee* "***means the United States Trustee for Region 7.

    ***1.233***   ***"Voting Deadline"*** means December 17, 2020 at 11:59 p.m. (Prevailing Central Time), or such date and time as may set by the Bankruptcy Court.

    ***1.234***   ***"Wendy's"*** means Wendy's International, LLC, together with its affiliates.

    ***1.235***   ***"Wendy's Business"*** means the Debtors' Wendy's business.

    ***1.236***   ***"Wendy's Franchisor"*** means The Wendy's Company, Quality Is Our Recipe, LLC, or any affiliate of the foregoing Entities.

*1.237* **"*Wendy's Purchaser*"** means Wendy's together with the Eligible Assignees, as defined in the purchase agreement attached as Exhibit B to the Notice of Successful Bids.

*1.238* **"*Wendy's Sale Process*"** means the auction and sale process of the Debtors' Wendy's Business.

*1.239* **"*Wendy's Standalone Event*"** means a Reorganization Transaction pursuant to which the assets of NPC QB are retained under this Plan, which assets shall vest in Reorganized NPC QB.

*1.240* **"*WholeCo Sale Process*"** means the auction and sale process of substantially all of the Debtors' Assets.

*1.241* **"*Wind Down*"** means, solely in the event of and following the consummation of the Sale Transaction, the process to wind down, dissolve, and liquidate the Estates and distribute any proceeds of the Sale Transaction not otherwise distributed on the Effective Date, and liquidate or otherwise administer, or distribute the proceeds of, any remaining assets in accordance with this Plan.

*1.242* **"*Wind Down Budget*"** means, solely in the event that the Sale Transaction is consummated, a reasonable budget for the disbursement of the Wind Down Fund to effectuate the Wind Down, including as it pertains to the payment of Administrative Expense Claims, to be agreed between the Debtors, the Creditors' Committee,  and the Requisite Creditors, and in consultation with McLane, solely in the event the Debtors obtain extended trade terms beyond zero-day ACH-credit terms from McLane and only as it pertains to the payment of McLane's Administrative Expense Claims.

*1.243* **"*Wind Down Co*"** means, solely in the event that the Sale Transaction is consummated, an Entity that, in the discretion of Debtors, may be established on the Effective Date for the benefit of holders of Claims against the Debtors (which Entity may be a liquidating trust or one of the Debtors other than any Reorganized Debtors) in connection with the distribution of proceeds from the Sale Transaction and any other assets of the Debtors (as determined by the Debtors or in accordance with the Successful Bid).

*1.244* **"*Wind Down Co Organizational Documents*"** means any organizational documents of Wind Down Co, including a liquidating trust agreement, substantially final forms of which will be contained in the Plan Supplement.

*1.245* **"*Wind Down Fund*"** means the amount of Cash equal to the aggregate amount of projected disbursements set forth in the Wind Down Budget, which constitutes Cash Collateral (as defined in the Cash Collateral Order).

*1.246* **"*Wind Down Reversion Amount*"** means the amount (if any) remaining in the Wind Down Fund after the Plan Administrator completes all of its duties under the Plan (other than the distribution of the Wind Down Reversion Amount in accordance with the Plan) and all liabilities of the Wind Down Co have been satisfied or otherwise extinguished.

### B.     Interpretation; Application of Definitions; Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in this Plan are for

convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions, but subject in all respects to the consent rights set forth in the Restructuring Support Agreement; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### D.    Consent Rights.

Notwithstanding anything herein to the contrary, any and all notice, consultation, and consent rights, as applicable, of the Consenting Creditors or other applicable party set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Disclosure Statement, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

### E.    Controlling Document.

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document, *provided*, that, in the event of any inconsistency between the Plan and the Plan Supplement or any Definitive Document regarding the injunctions, releases, and exculpation provisions embodied in Article X of this Plan or with respect to the GUC Trust Causes of Action, the terms of the Plan shall govern. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control, subject to the terms of the Restructuring Support Agreement.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1    *Treatment of Administrative Expense Claims.*

(a)    On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final satisfaction

of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

(b)      In accordance with the Driver Claimants Settlement, on (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Driver Claimant Admin Claim becomes an Allowed Driver Claimant Admin Claim, each holder of an Allowed Driver Claimant Admin Claim shall receive in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Claim, subject to Section 5.2(c)(vii) of this Plan.

### 2.2      *Treatment of Fee Claims.*

(a)      All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  For the avoidance of doubt, the Stalking Horse Purchaser shall not be liable or otherwise responsible for the payment of any Fee Claims except certain third party Fee Claims relating to the Sale Transaction, pursuant to express written agreement between the Stalking Horse Purchaser and such third party.

(b)      On or prior to the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims, which estimates shall be delivered to the Debtors and the Consenting Creditor Advisors at least two (2) Business Days prior to the anticipated Effective Date.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 434]; *provided*, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of this Plan.  To the extent surplus funds remain in the Fee Escrow Account after all Fee Claims have been resolved by the Bankruptcy Court or settled, such

fund shall be returned to the Reorganized Debtors.  No Liens, Claims, or Interests shall encumber the Fee Escrow Account in any way.

(c)      Any objections to Fee Claims shall be served and filed (i) no later than twenty-one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

**2.3      _Treatment of Priority Tax Claims._**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**2.4      _Restructuring Expenses._**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement or the Cash Collateral Order, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated in good faith prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; _provided_, _however_, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or before the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

**ARTICLE III.      CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.1      _Classification in General._**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; _provided_, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2      _Formation of Debtor Groups for Convenience Only._**

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of

any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

**3.3**      *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under this Plan; (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or deemed to reject this Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 2A | Driver Claimant Priority T1 Claims | Unimpaired | No (Presumed to accept pursuant to the Driver Claimants Settlement) |
| Class 2B | Driver Claimant Priority T2 Claims | Unimpaired | No (Presumed to accept pursuant to the Driver Claimants Settlement) |
| Class 3 | Priority Term Loan Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 4 | First Lien Secured Claims | Impaired | Yes |
| Class 5 | Second Lien Secured Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 9 | Existing Equity Interests | Impaired | No (Deemed to reject) |
| Class 10 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

**3.4**      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5**      *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

**3.6**      *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on this Plan shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.7**     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class.

**3.8**     *Voting; Presumptions; Solicitation.*

(a)     **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims in Classes 4 and 5 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 4, and 5 shall receive Ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 1, 2, 2A, 2B, 3, 7, and 10 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims and Interests in Classes 8 and 9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

**3.9**     *Cramdown.*

If any Class is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**3.10**     *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's, the Plan Administrator's, the GUC Trustee's, or other Person's right to object on any basis to any Claim.

**ARTICLE IV.      TREATMENT OF CLAIMS AND INTERESTS.**

**4.1**     *Class 1:  Other Secured Claims.*

(a)     **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Debtors or Reorganized Debtors, as applicable, with the consent of the Requisite Creditors: (i) Cash in an amount equal to the Allowed amount of such Other Secured Claim, (ii) reinstatement or such other treatment sufficient to render such holder's

27

Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b) **Impairment and Voting**:  Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.2   *Class 2:  Other Priority Claims.*

(a) **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Debtors or Reorganized Debtors, as applicable, with the consent of the Requisite Creditors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b) **Impairment and Voting**:  Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.3   *Class 2A:  Driver Claimant Priority T1 Claims.*

(a) **Treatment**:  In accordance with the Driver Claimants Settlement, each holder of an Allowed Driver Claimant Priority T1 Claim shall receive, in full and final satisfaction of such Allowed Driver Claimant Priority T1 Claim, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Driver Claimant Priority T1 Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter), Cash in an amount equal to the Allowed amount of such Driver Claimant Priority T1 Claim; *provided*, that, Plan Distributions on account of this Section 4.3 shall be subject to the approval of the Driver Claimants Settlement.

(b) **Impairment and Voting**:  Allowed Driver Claimant Priority T1 Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code and pursuant to the Driver Claimants Settlement, the holders of Allowed Driver Claimant Priority T1 Claim are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Driver Claimant Priority T1 Claim.

**4.4**     *Class 2B:  Driver Claimant Priority T2 Claims.*

(a)     **Treatment**:  In accordance with the Driver Claimants Settlement, each holder of an Allowed Driver Claimant Priority T2 Claim shall receive, in full and final satisfaction of such Allowed Driver Claimant Priority T2 Claim, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Driver Claimant Priority T2 Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter), Cash in an amount equal to the Allowed amount of such Driver Claimant Priority T2 Claim; *provided*, that Plan Distributions on account of this Section 4.4 shall be subject to the approval of the Driver Claimants Settlement..

(b)     **Impairment and Voting**:  Allowed Driver Claimant Priority T2 Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code and pursuant to the Driver Claimants Settlement, the holders of Allowed Driver Claimant Priority T2 Claim are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Driver Claimant Priority T2 Claim.

**4.5**     *Class 3:  Priority Term Loan Secured Claims.*

(a)     **Allowance**:  The Priority Term Loan Secured Claims shall be deemed Allowed on the Effective Date, consisting of (i) $40,482,222.22 in principal amount, plus (ii) accrued and unpaid interest (calculated on the basis of the alternate base rate and at the default rate under the Priority Term Loan Credit Agreement), fees, expenses, and other obligations arising, due, or owing under or in connection with the Priority Term Loan Credit Documents (including legal fees), in each case, through and including the Effective Date.

(b)     **Treatment**:  Except to the extent that a holder of an Allowed Priority Term Loan Secured Claims agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Priority Term Loan Secured Claim shall receive, on account of such Allowed Claim, Cash in the amount equal to the Allowed amount of such Claim in full and final satisfaction of such Allowed Claim.  On the Effective Date, the Priority Term Loan Credit Documents shall be deemed cancelled.

(c)     **Impairment and Voting**:  Priority Term Loan Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Term Loan Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Term Loan Secured Claims.

**4.6**     *Class 4:  First Lien Secured Claims.*

(a)     **Allowance**: The First Lien Secured Claims shall be deemed Allowed on the Effective Date in the amount of (A) (i) $751,779,077[2] in principal amount, plus (ii) accrued and unpaid interest (calculated at the default rate under the First Lien Credit Agreement), fees, expenses, and other obligations arising, due, or owing

---

[2]  Includes $27,488,165 of cash collateralized Letters of Credit.

under or in connection with the First Lien Credit Documents (including legal fees), in each case, through and including the Petition Date, *less* the amount of the First Lien Deficiency Claims (if any) plus (B) in the event (x) the Sale Proceeds exceed the amount of Priority Term Loan Secured Claims and the amount of First Lien Secured Claims as of the Petition Date or (y) the amount of First Lien Deficiency Claims equal $0, accrued and unpaid interest (calculated on the basis of the alternate base rate and at the default rate under the First Lien Credit Agreement), fees, expenses, and other obligations arising, due, or owing under or in connection with the First Lien Credit Documents (including legal fees) from the Petition Date through and including the Effective Date.

(b)     **Treatment**:  Except to the extent a holder of an Allowed First Lien Secured Claim agrees to less favorable treatment, each holder of an Allowed First Lien Secured Claim shall receive, in full and final satisfaction of such Allowed Claim, its Pro Rata share of:

(i)     **If a Sale Transaction occurs**:

(A)     on the Effective Date, on account of such Allowed First Lien Secured Claim, the remaining Sale Proceeds after the Allowed Priority Term Loan Secured Claims are satisfied in full, the UCC Settlement Amount and GUC Trust Reserve are funded to the GUC Trust, and the Wind Down Fund has been fully funded;

(B)     any surplus received by the Debtors under Section 5.2(c)(x) of the Plan; and

(C)     any surplus remaining at Wind Down Co when the Wind Down is completed;

in all respects subject to Section 6.13 in this Plan.  The holders of Allowed First Lien Secured Claims shall retain their rights under the 1L/2L Intercreditor Agreement to receive from the Prepetition 2L Agent, the Prepetition 2L Collateral Agent, and the Second Lien Lenders any Sale Proceeds they receive either directly or indirectly, including any Cash transferred to the GUC Trust from the Sale Proceeds.

(ii)    **If a Reorganization Transaction occurs**:

(A)     If the PH Business and/or Wendy's Business is/are sold, any sale proceeds not previously distributed pursuant to one or more orders of the Bankruptcy Court;

(B)     to the extent a Wendy's Standalone Event occurs, New QB First Lien Term Loans;

(C)     100% of Reorganized Equity Interests, subject to dilution by the Rights Offering Shares, the Backstop Put Premium, the MIP Equity, and certain New Warrants; and

(D)     Subscription Rights.

(c)     **Impairment and Voting**:  First Lien Secured Claims are Impaired.  Holders of Allowed First Lien Secured Claims are entitled to vote on this Plan.

**4.7**     _Class 5: Second Lien Secured Claims._

(a)     **Treatment**:  Except to the extent a holder of an Allowed Second Lien Secured Claim agrees to less favorable treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Second Lien Secured Claim becomes an Allowed Claim, each holder of an Allowed Second Lien Secured Claim shall receive, in full and final satisfaction of such Allowed Claim, such holder's Pro Rata share of:

(i)     **If a Sale Transaction occurs**: the remaining Sale Proceeds, if any, after the Allowed Priority Term Loan Secured Claims and the Allowed First Lien Secured Claims are satisfied in full, the UCC Settlement Amount and GUC Trust Reserve are funded to the GUC Trust, and the Wind Down Fund has been fully funded.

(ii)     **If a Reorganization Transaction occurs**: all Second Lien Secured Claims shall be treated as Second Lien Deficiency Claims and shall receive treatment as General Unsecured Claims under Class 6.

(b)     **Impairment and Voting**:  Allowed Second Lien Secured Claims are Impaired. Holders of Second Lien Secured Claims are entitled to vote on this Plan.

**4.8**     _Class 6:  General Unsecured Claims._

(a)     **Allowance:** Pursuant to the Driver Claimants Settlement, the Driver Claimant General Unsecured Claims shall be deemed Allowed on the Effective Date in a total amount up to the Driver Claimants GUC Cap.

(b)     **Treatment**:  Except to the extent a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, each holder of an Allowed General Unsecured Claim, including any Driver Claimant General Unsecured Claim Allowed under the Driver Claimants Settlement, shall receive, in full and final satisfaction of such Allowed Claim:

(i)     **If a Sale Transaction occurs**:

(A)     Class A GUC Trust Beneficiaries shall receive their Pro Rata share of the Class A GUC Trust Interests; and

(B)     Class B GUC Trust Beneficiaries shall receive their Pro Rata share of the Class B GUC Trust Interests;

_provided_, that, Plan Distributions on account of this Section 4.8(a)(i) shall be subject to the approval and consummation of the UCC Settlement and the Driver Claimants Settlement; _provided_, _further_, that, except as otherwise provided in this Plan, the First Lien Lenders and the Crossholder

Claim Holders on account of their First Lien Deficiency Claims and Second Lien Deficiency Claims shall not receive GUC Trust Interests or any Plan Distribution from the GUC Trust. Notwithstanding the foregoing, the First Lien Lenders shall retain the right to receive any Plan Distributions that would otherwise be made on account of any Second Lien Deficiency Claims pursuant to this Plan from any source other than the GUC Trust Causes of Action pursuant to the 1L/2L Intercreditor Agreement, including, without limitation, the turnover provisions, and such Plan Distributions, if any, to each Second Lien Lender shall instead be distributed to the First Lien Lenders, which shall be or deemed to be contributed into the GUC Trust by the Prepetition 1L Agent on behalf of the First Lien Lenders.

(ii) **If a Reorganization Transaction occurs**: such holder's Pro Rata Share of:

(A) If neither of the PH Business nor the Wendy's Business is sold, New Warrants to purchase Reorganized Equity Interests representing in the aggregate 12.5% of the total outstanding Reorganized Equity Interests issued pursuant to this Plan as of the Effective Date; or

(B) If either of the PH Business or Wendy's Business is sold, New Warrants to purchase Reorganized Equity Interests representing in the aggregate 18.0% of the total outstanding Reorganized Equity Interests issued pursuant to this Plan as of the Effective Date;

*provided*, that, to the extent considered necessary or advisable for the Reorganized Debtors to remain a private company, without being required to register under Section 12(g) of the Exchange Act as a result of the number of record holders of its outstanding securities, the Debtors may distribute to holders of Allowed General Unsecured Claims that declare under penalty of perjury that they are not accredited investors (as defined in Rule 501(a) of Regulation D under the Securities Act) Cash or other property in a reasonably equivalent amount to the discounted net present value of the New Warrants in accordance with the underlying enterprise valuation of the Reorganized Debtors (which aggregate Cash amount shall be subject to the consent of the Requisite Creditors); *provided*, *further*, that holders of Allowed First Lien Deficiency Claims (if any) shall be entitled to vote but, except as otherwise provided in this Plan, shall be deemed to have waived the entitlement to receive the New Warrants.

(c) **Impairment and Voting**: Allowed Unsecured Claims are Impaired. Holders of General Unsecured Claims are entitled to vote on this Plan.

### 4.9 *Class 7: Intercompany Claims.*

(a) **Treatment**: On or after the Effective Date, all Intercompany Claims shall be reinstated, or cancelled and released at the option of the Debtors, subject to the Cash Management Order and the reasonable consent of the Requisite Creditors,

*provided* that no distribution shall be made on account of such Intercompany Claims.

(b)     **Impairment and Voting**:   All Allowed Intercompany Claims are deemed Unimpaired.   In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

**4.10    *Class 8:  Subordinated Claims.***

(a)     **Treatment**:   All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Claims shall not receive any distribution on account of such Allowed Subordinated Claims.

(b)     **Impairment and Voting**:   Allowed Subordinated Claims are Impaired.   In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

**4.11    *Class 9:  Existing Equity Interests.***

(a)     **Treatment**:   All Existing Equity Interests shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and such holders of Allowed Existing Equity Interests shall not receive any distribution on account of such Allowed Existing Equity Interests; *provided* that solely if the Sale Transaction is consummated, the Wind Down Co is formed and is a Debtor, and it is determined by the Debtors (with the consent of the Requisite Creditors) to be advantageous from a tax perspective, the following will occur:

(i)     On the Effective Date, all Existing Equity Interests shall be cancelled and one share of NPC Holdings, Inc. common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Existing Equity Interests consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator;

(ii)     Each former holder of Existing Equity Interests (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Existing Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of Existing Equity Interests may receive its share of any remaining assets of NCP Holdings, Inc. consistent with such holder's rights of payment existing immediately prior to the Petition Date. Unless otherwise determined by the Plan Administrator, on the date that the Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date

shall be deemed cancelled and of no further force and effect; *provided* that such cancellation does not adversely impact the Estates; and

(iii)    The continuing rights of former holders of Existing Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except by operation of law, or, subject to the Plan Administrator's consent, for administrative transfers where the ultimate beneficiary has not changed.

(b)    **Impairment and Voting:** Existing Parent Equity Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Parent Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Existing Parent Equity Interests.

### 4.12   *Class 10:  Intercompany Interests.*

(a)    **Treatment**: Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests, in the Debtors' or the Reorganized Debtors' discretion, will be (i) cancelled (or otherwise eliminated) or (ii) reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure and shall otherwise receive no recovery or distributions.

(b)    **Impairment and Voting**: Intercompany Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

## ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1   *No Substantive Consolidation.*

This Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in this Plan.

### 5.2   *Compromise and Settlement of Claims, Interests, and Controversies.*

(a)    Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan, the Second Lien Settlement, the UCC Settlement, and the Driver Claimants Settlement shall each constitute a good faith and integrated set of compromises of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including the Second Lien Settlement, the UCC Settlement, and the Driver Claimants Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, including the Second Lien Settlement, UCC Settlement, and the Driver Claimants Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best

interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

      (b)    *UCC Settlement*.  The treatment provided for hereunder to Allowed General Unsecured Claims incorporates and reflects a proposed integrated compromise and settlement by and among the Debtors, the Creditors' Committee, and the Consenting Creditors under a Sale Transaction scenario (the "**UCC Settlement**").  The following constitutes the integrated provisions and conditions of the UCC Settlement:

      (i)    On the Effective Date, and solely for purposes of Plan Distributions from the GUC Trust:  (1) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (2) all guaranties of the Debtors of the obligations of any other Debtor that comprise a General Unsecured Claim shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (3) each and every General Unsecured Claim filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (4) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  For the avoidance of doubt, such consolidation shall be for reconciliation and distribution purposes only and shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

      (ii)    On the Effective Date, (x) the GUC Trust shall be established in accordance with Section 5.18 of the Plan and shall be governed and administered in accordance with the GUC Trust Agreement and (y) the GUC Trust Reserve shall be funded to the GUC Trust.

      (iii)    On the Effective Date, the Debtors and the Estates shall transfer to the GUC Trust, the GUC Trust Assets, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the GUC Trust Beneficiaries.  In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Trust Assets, shall vest in the GUC Trust, for the benefit of the GUC Trust Beneficiaries.

      (iv)    The GUC Trustee shall determine whether to enforce, settle, release, or compromise the GUC Trust Causes of Action (or decline to do any of the foregoing).  The Plan Administrator shall not be subject to any claims or counterclaims with respect to the GUC Trust Causes of Action, or otherwise.

      (v)    The Creditors' Committee commits to support the Plan, including all settlements contemplated herein, and shall not prosecute any objection to the Plan or the Sale Transaction. As a condition precedent to consummation of the UCC Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan, the Sale Transaction, or approval of the UCC Settlement.

      (vi)    On the Effective Date, if the Sale Transaction has occurred, (1) the Creditors' Committee's Standing Motion shall be deemed resolved and withdrawn with prejudice, (2) the

Challenge Period (as defined in the Cash Collateral Order) shall be deemed expired with respect to the Creditors' Committee; (3) the stipulations set forth in Section F of the Cash Collateral Order shall be final; and (4) the releases in paragraph 15 of the Cash Collateral Order shall be final, conclusive, and binding on all Entities.

        (vii)    The Sale Proceeds shall constitute Prepetition Collateral (as defined in the Cash Collateral Order) and the 1L/2L Intercreditor Agreement shall be enforced, in each case, as a condition to the implementation and consummation of the Sale Transaction and the UCC Settlement.

        (viii)    Any portion of the GUC Trust Reserve that remains after payment of the costs of administering the GUC Trust shall be returned to Wind Down Co for distribution to the First Lien Lenders.

    (c)    *Driver Claimants Settlement*.  The treatment provided for hereunder to Allowed Claims held by Driver Claimants incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Driver Claimants Group, and the Consenting Creditors as a result of the mediation conducted by the Honorable Marvin Isgur of the United States Bankruptcy Court for the Southern District of Texas (the "**Driver Claimants Settlement**").  The following constitutes the integrated provisions and conditions of the Driver Claimants Settlement:

        (i)    The Estimation Motion and all related pleadings shall be deemed resolved and withdrawn, and the Driver Claimants 7023 Motion shall be deemed resolved and approved with respect to the certification of the Driver Claimants Certified Class for settlement purposes only, subject to the approval of the Driver Claimants Settlement.  Upon the entry of the Confirmation Order, the appropriate members of the Driver Claimants Group shall dismiss, with prejudice and with each party bearing its own costs and expenses (including legal fees), the *Collins* Action and the *Marshall* Action.

        (ii)    The Driver Claimants Settlement, all provisions contained herein, and any documents, negotiations, or proceedings relating in any way to the Driver Claimants Settlement are for settlement purposes only, are not precedent, and are not to be used as precedent.  The Driver Claimants Settlement incorporated in this Plan and all provisions contained herein, and any documents, negotiations, or proceedings relating in any way to the Driver Claimants Settlement shall not be used, construed as, or deemed to be evidence of an admission or concession of liability of any kind by the Debtors or any of its officers, and shall not be offered into evidence, received into evidence, or deemed to be evidence in any proceeding in any court, administrative agency, or other tribunal except in an action brought to enforce the terms of the Driver Claimants Settlement or in proceedings before the Bankruptcy Court to confirm the Plan. Nor shall this Plan be construed as a finding or conclusion of the Bankruptcy Court with respect to the merit of any claim or defense asserted in the action.

        (iii)    The Driver Claimants Group commits to support the Plan, including all settlements contemplated herein, and shall not prosecute any objection to the Plan, including the Sale Transaction.

        (iv)    The Driver Claimants Group affirmatively consents or is deemed to consent to the releases provided in Section 10.7(c) of this Plan pursuant to the Driver Claimants Settlement. In addition, each member of the Driver Claimants Certified Class who does not decline to participate in the Driver Claimants Settlement shall be deemed to consent to and be bound by the release provided in Section 10.7(c) of this Plan.

        (v)    After entry of the Confirmation Order, the Debtors shall cause to be served the Driver Claimants Settlement Distribution Forms to the Driver Claimants Certified Class, which shall

be in form and substance reasonably acceptable to the Debtors, the Driver Claimants Group and approved by the Bankruptcy Court. The Driver Claimants shall have until the Driver Claimants Settlement Distribution Form Deadline to timely submit executed Driver Claimants Settlement Distribution Forms to be entitled to receive a distribution under this Plan from the Debtors or Wind Down Co (in connection with any Allowed Driver Claimant Admin Claims, Allowed Driver Claimant Priority T1 Claims and Allowed Driver Claimant Priority T2 Claims), as applicable, and/or the GUC Trust (in connection with any Allowed General Unsecured Claims) in accordance with the Driver Claimants Settlement, as provided in Sections 2.1(b), 4.3, and 4.4 of this Plan; *provided*, that, any Driver Claimant that elects not to participate in the Driver Claimants Settlement shall not receive any Plan Distribution under this Plan in accordance with the Driver Claimants Settlement and shall not be subject to the releases provided in Section 10.7(c) of this Plan.

(vi)    The Driver Claimants Group and the Driver Claimants Settlement Participants, collectively, shall be deemed to hold Allowed Driver Claimant General Unsecured Claims, subject to the Driver Claimants GUC Cap. The maximum Allowed General Unsecured Claims of individual members of the Driver Claimants Group and the Driver Claimants Settlement Participants shall be determined as follows: (A) each member in the Drivers Claimant Group shall be allowed a Driver Claimants Group General Unsecured Claim in an amount based on the hypothetical mileage reimbursement rate as indicated in the Driver Claimants Settlement Distribution Form and the total number of miles actually driven by such member for the Debtors; *provided*, that, should the aggregate amount of all Driver Claimants Group General Unsecured Claims exceed the Driver Claimants GUC Cap, each such member shall receive an Allowed Driver Claimants Group General Unsecured Claim in an amount equal to the Pro Rata share of the Driver Claimants GUC Cap; and (B) each Driver Claimants Settlement Participant shall be Allowed a Driver Claimants Settlement Participant General Unsecured Claim in an amount equal to the Pro Rata share of (x) the Driver Claimants GUC Cap, minus (y) the aggregate amount of the Driver Claimants Group General Unsecured Claims; *provided*, that in the event the aggregate amount of all Driver Claimants Group General Unsecured Claims is not less than the Driver Claimants GUC Cap, the Driver Claimants Settlement Participant General Unsecured Claims shall equal zero and be disallowed and extinguished. Periodically, the Debtors or Plan Administrator, as applicable, shall deliver a reconciliation of certain Allowed Driver Claimant General Unsecured Claims with supporting detail to the GUC Trust. On the date of the next Plan Distribution, the GUC Trust shall distribute the applicable Pro Rata share of the GUC Trust Assets to the Plan Administrator on account of the Allowed Driver Claimant General Unsecured Claims, subject to the Driver Claimants GUC Cap. Reasonably practicably thereafter, the Plan Administrator shall be responsible for making distributions to holders of Allowed Driver Claimant General Unsecured Claims. The Bankruptcy Court shall retain jurisdiction over any dispute arising from the reconciliation of the amount of each Allowed Driver Claimant General Unsecured Claim.

(vii)    Notwithstanding any other provision of the Driver Claimants Settlement, if the aggregate amount of the Allowed Driver Claimant Admin Claims exceeds the Driver Claimant Admin Cap, each holder of an Allowed Driver Claimant Admin Claim shall have an Allowed Driver Claimant Admin Claim equal to its Pro Rata share of the Driver Claimant Admin Cap.

(viii)    Notwithstanding any other provision of the Driver Claimants Settlement, if the aggregate amount of the Allowed Driver Claimant Priority T1 Claims exceeds the Driver Claimant Priority T1 Cap, each holder of an Allowed Driver Claimant Priority T1 Claim shall have an Allowed Driver Priority T1 Claim equal to its Pro Rata share of the Driver Claimant Priority T1 Cap.

(ix)    Notwithstanding any other provision of the Driver Claimants Settlement, (A) each Driver Claimant Priority T2 Claim shall be compromised for an amount equal to 10% of the amount otherwise allowable based on the information provided in the Driver Claimants Settlement Distribution Form, and (B) if the aggregate amount of the Allowed Driver Claimant Priority T2 Claims

based on the calculation in (A) exceeds the Driver Claimant Priority T2 Cap, each holder of an Allowed Driver Claimant Priority T2 Claim shall have an Allowed Priority T2 Claim equal to its Pro Rata share of the Driver Claimant Priority T2 Cap.

(x)      In the event all Allowed Driver Claimant Admin/Priority Claims are fully paid in accordance with this Plan and the Driver Claimants Settlement, including and considering the caps set forth in Sections Article I.1.69, Article I.1.79, and Article I.1.81 of this Plan, any remaining amounts in the Driver Claimant  Recovery Reserve shall revert to the Debtors or the Wind Down Co, which shall promptly remit any such surplus to the First Lien Lenders; for the avoidance of doubt, the Debtors or the Wind Down Co, as applicable, shall have vested reversionary interests in any amounts remaining in the Driver Claimants Recovery Reserve but that reversionary interest shall be deemed to constitute Sales Proceeds that are collateral for the First Lien Lenders.  If it is determined in good faith by the Plan Administrator that the maximum amount of outstanding Allowed Driver Claimant Admin/Priority Claims are less than the amounts remaining in the Driver Claimants Recovery Reserve, the Plan Administrator may reduce the Driver Claimants Recovery Reserve by 75% of that amount.

(xi)      On the Effective Date, the Debtors shall pay the Driver Claimants Group Counsel Settlement Fee Amount.

### 5.3      *Sources of Consideration for Plan Distributions.*

(a)      **Sale Transaction**.  In the event that the Debtors pursue the Sale Transaction, the Debtors or the Wind Down Co shall fund Plan Distributions and satisfy applicable Allowed Claims under this Plan using Cash on hand and the Sale Proceeds.  The GUC Trust shall fund Plan Distributions to holders of Allowed General Unsecured Claims from the GUC Trust Assets.

(b)      **Reorganization Transaction**.  In the event of a Reorganization Transaction, the Debtors shall fund Plan Distributions and satisfy applicable Allowed Claims under this Plan with Cash on hand, Reorganized Equity Interests, New Warrants, proceeds of the Rights Offering Shares, any proceeds from the sale of the PH Business and/or Wendy's Business, and solely to the extent that a Wendy's Standalone Event occurs, the proceeds from the New QB First Lien Term Loans, if any.

### 5.4      *Sale Transaction:  Wind Down and Dissolution of the Debtors.*

Solely in the event a Sale Transaction is consummated, the following shall apply:

(a)      In accordance with the Bidding Procedures, on the Closing Date(s), the Debtors shall consummate the Sale Transaction contemplated by a Successful Bids, and, among other things, all or substantially all of the Debtors' Interests and Assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidders pursuant to Article VIII hereof), as applicable, shall be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the applicable purchase agreement and Sale Orders (or such other applicable order of the Bankruptcy Court).

(b)      The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (1) except to the extent Claims have been Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to the General Unsecured Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims); (2) make Plan Distributions to holders of Allowed

Claims in accordance with this Plan, other than with respect to holders of Allowed General Unsecured Claims; (3) subject in all respects to <u>Article X</u> and <u>Section 5.13</u> of the Plan, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors' estates, other than with respect to the GUC Trust Causes of Action; (4) retain professionals to assist in performing its duties under the Plan; (5) maintain the books, records, and accounts of the Debtors; (6) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; (7) determine whether to create a liquidating trust for the assets of a Debtor and which assets to transfer to such liquidating trust; and (8) perform other duties and functions that are consistent with the implementation of the Plan.

(c)     After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind Down; and shall sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' Estates after consummation of the Sale Transaction without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to the General Unsecured Claims and GUC Trust Causes of Action.

(d)     The Wind Down Co shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(e)     Any Plan Distributions made subsequent to the initial Plan Distributions made by the Debtors pursuant to <u>Section 6.3</u> of the Plan shall be made by the Plan Administrator in an expeditious, timely, and orderly manner pursuant to the Plan and the Confirmation Order.

(f)     As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, or the members of any Debtor. Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases. Following the Effective Date, the Plan Administrator, or one or more designees thereof, shall serve as the member(s) or director(s) of any such dissolved board in the event that the Plan Administrator deems doing so necessary at any time following the Effective Date in order to effectuate the provisions of this Plan. The Plan Administrator shall be authorized to file on behalf of the Debtors, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(g)     The Plan Administrator shall effectuate the Wind Down (other than with respect to the GUC Trust Assets, which shall be governed by <u>Section 5.18</u>) with the Wind Down Fund, which shall be used in accordance with the Wind Down Budget.

(h)     Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all Plan Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind Down Co shall be deemed to be dissolved or cancelled, as applicable, without any further action by the Plan Administrator and without the payment of any filing fees, or other similar amounts, other than the filing of any requisite certificates or documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction. Holders of

Allowed First Lien Secured Claims shall have and retain a vested reversionary interest in the Wind Down Reversion Amount, and the Plan Administrator shall distribute to such holders of Allowed First Lien Secured Claims the Wind Down Reversion Amount before the dissolution of Wind Down Co, subject to <u>Section 6.13</u> of this Plan.

      (i)     ***Establishment of Wind Down Co.***

      (i)     On or before the Effective Date, in furtherance of the Sale Transaction, the Debtors shall establish the Wind Down Co.  The Debtors shall determine the form of entity that Wind Down Co will be, *e.g.*, a corporation, a limited liability company or a liquidating trust, among others, if applicable.

      (ii)     In the event it is determined that Wind Down Co shall take the form of a liquidating trust, (1) the terms of the liquidating trust shall be set forth in a liquidating trust agreement, (2) Wind Down Co shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of Claims, consistent with the terms of the Plan, (3) the sole purpose of Wind Down Co shall be the liquidation and distribution of the assets transferred to Wind Down Co in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of Claims, with no objective to continue or engage in the conduct of a trade or business, (4) all parties (including the Debtors, holders of Claims, the Creditors' Committee, and the trustee of the liquidating trust) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to Wind Down Co), (5) all parties shall report consistently with the valuation of the assets transferred to Wind Down Co as determined by the trustee of the liquidating trust (or its designee), (6) the trustee of the liquidating trust shall be responsible for filing returns for the trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a), and (7) the trustee of the liquidating trust shall annually send to each holder of an interest in the liquidating trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

      (iii)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the trustee of the liquidating trust of a private letter ruling if the trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee), the trustee of the liquidating trust may (x) timely elect to treat the any portion of the liquidating trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 (and make any appropriate elections), (y) file such tax returns (including but not limited to the filing of a separate federal tax return for the "disputed ownership fund") and pay such taxes as may be required consistent with such treatment, and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors, holders of Claims, the Creditors' Committee, and the trustee of the liquidating trust) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

      ***5.5***     ***Reorganization Transaction.***

      (a)     In the event of a Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth herein.

      (b)     ***Wendy's Standalone Event.***

      (i)     Solely to the extent a Wendy's Standalone Event occurs, prior to the Effective Date, the New QB First Lien Term Loan Credit Agreement shall be executed and delivered, and

the Reorganized Debtors, as applicable, shall be authorized to execute, deliver, and enter into the New QB First Lien Term Loan Credit Documents, without the need for any further corporate, limited liability partnership or limited liability company action and without further action by the holders of Claims or Interests.

(ii)     The obligations arising under the New QB First Lien Term Loan Credit Agreement shall be secured by a first priority perfected security interest in substantially all present and after acquired property (whether tangible, intangible, real, personal or mixed) of Reorganized NPC QB, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of Reorganized NPC QB, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to any exceptions and materiality thresholds reasonably acceptable to the Requisite Creditors; *provided*, that, for the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the foregoing shall not include leasehold interests or leases of non-residential real property (in either cases, unless otherwise expressly permitted by the terms of such non-residential lease or if the imposition of a lien therein would not otherwise constitute a default or event of default under any such lease of non-residential real property or if a default occurred thereunder that would be excused or rendered ineffective by operation of applicable law), but, in any such case, the foregoing shall include the proceeds, product, or offspring thereof.

(iii)    Reorganized NPC QB shall be authorized to execute, deliver, and enter into and perform under the New QB First Lien Term Loan Credit Agreement without the need for any further corporate, limited liability partnership or limited liability company action and without further action by the holders of Claims or Interests. Any holder of an Allowed First Lien Secured Claim who becomes a lender under the New QB First Lien Term Loan Credit Agreement shall be deemed to agree to the New QB First Lien Term Loan Credit Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with its respective terms.

(iv)    100% of the equity of Reorganized NPC QB shall be owned directly or indirectly by New NPC Parent.

(c)     In the event of a Reorganization Transaction, Reorganized NPCI shall be directly or indirectly owned by New NPC Parent.

(d)     ***Rights Offering and Backstop Commitment Agreement***.

(i)     The Rights Offerings shall be conducted by the Debtors and consummated on the terms and subject to the conditions set forth in the Rights Offering Procedures and the Backstop Commitment Agreement. The Rights Offering shall be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.

(ii)    To facilitate the Rights Offering and the Reorganization Transaction, and in exchange for the Backstop Put Premium, the Backstop Parties have agreed to consummate the Backstop Commitment, subject to the terms and conditions set forth in the Backstop Commitment Agreement. The Backstop Parties' obligation to consummate the Backstop Commitment pursuant to the Backstop Commitment Agreement shall be contingent upon all conditions set forth in the Backstop Commitment Agreement being satisfied or otherwise waived in accordance with the Backstop Commitment Agreement.

(iii)    In accordance with the Rights Offering Procedures Order, the Debtors shall distribute the Subscription Rights to holders of First Lien Secured Claims as set forth in the Plan and the Rights Offering Procedures. Each eligible holder of First Lien Secured Claims shall be offered the

Subscription Rights to purchase its Pro Rata allocation of the Rights Offering Shares. The Subscription Rights are not detachable from the First Lien Secured Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights) (such acts, collectively, "transfer" or "transferred"), except, in the case of the Backstop Parties, as set forth in the Backstop Commitment Agreement. Any transfer following the Subscription Record Date of the corresponding First Lien Secured Claim (except as provided in the Rights Offering Procedures) shall void the Subscription Right, and neither the transferring party nor the purported transferee will receive any Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights.

(iv)    In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, the amount of Rights Offering Shares equal to their respective Backstop Commitment. The Backstop Commitment shall be treated as a put option and the Backstop Put Premium shall be treated as remuneration for agreeing to enter into such put option. Upon the Effective Date, the Backstop Put Premium shall be immediately and automatically paid and issued.

(v)    The proceeds of the Rights Offering shall be used to (1) fund Plan Distributions, (2) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (3) pay all reasonable and documented Fee Claims and Restructuring Expenses.

(vi)    The distribution of the Rights Offering Shares (including as payment of the Backstop Put Premium) pursuant to the Rights Offering, the Backstop Commitment Agreement, or the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of Rights Offering Shares or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors and the Requisite Creditors, in accordance with the customary practices of such agent, as and to the extent practicable. Any Entity's acceptance of Rights Offering Shares (including as payment of Backstop Put Premium) shall be deemed as its agreement to the Amended/New Organizational Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms.

(e)    *Authorization and Issuance of Reorganized Equity Interests and New Warrants*.

(i)    On the Effective Date, (1) New NPC Parent is authorized to issue or cause to be issued and shall issue (A) the Reorganized Equity Interests and (B) the New Warrants, and (2) the issuance of Rights Offering Shares by New NPC Parent in connection with the Rights Offering is authorized, ratified, and confirmed in all respects, in each case, in accordance with the terms of this Plan without the need for any further corporate or shareholder action. All of the Reorganized Equity Interests, New Warrants, and Rights Offering Shares (including as payment of the Backstop Put Premium) issuable under this Plan (including under the Rights Offering and the Backstop Commitment Agreement, as applicable), when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)    The distribution of the Reorganized Equity Interests and New Warrants pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of Reorganized Equity Interests and New Warrants or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors and the Requisite Creditors, in accordance with the customary practices of such agent, as and to the extent practicable. Any Entity's acceptance of Reorganized Equity Interests and New Warrants shall be deemed as its agreement to the Amended/New Organizational Documents, the New Shareholders Agreement, and the New Warrant

Agreement (as applicable), as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms.

  (f)  ***Continued Corporate Existence***.

    (i)  The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended/New Organizational Documents unless otherwise determined in accordance with <u>Section 5.7</u> of this Plan; *provided*, *that*, in the event of a Reorganization Transaction, Reorganized NPC QB and Reorganized NPCI shall be owned directly or indirectly by New NPC Parent pursuant to <u>Sections 5.5(b)(iv)</u> or <u>5.5(c)</u> above, as applicable.

    (ii)  On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended/New Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, for the avoidance of doubt, as provided in (i) above.

  (g)  ***Officers and Board of Directors***.

    (i)  Upon the Effective Date, the New Board shall consist of five (5) directors, or, solely to the extent a Wendy's Standalone Event occurs, seven (7) directors.  If known, the identities of the directors and officers of the Reorganized Debtors shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

    (ii)  Except to the extent that a member of the board of directors, managers, or limited partners, as applicable, of a Debtor continues to serve as a director, manager, or limited partner of such Debtor on and after the Effective Date, the members of the board of directors, managers, or limited partners of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director, manager or limited partner will be deemed to have resigned or shall otherwise cease to be a director, manager or limited partner of the applicable Debtor on the Effective Date.

  (h)  ***Reorganized Debtors' Authority***.

    (i)  The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of this Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make Plan Distributions to holders of Allowed Claims in accordance with the Plan; (c) subject in all respects to <u>Article X</u> and <u>Section 5.13</u> of the Plan, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action; (d) retain professionals to assist in performing their duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

    (ii)  After the Effective Date, the Reorganized Debtors may operate the Debtors' business(es) and may use, acquire, or dispose of property and compromise or settle any Claims,

Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(iii)     Each Plan Distribution and issuance referred to in Article V hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).

### 5.6     *Employee Matters.*

(a)     Subject to Section 5.6(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all Employee Arrangements.  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.  The Reorganized Debtors shall be authorized to amend any existing or establish any new Benefit Plan or enter into employee agreements as it determines is in the best interests of creditors.

(b)     Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  The MIP Equity shall be reserved for grants made from time to time to directors, officers, and other management and employees of the Reorganized Debtors, and will be dilutive of all other Reorganized Equity Interests issued pursuant to this Plan (including on account of the New Warrants, the Rights Offering Shares, and the Backstop Put Premium).

(c)     For the avoidance of doubt, if an Employee Arrangement or a Benefit Plan provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.11 of this Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement or Benefit Plan.

(d)     On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all agreements providing for retiree benefits within the meaning of section 1114 of the Bankruptcy Code (which, for the avoidance of doubt, excludes the Deferred Comp Plans).

(e)     The Reorganized Debtors shall assume obligations arising under the Deferred Comp Plans solely in an amount equal to the amount, and from the proceeds, of distributions of cash under this Plan to satisfy any Allowed Adequate Protection Claims or any Claims secured by Prepetition Priority/1L Adequate Protection Liens on the Specified Assets (as defined in the Restructuring Support Agreement), in each case, as provided in, and subject to, the Restructuring Support Agreement.

### 5.7     *Effectuating Documents; Further Transactions.*

(a)     On or as soon as practicable after the Confirmation Date, the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such reasonable actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution,

or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the execution, delivery, and/or filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended/New Organizational Documents (which shall, under certain circumstances, solely to the extent required by new or existing franchise agreements, limit only the voting rights of certain holders of equity interests (but not their economic rights); *provided* that such limitation shall only apply to the initial holder of equity interests, and not to any purchaser, transferee, or assignee of all or a portion of such equity interests), including pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) to the extent applicable, the execution and delivery of the New QB First Lien Term Loan Credit Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); and (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended/New Organizational Documents.

(b) Each officer, manager, limited partner or member of the board of directors of the Debtors is (and each officer, manager, limited partner or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and, in the event that the Debtors pursue the Reorganization Transaction, the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders, limited partners, directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Co) except for those expressly required pursuant to the Plan.

(c) In order to preserve the Reorganized Debtors' or Wind Down Co's ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the Reorganized Equity Interests, New Warrants, or Rights Offering Shares, subject to the consent of the Requisite Creditors.

(d) The Reorganization Transaction or Sale Transaction, as applicable, shall be conducted in a manner that, in the business judgment of the Debtors, is intended to ensure that the Reorganized Debtors or Wind Down Co, as applicable, receive favorable and efficient tax treatment, given the totality of the circumstances and would not materially adversely affect the Requisite Creditors or their respective recoveries, entitlements, or rights under the Plan, the Restructuring Support Agreement, or any of the Definitive Documents without their consent.

(e) All matters provided for herein involving the corporate structure of the Debtors, Reorganized Debtors, or Wind Down Co, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Co in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, limited partners, directors or managers of the Debtors, Reorganized Debtors, or the Wind Down Co, as applicable, and with like effect as though such action had been taken unanimously by the

stockholders, members, limited partners, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Co.

### 5.8    *Exception from Securities Laws.*

(a)      The issuance and distribution of the Reorganized Equity Interests, New Warrants, and Reorganized Equity Interests that are issued upon the exercise of New Warrants to holders of Allowed First Lien Secured Claims and General Unsecured Claims under Article IV of this Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

(b)      Except as provided in clause (c) below, the offer, issuance and sale, as applicable, of the Rights Offering Shares to holders of Allowed First Lien Secured Claims under Article IV of this Plan shall be exempt, pursuant to (i) section 1145 of the Bankruptcy Code or (ii) section 4(a)(2) of the Securities Act and Regulation D thereunder, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by the applicable exemption therefrom.

(c)      The offer, issuance and sale, as applicable, of the Rights Offering Shares to be issued pursuant to the Backstop Commitment Agreement, including those to be issued in respect of the Backstop Commitment Premium, are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.

(d)      With respect to the foregoing Securities issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder, such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act.  With respect to the foregoing Securities issued pursuant to section 1145(a) of the Bankruptcy Code, such Securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(e)      None of the Debtors, the Reorganized Debtors, or any other Person shall be required to provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of the Reorganized Equity Interests, New Warrants, or the Rights Offering Shares under applicable securities laws.  DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon this Plan or Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity Interests, New Warrants, or the Rights Offering Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

(f)      Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including whether the Reorganized Equity Interests, New Warrants, and the Rights Offering Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**5.9**    _**Cancellation of Existing Securities and Agreements.**_

(a)    Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Intercreditor Agreements, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to or in connection with the Priority Term Loan Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, without any need for a holder of Priority Term Loan Secured Claims, First Lien Secured Claims, or Second Lien Secured Claims to take further action with respect thereto, and the obligations of the Debtors and the Agents thereunder shall be deemed fully satisfied, released, and discharged.  For the avoidance of doubt, except as otherwise provided in this Plan, the Agents shall have no further duties or obligations under the Priority Term Loan Credit Documents, the First Lien Credit Document or the Second Lien Credit Documents, as applicable.

(b)    Notwithstanding such cancellation and discharge, the Priority Term Loan Credit Documents, the First Lien Credit Documents, and the Second Lien Credit Documents shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive Plan Distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, and the Agents (as applicable) to make post-Effective Date Plan Distributions or take such other action pursuant to this Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the Interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Agents to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors (except as otherwise set forth in this Plan), including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Agents to payment of fees, costs, expenses, and indemnification obligations, including as against any money or property distributable to lenders, under the Priority Term Loan Credit Documents, lenders under the First Lien Credit Documents, and lenders under the Second Lien Credit Documents, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Agents to enforce any obligations owed to them under this Plan; (vii) to allow the Agents to exercise rights and obligations relating to the interests of themselves or the lenders under the Priority Term Loan Credit Documents, lenders under the First Lien Credit Documents, and lenders under the Second Lien Credit Documents, as applicable; (viii) to permit the Agents to perform any function necessary to effectuate the foregoing; and (ix) to allow the Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Priority Term Loan Credit Documents, the First Lien Credit Documents, or the Second Lien Credit Documents; _provided_, that nothing in this Section 5.9 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors (except as otherwise set forth in this Plan). Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Priority Term Loan Credit Documents, the First Lien Credit Documents, and the Second Lien Credit Documents shall survive the termination thereof and shall not be discharged or released pursuant to this Plan or the Confirmation Order.

(c)    Except for the foregoing, subsequent to the performance by the Prepetition Priority Agent of its obligations pursuant to this Plan, the Prepetition Priority Agent and its agents shall be relieved of all further duties and responsibilities related to the Priority Term Loan Credit Documents.

(d)    Except for the foregoing, subsequent to the performance by the Prepetition 1L Agent of its obligations pursuant to this Plan, the Prepetition 1L Agent and its agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Documents.

(e)        Except for the foregoing, subsequent to the performance by the Prepetition 2L Agent of its obligations pursuant to this Plan, the Prepetition 2L Agent and its agents shall be relieved of all further duties and responsibilities related to the Second Lien Credit Documents.

(f)        Notwithstanding anything to the contrary herein, all rights under the First Lien Credit Agreement shall remain subject to the First Lien Intercreditor Agreement.

(g)        Notwithstanding anything to the contrary herein, all rights under the Second Lien Credit Agreement shall remain subject to the 1L/2L Intercreditor Agreement.

(h)        Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 5.10    *Letters of Credit.*

Any Letters of Credit that remain outstanding on the Effective Date shall be (a) cash collateralized by the Debtors or Reorganized Debtors, as applicable, pursuant to arrangements reasonably satisfactory to the Prepetition 1L Agent (at an amount equal to 100% of the face amount thereof), (b) terminated, cancelled, or returned undrawn to the applicable issuer, or (c) otherwise addressed through arrangements acceptable to the Prepetition 1L Agent, the applicable issuer, the Debtors, and the Requisite Creditors.

### 5.11    *Cancellation of Liens.*

Except as otherwise specifically provided in this Plan, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 5.12    *Intercompany Interests; Corporate Reorganization.*

To the extent reinstated under this Plan, on the Effective Date, the Intercompany Interests (i) shall be reinstated for the ultimate benefit of the holders of Claims that receive Reorganized Equity Interests and New Warrants under this Plan, and shall receive no recovery or distribution, and (ii) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.13    *Preservation of Causes of Action.*

(a)        In accordance with section 1123(b) of the Bankruptcy Code and pursuant to the UCC Settlement, but subject in all respects to Article X of the Plan, the GUC Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising

before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article X</u> of the Plan (including any such Avoidance Actions and Causes of Actions against any of the Released Parties), which shall be deemed released and waived as of the Effective Date.

(b)     The GUC Trustee may pursue such Retained Causes of Action in accordance with the best interests of the GUC Trust Beneficiaries.  The GUC Trustee shall retain and may exclusively enforce any and all such Retained Causes of Action.  The GUC Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

(c)     **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the GUC Trust shall not pursue any and all available Causes of Action against it, except to the extent such Causes of Action are assigned or transferred to the Successful Bidders or their designee(s) in accordance with the Purchase Agreements or as otherwise expressly provided in this Plan, including this <u>Article V</u> and <u>Article X</u> of this Plan.**  Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or transferred to the Successful Bidders or their designee(s) in accordance with the Purchase Agreements, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the GUC Trust for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.

### 5.14   *Subordination Agreements.*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Intercreditor Agreements, governing Claims or Interests shall be enforced in accordance with such agreement's terms.

### 5.15   *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 5.16   *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors, Plan Administrator, or the GUC Trustee, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; *provided*, that, as of the Effective Date, the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, may submit separate orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further*, that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

**5.17**     *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**5.18**     *GUC Trust.*

(a)     *Creation and Governance of the GUC Trust*.  On or before the Effective Date, the Debtors shall irrevocably transfer the GUC Trust Assets to the GUC Trust and the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Trust all of their rights, title and interest in and to all of the GUC Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust without further action by any Person, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the GUC Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement.  The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.18.  The GUC Trustee shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and the GUC Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Trust Agreement.  After the Effective Date, the Debtors and the Wind Down Co shall have no interest in the GUC Trust Assets except as set forth in the GUC Trust Agreement.

(b)     *GUC Trustee and GUC Trust Agreement*.  The GUC Trust Agreement generally will provide for, among other things: (i) the transfer of the GUC Trust Assets to the GUC Trust; (ii) the payment of certain reasonable expenses of the GUC Trust, first from the GUC Trust Reserve, second from the GUC Trust Assets; (iii) litigation of any GUC Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; (iv) Plan Distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Trust Agreement; and (v) maintaining and administering a disputed claims reserve, if applicable.  The GUC Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the GUC Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the GUC Trust.  Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets, except as otherwise provided in the GUC Trust Agreement.

(c)     *Preservation of Privilege*.  The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets.  The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, the Wind Down Co, or the Plan Administrator, as applicable, and the Debtors, Wind Down Co, or the Plan Administrator, as applicable, retain the sole right to waive their own privileges.

(d)     *GUC Trust Causes of Action*.  The GUC Trustee shall have the exclusive right in respect of all GUC Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Trust Agreement. From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement.  All costs and expenses of investigating, pursuing, prosecuting and/or compromising GUC Trust Causes of Action shall be satisfied from the proceeds of the GUC Trust Causes of Action before any proceeds remaining after the satisfaction of such costs and expenses are paid to GUC Trust Beneficiaries as provided in this Plan.  To the extent of any costs or expenses advanced by the GUC Trust or GUC Trustee prior to receipt of any proceeds of GUC Trust Causes of Action, the GUC Trust Reserve and/or the Cash GUC Trust Assets, as applicable, shall be replenished as and when proceeds of GUC Trust Causes of Action are received.  For the avoidance of doubt, the GUC Trustee may expend such portion of the GUC Trust Assets as the GUC Trustee deems necessary to investigate, pursue, prosecute and/or compromise GUC Trust Causes of Action.

(e)     *GUC Trust Fees and Expenses*.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable expenses (including professional fees) incurred by the GUC Trust and any professionals retained by the GUC Trust, first from the GUC Trust Reserve, second from the GUC Trust Assets, except as otherwise provided in the GUC Trust Agreement.  The Wind Down Co or the Plan Administrator, or any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust.  The GUC Trust Reserve shall only be used to pay the reasonable expenses (including professional fees) incurred by the GUC Trust and any professionals retained by the GUC Trust.

(f)     *Tax Treatment*.  In furtherance of this <u>Section 5.18</u> of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors, holders of General Unsecured Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims, as applicable, followed by the deemed transfer of such assets to the GUC Trust); (iv) all parties shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee may (x) timely elect to treat any disputed claims reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 (and make any appropriate elections), (y) file such tax returns (including but not limited to the filing of a separate federal tax return for the "disputed ownership fund") and pay such taxes as may be required consistent with such treatment and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors, holders of General Unsecured Claims, and the GUC Trustee) shall report for United States federal,

state, and local income tax purposes consistently with the foregoing.  The GUC Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the GUC Trust for all taxable periods through the date on which final distributions are made.

(g)  *Non-Transferability of GUC Trust Interests*.  The GUC Trust Interests, and any right to receive a Plan Distribution from the GUC Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee.  Any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  In addition, any and all GUC Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance, and Plan Distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

(h)  *Dissolution of the GUC Trust*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all Plan Distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Trust: (i) any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, as appropriate, or, in the event all Allowed General Unsecured Claims and obligations of the GUC Trust are paid in full, such remaining GUC Trust Assets shall revert to the Wind Down Co and (ii) any remaining amounts in the GUC Trust Reserve shall be distributed to Wind Down Co for distribution to holders of Allowed First Lien Secured Claims, subject to Section 6.13 of this Plan.

(i)  *Single Satisfaction of Allowed General Unsecured Claims*.  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Trust.

(j)  *Driver Claimant General Unsecured Claims*.  Notwithstanding anything to the contrary herein, the GUC Trust shall not be responsible for (i) reconciling the Driver Claimant General Unsecured Claims, or (ii) making distributions to the holders of Allowed Driver Claimant General Unsecured Claims.

## ARTICLE VI.      DISTRIBUTIONS.

### 6.1      Distributions Generally.

One or more Disbursing Agents shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

### 6.2      No Postpetition Interest on Claims.

Notwithstanding anything else in the Plan or Confirmation Order, postpetition interest shall accrue or be paid on the Priority Term Loan Secured Claims and on the First Lien Secured Claims (in the event the Sale Proceeds exceed the amount of Priority Term Loan Secured Claims and the amount of First Lien Secured Claims as of the Petition Date or in the event the amount of First Lien Deficiency Claims equal $0). Except as otherwise specifically provided for in this Plan (including as set forth in the preceding sentence and Sections 4.3 and 4.6 of this Plan), the Confirmation Order, or another order of the Bankruptcy

Court, postpetition interest shall not accrue or be paid on any other Claims, and no holder of any other Claims shall be entitled to interest accruing on such Claims on or after the Petition Date.

### 6.3     *Date of Distributions.*

(a)     The Debtors shall make Plan Distributions to holders of Allowed Priority Term Loan Secured Claims, Allowed First Lien Secured Claims, and Allowed Second Lien Secured Claims (solely in the event that the Sale Transaction is consummated) on the Effective Date.  Unless otherwise provided in this Plan, any other Plan Distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Plan Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.

(b)     In the event that the Sale Transaction is consummated and the Wind Down Fund is funded, the Plan Administrator shall reserve from the Wind Down Fund an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Other Secured Claims (if any), Disputed Other Priority Claims, and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of all such Disputed Claims, the Plan Administrator shall treat any amounts that were reserved for such Disputed Claims that do not become Allowed Claims as Sale Proceeds and distributed pursuant to the Plan, *first*, to holders of Allowed Priority Term Loan Secured Claims until such Claims are paid in full in Cash; *second*, to holders of Allowed First Lien Secured Claims until such Claims are paid in full in Cash; *third*, to holders of Allowed Second Lien Secured Claims until such Claims are paid in full in Cash; and *fourth*, to holders of Allowed General Unsecured Claims until such Claims are paid in full in Cash.

(c)     Section 6.3(b) above shall not apply to Plan Distributions to holders of Allowed General Unsecured Claims, which will be governed by Section 5.18 and the GUC Trust Agreement.

### 6.4     *Distribution Record Date.*

(a)     As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to Plan Distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     In connection with any Plan Distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, shall be entitled to recognize and deal for all purposes under this Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

### 6.5    *Distributions after Effective Date.*

Plan Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6    *Disbursing Agent.*

Except as otherwise set forth in this Plan, all Plan Distributions under this Plan shall be made by the applicable Disbursing Agent on and after the Effective Date as provided herein.  The applicable Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors, Plan Administrator, or GUC Trustee) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', Wind Down Co's, or GUC Trust's, as applicable, books and records.  The Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors, Plan Administrator, or GUC Trustee) to comply with the reporting and withholding requirements outlined in Section 6.16 of the Plan.

### 6.7    *Rights and Powers of Disbursing Agent.*

(a)    **Powers of Disbursing Agent**.  Each Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the applicable Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan, the Wind Down Co Organizational Documents, or the GUC Trust Agreement, as applicable, or (B) as deemed by the applicable Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)    **Expenses Incurred on or After the Effective Date**.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable and documented compensation and expense reimbursement Claims (including for reasonable and documented attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash.  This Section 6.7(b) shall not apply to post-Effective Date expenses of the GUC Trustee or any Disbursing Agent retained by the GUC Trustee, which shall be governed by Section 5.18 and the GUC Trust Agreement.

### 6.8    *Delivery of Distributions.*

(a)    Subject to Sections 6.4(b) and 6.8(b) of this Plan, the applicable Disbursing Agent shall issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, shall make all Plan Distributions to any holder of an Allowed Claim as and when required by this Plan at:  (i) the address of such holder on the books and records of the Debtors or their agents; or (ii) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any Plan Distribution to any holder is returned as undeliverable, no Plan Distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then-

current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

(b)        Notwithstanding the foregoing, the Debtors shall deposit on or before the Effective Date all Plan Distributions of Cash on account of Priority Term Loan Secured Claims or First Lien Secured Claims, if any, with the Prepetition Priority Agent and the Prepetition 1L Agent, as applicable, for distribution to holders of Priority Term Loan Secured Claims and First Lien Secured Claims, respectively, in accordance with the terms of the Priority Term Loan Credit Documents, the First Lien Credit Documents, and the First Lien Intercreditor Agreement, and shall be deemed completed when deposited with the Prepetition Priority Agent and the Prepetition 1L Agent, as applicable.  All Plan Distributions of Cash on account of Second Lien Secured Claims, if any, shall be deposited with the Prepetition 2L Agent for distribution to holder of Second Lien Secured Claims in accordance with the terms of the Second Lien Credit Documents and the 1L/2L Intercreditor Agreement, and shall be deemed completed when deposited with the Prepetition 2L Agent.

(c)        All Plan Distributions other than of Cash on account of First Lien Secured Claims or Second Lien Secured Claims, if any, may, with the consent of the Prepetition 1L Agent (at the direction of Required First Lien Lenders in their sole discretion) and the Prepetition 2L Agent, be made by the Disbursing Agent directly to holders of First Lien Secured Claims and Second Lien Secured Claims in accordance with the terms of this Plan, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the 1L/2L Intercreditor Agreement.

(d)        To the extent the Prepetition Priority Agent, the Prepetition 1L Agent, or the Prepetition 2L Agent effectuates, or is requested to effectuate, any Plan Distributions hereunder, the Prepetition Priority Agent, the Prepetition 1L Agent, and the Prepetition 2L Agent shall be deemed a "Disbursing Agent" for purposes of this Plan.

### 6.9    *Unclaimed Property.*

(a)        Other than Plan Distributions payable to holders of GUC Trust Interests, one year from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions that remain payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Debtors, Reorganized Debtors, or Wind Down Co, as applicable, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors, the Plan Administrator, or GUC Trustee, as applicable, and the Disbursing Agent (if other than the Reorganized Debtors, Plan Administrator, or GUC Trustee) shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

(b)        With respect to Plan Distributions payable to holders of the GUC Trust Interests, all Plan Distributions on account of Allowed General Unsecured Claims that are unclaimed and remain payable within the meaning of the paragraph set forth immediately below for a period of more than ninety (90) calendar days shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and (i) the respective holders of Allowed General Unsecured Claims otherwise entitled to such unclaimed property shall cease to be entitled thereto and shall be entitled to no further Plan Distributions under the Plan, (ii) such Allowed General Unsecured Claims shall be deemed disallowed and expunged in their entirety, and (iii) the funds representing such unclaimed distribution shall revert to the GUC Trust and become GUC Trust Assets for all purposes including redistribution to other holders of GUC Trust Interests in accordance with the terms of this Plan, the Confirmation Order, and the GUC Trust Agreement, notwithstanding any federal, provincial, or state escheat, abandonment, or unclaimed property law to the

contrary.  Requests to the GUC Trustee for reissuance of any check must be made in writing to the GUC Trustee by the claimholder that originally was issued such check within sixty (60) calendar days after the date of issuance thereof.

(c)    For the avoidance of doubt, a Plan Distributions shall be deemed unclaimed if a holder has not:  (i) accepted a particular Plan Distribution or, in the case of Plan Distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtors, the Plan Administrator, or GUC Trustee, as applicable, of an intent to accept a particular Plan Distribution; (iii) responded to the Debtors', Reorganized Debtors', Plan Administrator's, or GUC Trustee's, as applicable, requests for information necessary to facilitate a particular Plan Distribution (including, but not limited to, the provision of the appropriate tax form (Form W-9 or, if applicable, Form W-8) within the time period specified in Sections 6.16(a) or (b)); or (iv) taken any other action necessary to facilitate such distribution.

### 6.10    *Satisfaction of Claims.*

Unless otherwise provided herein, any Plan Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.11    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors, the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or, in the case of the GUC Trustee, in his/her/its discretion.

### 6.12    *Fractional Shares and De Minimis Cash Distributions.*

No fractional Reorganized Equity Interests or New Warrants shall be distributed.  When any Plan Distribution would otherwise result in the issuance of a number of Reorganized Equity Interests or New Warrants that is not a whole number, the Reorganized Equity Interests or New Warrants subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of Reorganized Equity Interests and New Warrants to be distributed in connection with this Plan shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  The Reorganized Debtors, Wind Down Co, the GUC Trustee, or the Disbursing Agent (if other than the Reorganized Debtors, Plan Administrator, or GUC Trustee) shall not have any obligation to make a Plan Distribution that is less than one (1) Reorganized Equity Interest or New Warrant or $100.00 in Cash.  Fractional Reorganized Equity Interests or New Warrants that are not distributed in accordance with this Section 6.12 shall be returned to, and ownership thereof shall vest in, New NPC Parent.  Cash that is not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, the Wind Down Co or the GUC Trust, as applicable.

### 6.13    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Sections 4.3, 4.6, and 6.2 of this Plan).

### 6.14    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Co), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.15    *Setoffs and Recoupments.*

The Debtors, the Reorganized Debtors, the Wind Down Co, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the applicable Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any Plan Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, the Wind Down Co, or the GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor, Reorganized Debtor, the Wind Down Co, or the GUC Trust, as applicable, or its successor of any claims, rights, or Causes of Action that a Debtor, Reorganized Debtor, the Plan Administrator, or GUC Trust, as applicable, or its successor or assign may possess against the holder of such Claim.

### 6.16    *Withholding and Reporting Requirements.*

(a)    Except as set forth in 6.16(b) hereof with respect to Plan Distributions to be made by the GUC Trust, in connection with this Plan, any Person issuing any instrument or making any Plan Distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may require the intended recipient of such Plan Distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such Plan Distribution or withhold an appropriate portion of such distributed property and either (i)  sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a Plan Distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.  Any party entitled to receive any property as an issuance or Plan Distribution under this Plan shall deliver to the withholding agent or such other Person designated by the Reorganized Debtors or Plan Administrator, as applicable, a Form W-8, Form W-9 and/or any other forms or documents, as applicable, requested by any Reorganized Debtor or Plan Administrator, as applicable, to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or Plan Distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or Plan Distribution shall irrevocably revert to the applicable Reorganized Debtor or Wind Down Co, as applicable, and any Claim in respect of such Plan Distribution under this Plan shall be discharged and forever barred from assertion against such Reorganized Debtor or Wind Down Co, as applicable, or its respective property.

(b)    All Plan Distributions to be made by the GUC Trust or GUC Trustee under the Plan and GUC Trust Agreement shall, to the extent applicable, comply with all tax withholding, payment and reporting requirements imposed by any federal, state or local taxing authority, and all such Plan Distributions shall be subject to any such withholding, payment and reporting requirements.  The GUC Trustee may require each holder of Allowed General Unsecured Claims to provide a current executed Form

W-9, Form W-8 or similar tax form as a prerequisite to receiving a Plan Distribution by sending a request for such forms by any commercially reasonable means to all holders of Allowed General Unsecured Claims potentially entitled to a Plan Distribution to either (i) the address set forth on the Proof(s) of Claim filed by such claimholder, (ii) the address reflected in the Schedules if no Proof of Claim has been filed, or (iii) the address set forth in any written notice of change of address delivered to the GUC Trustee and filed with the Bankruptcy Court.  Any holder of General Unsecured Claims failing to return a completed Form W-9 (or, if applicable, Form W-8) to the GUC Trustee within ninety (90) calendar days of the GUC Trustee's request (or within any further time period expressly agreed to in writing between the GUC Trustee and such holder of a General Unsecured Claim), shall be deemed to have forfeited his, her, or its respective rights to any current, reserved or future Plan Distributions and such General Unsecured Claim shall be expunged without further order of the Bankruptcy Court.  Any such forfeited Plan Distribution shall be deemed to have reverted back to the GUC Trust for all purposes, including for distribution to other holders of Allowed General Unsecured Claims, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

(c)     Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

(d)     Notwithstanding any other provision of this Plan, the obligations of the Backstop Parties and the rights of the Debtors with respect to any taxes applicable to the Backstop Put Premium shall be governed exclusively by the Backstop Commitment Agreement.

## ARTICLE VII.     PROCEDURES FOR DISPUTED CLAIMS.

### 7.1     *Allowance of Claims.*

Except as expressly provided in this Plan (including as provided in Sections 4.3 and 4.6 of this Plan) or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to this Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.  On and after the Effective Date, each of the Debtors, the Reorganized Debtors, Wind Down Co, and GUC Trust, as applicable, shall have and retain any and all rights and defenses with respect to any Claim immediately before the Effective Date, except for such rights and defenses that constitute Transferred Assets (as defined in the Purchase Agreements) assigned or transferred to the Successful Bidders or their designee(s) in accordance with the Purchase Agreements.

### 7.2     *Objections to Claims.*

Except insofar as a Claim is Allowed under this Plan, the Debtors, the Reorganized Debtors, or Plan Administrator, as applicable, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and Intercompany Claims.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims; *provided*, that, the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, shall have sole responsibility for objecting to all Driver Claimant General Unsecured Claims. Except as otherwise expressly provided in this Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, (a) the Reorganized Debtors or Plan Administrator, as applicable, shall have the authority (i) to file, withdraw, or litigate to judgment objections to Administrative Expense Claims, Driver Claimant Admin Claims, Priority Tax Claims, Other Priority Claims, Driver Claimant Priority T1 Claims, Driver Claimant Priority T2 Claims, Other Secured Claims,

and Intercompany Claims; (ii) to settle or compromise any such Claim that are disputed without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; and (b) the GUC Trustee shall have the authority (i) to file, withdraw, or litigate to judgment objections to General Unsecured Claims; (ii) to settle or compromise any disputed General Unsecured Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3    _Estimation of Claims._

Before or after the Effective Date, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Plan Distributions), as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

### 7.4    _Adjustment to Claims Register Without Objection._

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors, the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.5    _Time to File Objections to Claims._

Any objections to a Claim shall be filed on or before the date that is the later of (a) one hundred eighty (180) days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, as such deadline may be extended from time to time.

### 7.6    _Disallowance of Claims._

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any Plan Distributions on

account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, Wind Down Co, or GUC Trust, as applicable.

### 7.7    *Amendments to Claims.*

On or after the Effective Date, except as provided in this Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable.

### 7.8    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Plan Distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.9    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Plan Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the applicable Disbursing Agent shall provide to the holder of such Allowed Claim the Plan Distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.10    *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with this Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section 5.6(a) of this Plan; (v) is identified in Section 8.6 of this Plan; (vi) is reinstated in Section 4.1 of this Plan; or (vii) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement. With respect to the Sale Transaction, all unexpired leases identified on the Schedule of Assumed Contracts included in the Plan Supplement to which any of the Debtors are parties shall be deemed assumed upon entry of the Confirmation Order, and the unexpired leases to which any of the Debtors are parties shall be deemed assigned and executory contracts shall be deemed assumed and assigned in accordance with the Bidding Procedures, the applicable sale and purchase agreement(s), and the Sale Orders.

(b)        Subject to (i) the occurrence of the Effective Date for executory contracts and (ii) entry of the Confirmation Order for unexpired leases, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Wind Down Co, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Wind Down Co, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

(c)        To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

(d)        The Debtors reserve the right to amend the Schedule of Assumed Contracts and/or the Cure Notice, subject to the reasonable consent of the Requisite Creditors, to add or remove any executory contract or unexpired lease; *provided* any affected counterparty whose executory contract or unexpired lease is newly added to the Schedule of Assumed Contracts will have until the earlier of (i) seven (7) days from filing and service of the amended Schedule of Assumed Contracts and/or Cure Notice and (ii) the Confirmation Hearing to object to assumption and/or proposed Cure Amount; *provided*, *further* that the Debtors may amend the Schedule of Assumed Contracts to add or delete any executory contracts or unexpired leases at any time prior to the entry of the Confirmation Order without notice to the extent agreed with the relevant counterparties, subject to the reasonable consent of the Requisite Creditors, and entry of an order of the Bankruptcy Court.

(e)        Following the entry of the Confirmation Order and no later than ten (10) days prior to the Effective Date, the Debtors may add or remove any executory contract to the Schedule of Assumed Contracts, subject to the reasonable consent of the Requisite Creditors, *provided*, that, any affected counterparty whose executory contract is (i) newly added to the Schedule of Assumed Contracts will have seven (7) days from filing and service of the amended Schedule of Assumed Contracts to object to assumption and assignment of such executory contract or unexpired lease to the Wind Down Co, and (ii) removed from the Schedule of Assumed Contracts will have until forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date to file a Proof of Claim with the Bankruptcy Court and serve such Proof of Claim upon counsel for the Debtors, the Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, for any Claim resulting from the rejection of such removed executory contract; *provided*, *further*, that the Debtors may add any executory contract the Schedule of Assumed Contracts without notice to the extent agreed with the relevant counterparties, subject to the reasonable consent of the Requisite Creditors.

### 8.2    *Determination of Cure Amounts and Deemed Consent.*

(a)        The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts, which shall be in form and substance acceptable to the Requisite Creditors.  At least fourteen (14) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and,

where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by this Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, any Reorganized Debtor, or Wind Down Co, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, any Reorganized Debtor, or Wind Down Co, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to this Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(a), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by this Plan.

(b)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, *provided*, that the Debtors, the Reorganized Debtors, or Plan Administrator, or the assignee of such executory contract or unexpired lease, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Debtors, the Reorganized Debtors, or Wind Down Co, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor or Wind Down Co, as applicable).

(d)     Subject to Section 8.1 above and notwithstanding anything to the contrary herein, in the event of a Sale Transaction, the terms of the Bidding Procedures, Sale Documents, and any other related orders of the Bankruptcy Court, to the extent inconsistent with the terms of this Plan, shall govern the assignment of unexpired leases and assumption and assignment of executory contracts with respect to the Sale Transaction; *provided* that if the Bidding Procedures, Sale Documents, and any other related order of the Bankruptcy Court do not provide for the assumption of an executory contract or unexpired lease, the terms of the Plan will govern the assumption or rejection of such executory contract on unexpired lease.

### 8.3     *Payments Related to Assumption of Contracts and Leases.*

(a)     Subject to Section 8.2 above, any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash (i) with respect to unexpired leases, on the earlier of (1) fourteen (14) days following the entry of the Confirmation Order, *provided*, that, such payment shall be made by the Debtors, or (2) the Closing Date(s), or promptly thereafter, in accordance

with the applicable Purchase Agreement, and (ii) with respect to executory contracts, (1) on the Closing Date(s) or promptly thereafter if assigned to the Successful Bidders, and (2) on the Effective Date or promptly thereafter if assumed by the Wind Down Co, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to this Plan or otherwise and payment of the Cure Amount shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease; *provided*, that the Debtors, the Reorganized Debtors, the Wind Down Co, or the Successful Bidders (or their applicable eligible designee), as applicable, will remain obligated to pay any unpaid, due and owing, and undisputed Administrative Expense Claims and any accrued but unbilled or not yet due rent and other charges under any such assumed or assumed and assigned unexpired lease of non-residential real property, including with respect to any reconciliations, adjustments, and indemnification obligations, *provided further*, that, with respect to the Successful Bidders (or their applicable eligible designee), such obligation shall be as provided and subject to the applicable Purchase Agreement, including the proration provisions, as applicable.  Notwithstanding anything to the contrary in this Plan, nothing shall modify the rights, if any, of any holder of a Claim, to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, the Reorganized Debtors, the Wind Down Co or any successors to the Debtors, under the Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Reorganized Debtors, the Estates, the Wind Down Co or any successors of the Debtors, as applicable.  The Debtors reserve all rights to object with respect to the foregoing.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease; *provided*, that, if a determination of the related Cure Amount is appealed, such proofs of Claim shall not be deemed disallowed or expunged until the entry of an applicable court order concluding all appeal processes or the appellant's withdrawal or dismissal thereof.

### 8.4     *Rejection Damages Claims.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such executory contract or unexpired lease, unless such party or parties file a Proof of Claim for any Claim for such damages with the Bankruptcy Court and served upon counsel for the Debtors, the Reorganized Debtors, Plan Administrator, or the GUC Trustee, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective Estates, the Wind Down Co, or the GUC Trust, as applicable, properties or interests in property as agent, successor, or assigns.

### 8.5     *Survival of the Debtors' Indemnification Obligations.*

(a)     Solely with respect to the Reorganization Transaction, the Debtors and the Reorganized Debtors shall honor any Indemnification Obligations in place immediately prior to the Effective Date

(whether in by-laws, board resolutions, corporate charters (or other equivalent governing documents), indemnification agreements, or employment contracts) solely for the Covered Persons; *provided*, that the Reorganized Debtors or Wind Down Co, as applicable, shall not indemnify the Covered Persons for any Claim or Causes of Action that is not indemnified by such Indemnification Obligation.  In addition, after the Effective Date, the Reorganized Debtors or the Wind Down Co, as applicable, shall not terminate or otherwise reduce the coverage under any current and former D&O Policy (including any "tail policy") in effect as of the Petition Date, and Covered Persons shall be entitled to the full benefits of any such D&O Policy for the full term of such D&O Policy regardless of whether such Covered Persons remain in their respective positions after the Effective Date to the extent set forth in such D&O Policies.  For the avoidance of doubt and notwithstanding the foregoing, the Reorganized Debtors shall not retain any ongoing obligations or liabilities arising from or related to any agreements or arrangements to which the Sponsors (as defined in the First Lien Credit Agreement) or their principals or Affiliates are a party with any other party; *provided*, *however*, nothing herein shall release, waive, discharge or extinguish any obligation or liability of the Reorganized Debtors under any unexpired lease that may be assumed and as to which any Sponsor or any of its principals or any Affiliate may be the lessor.

(b)     Solely with respect to the Sale Transaction, subject to the occurrence of the Effective Date, the obligations of each Debtor to indemnify, defend, reimburse or limit the liability of any Released Parties, against any Claims or Causes of Action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds.  Indemnification claims arising out of prepetition conduct shall be treated as General Unsecured Claims against the Debtors to the extent Allowed.  Indemnification claims arising out of postpetition conduct shall be treated as Administrative Expense Claims against the Debtors to the extent Allowed.

(c)     Notwithstanding anything to the contrary in this Plan, the Debtors and Reorganized Debtors shall honor the indemnification obligations of the Debtors under the Priority Term Loan Credit Documents, the First Lien Credit Documents, or the Second Lien Credit Documents, as applicable, which indemnification obligation shall survive confirmation of the Plan and shall be governed by the terms of the Priority Term Loan Credit Documents, the First Lien Credit Documents, or the Second Lien Credit Documents, as applicable.

### 8.6     *Insurance Policies.*

(a)     Notwithstanding anything to the contrary in the Definitive Documents, this  Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in this Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (x) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (y) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the

Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (z) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.7 *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

8.8 *Reservation of Rights.*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Reorganized Debtors, Wind Down Co, or GUC Trust, as applicable, or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, Wind Down Co, or GUC Trust, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Reorganized Debtors, or Wind Down Co, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors, the Reorganized Debtors, or Plan Administrator, as applicable, shall, subject to the reasonable consent of the Requisite Creditors, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

8.9 *Sale Orders; Assumption and Assignment Procedures.*

Nothing contained in this Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the Sale Orders or any assumption or assignment procedures described therein.

**ARTICLE IX.    CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

9.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following applicable conditions precedent have been satisfied or waived in accordance with this Plan and the Restructuring Support Agreement:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(b)        the documents contained in the Plan Supplement will contain terms and conditions consistent in all material respects with this Plan;

(c)        the Bankruptcy Court shall have entered the Confirmation Order, which shall:

(i)        be in form and substance acceptable to the Requisite Creditors and consistent with the Restructuring Support Agreement;

(ii)        authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with this Plan;

(iii)        decree that the provisions in the Confirmation Order and this Plan are nonseverable and mutually dependent;

(iv)        authorize the Debtors, as applicable/necessary, to:  (A) implement the Restructuring, including the Rights Offering; (B) issue the Reorganized Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements;  (C) make all Plan Distributions and issuances as required under this Plan, including any undistributed Cash from a sale of the PH Business and/or the Wendy's Business (as applicable and if any), the New QB First Lien Term Loans, if applicable, Reorganized Equity Interests, New Warrants, Subscription Rights to participate in the Rights Offering for Rights Offering Shares, and Rights Offering Shares (including as payment of the Backstop Put Premium); (D) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement; and (E) assume or reject (as applicable) any Franchise Documents, unexpired leases, or material executory contracts that have been consented to in writing by the Requisite Creditors, and provide for the payment of such cure amounts related to or arising from such Franchise Document, unexpired lease or material executory contract assumed hereunder, which cure amounts have been consented to in writing by the Requisite Creditors;

(v)        authorize the implementation of this Plan in accordance with its terms; and

(vi)        provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(d)        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan;

(e)        the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and this Plan;

(f)        the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated;

(g)        the Cash Collateral Order shall be in full force and effect and shall not have been terminated;

(h)     the Bankruptcy Court shall have entered the Rights Offering Procedures Order and the Rights Offering Procedures Order shall not have been terminated;

(i)     the Backstop Commitment Agreement shall be in full force and effect and shall have not been terminated and the fees and payments payable under the Backstop Agreement shall have been paid;

(j)     if applicable, the Rights Offering shall have been consummated and shall have been conducted in accordance with the Rights Offering Procedures and this Plan;

(k)     the Bankruptcy Court shall have entered the Sale Orders and any such entered order shall be a Final Order; and the Sale Transaction shall have been consummated;

(l)     the Wind Down Co shall have been formed;

(m)     if applicable, the Wind Down Budget shall have been agreed to and the Wind Down Fund shall have been fully funded;

(n)     all Letters of Credit outstanding under the First Lien Credit Agreement shall have been treated in a manner consistent with the Restructuring Support Agreement;

(o)     the documentation related to the New QB First Lien Term Loan Facility, if applicable, shall have been duly executed and delivered by all of the entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New QB First Lien Term Loan Facility shall have been satisfied or duly waived in writing in accordance with the terms of each of the New QB First Lien Term Loan Facility and the closing of the New QB First Lien Term Loan Facility shall have occurred;

(p)     all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws and shall comply with the consent rights set forth in the Restructuring Support Agreement;

(q)     all Cure Amounts shall have been agreed to with the applicable Franchise Document, unexpired lease or material contract counterparty or determined by the Bankruptcy Court and such agreed or determined Cure Amount shall be acceptable to the Requisite Creditors;

(r)     the Debtors shall have paid, caused to be paid, or funded into escrow for payment all Restructuring Expenses, including those fees and expenses estimated to be incurred through and following the Effective Date, as applicable;

(s)     the Debtors shall have implemented the Restructuring and all transactions contemplated in and in a manner consistent with the Restructuring Support Agreement and this Plan;

(t)     the Restructuring to be implemented on the Effective Date shall be consistent with this Plan; and

(u)     the GUC Trust shall have been created by execution of the GUC Trust Agreement and funded with the GUC Trust Assets.

### 9.2     *Waiver of Conditions Precedent.*

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors, the Requisite Creditors, and, as applicable, the Backstop Parties, and the Creditors' Committee with respect to Section 9.1(u) of this Plan, without leave of or order of the Bankruptcy Court. If any such condition precedent is waived pursuant to this Section 9.2 and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court.  If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3     *Effect of Failure of a Condition.*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Person.

### 9.4     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.     EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

### 10.2     *Vesting of Assets.*

(a)     On the Effective Date and solely with respect to the Reorganization Transaction, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to this Plan, the Confirmation Order, and the New QB First Lien Term Loan Credit

Documents (if applicable).  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)     On the Effective Date and solely with respect to the Sale Transaction, all remaining property of the Debtors' Estates shall vest in the Wind Down Co free and clear of all Claims, Liens, encumbrances, charges, and other interests, other than the GUC Trust Assets, which shall be governed by Section 5.18 hereof, after giving effect to the Plan Distributions to be made on the Effective Date under the Plan, and except as provided pursuant to the Plan, the Confirmation Order, and the applicable purchase agreement(s) free and clear of all Claims, Interests, Liens, other encumbrances for interests of any kind.

### 10.3    *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, if the Reorganization Transaction occurs, and in consideration of the Plan Distributions to be made hereunder, except as otherwise expressly provided under this Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction Against Interference With Plan.*

Except as otherwise provided in this Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6 *Plan Injunction.*

(a)      Except as otherwise provided in this Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from:  (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, the Wind Down Co, the Plan Administrator, the GUC Trust, or the GUC Trustee, or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, the Wind Down Co, or the GUC Trust, or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, the Wind Down Co, the Plan Administrator, the GUC Trust, or the GUC Trustee, or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, that nothing contained in this Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, the Wind Down Co, the Plan Administrator, the GUC Trust, or GUC Trustee from exercising their respective rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of this Plan.

(b)      By accepting Plan Distributions pursuant to this Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in <u>Section 10.6</u> of this Plan and all transactions, documents, and agreements contemplated hereunder that govern the property that is the subject of such distributions.

### 10.7 *Releases.*

(a)      **Release by Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by the Definitive Documents and the documents in the Plan Supplement or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, the Wind Down Co, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind Down Co, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Wind Down Co, the Reorganized Debtors, the Estates, or any of their**

respective affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, and/or consummation of this Plan, the Restructuring Support Agreement, and the casting of votes to accept or reject the Plan by the Consenting Creditors, the Disclosure Statement, New QB First Lien Term Loan (if applicable), New QB First Lien Term Loan Credit Documents (if applicable), the New Shareholders Agreement, the New Warrant Agreement, the PH Sale Process, the Wendy's Sale Process, the WholeCo Sale Process, the Sale Transaction (if applicable), the Sale Documents (if applicable), the Rights Offering, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases, based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (such Claims and Causes of Action, the "*Debtor Claims*"). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under this Plan, any transaction thereunder, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or (ii) any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted a criminal act, intentional fraud, gross negligence or willful misconduct. Notwithstanding anything else herein, the holders of First Lien Secured Claims shall not pursue, prosecute or assert any of the Debtor Claims, but shall not waive any entitlement, on account of any First Lien Deficiency Claims, to any recovery resulting from of any party's pursuit, prosecution, resolution, settlement or adjudication of any Debtor Claims retained by any entity under or pursuant to the Plan (including any Retained Causes of Action), if any.

(b)     **Releases by Holders of Claims or Interests**. As of the Effective Date, except as set forth in this Plan and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the documents in the Plan Supplement and the obligations contemplated by the Restructuring, on and after the Plan Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind Down Co, the Reorganized Debtors, or their Estates; such Claims or Causes of Action, the "*Additional Debtor Claims*"), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Wind Down Co, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual

71

arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, and/or consummation of this Plan, the Restructuring Support Agreement, the Disclosure Statement, New QB First Lien Term Loan (if applicable), New QB First Lien Term Loan Credit Documents (if applicable), the New Shareholders Agreement, the New Warrant Agreement, the PH Sale Process, the Wendy's Sale Process, the WholeCo Sale Process, the Sale Transaction (if applicable), the Sale Documents (if applicable), the Rights Offering, the Definitive Documents and the documents in the Plan Supplement, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission related to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan, any transaction thereunder, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan (ii) any obligations or liability of any of the Debtors or the Reorganized Debtors or the Related Parties of the foregoing, as lessee, to any of the Sponsors or their Related Parties that is a lessor under an unexpired lease, or (iii) any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted a criminal act, intentional fraud, gross negligence or willful misconduct. Notwithstanding anything else herein, the holders of First Lien Secured Claims shall not pursue, prosecute or assert any of the Additional Debtor Claims, but shall not waive any entitlement, on account of any First Lien Deficiency Claims, to any recovery resulting from of any party's pursuit, prosecution, resolution, settlement or adjudication of any Additional Debtor Claims retained by any entity under or pursuant to the Plan (including any Retained Causes of Action), if any.

(c)    **Releases of Directors and Officers by Driver Claimants**.  As of the Effective Date, all current and former directors, officers, employees, and managing agents of the Debtors, including, for the avoidance of doubt, the named defendants in the *Marshall* Action, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Driver Claimants (unless a Driver Claimant (other than a member of the Driver Claimants Group) expressly elects in writing pursuant to a timely submitted Driver Claimants Settlement Distribution Form not to participate in the Driver Claimants Settlement), in each case from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Driver Claimants or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Driver Claimant or other Person, arising out of or relating to, in whole or in part, the employment of the Driver Claimants by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*, or any related or similar state wages and labor laws, and any Claims arising under or related to the *Collins* Action and the *Marshall* Action and the underlying facts that were or could have been pled in those actions.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, any transaction thereunder, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

10.8     _Exculpation._

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases (other than ordinary course Administrative Expense Claims of the Debtors such as Fee Claims; the negotiation, formulation, preparation, execution, filing, and/or consummation of the New QB First Lien Term Loan (if applicable), the New QB First Lien Term Loan Credit Documents (if applicable), the PH Sale Process, the Wendy's Sale Process, the WholeCo Sale Process, the Sale Documents (if applicable), the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring, the Sale Transaction (if applicable), the Rights Offering, the New Shareholders Agreement, the New Warrant Agreement, and this Plan (including the Definitive Documents and the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan and the transactions contemplated thereby; the Confirmation Order; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of Securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

10.9     _Injunction Related to Releases and Exculpation._

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

10.10    _Subordinated Claims._

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Plan Distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto (including as set forth in any of the Intercreditor Agreements), whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, Plan Administrator, and the GUC Trustee, as applicable, reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.   The Reorganized Debtors or the GUC Trustee (in connection with the pursuit of GUC Trust Causes of Action or objections to General Unsecured Claims), as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.   Notwithstanding anything herein to the contrary, neither the Reorganized Debtors nor the GUC Trustee shall have, retain, reserve, or be entitled to assert any right, Claim, or Cause of Action that is to be transferred or assigned to the Successful Bidders under the terms of the Sale Documents.

### 10.12    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following:  (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

## ARTICLE XI.    RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to Plan Distributions under this Plan;

(e)        to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)        to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)        to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)        to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)        to hear and determine all Fee Claims;

(j)        to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)        to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)        to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, including, for the avoidance of doubt, relating to the Wind Down (if applicable), as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, exculpation, or injunction provisions set forth in this Plan, following the occurrence of the Effective Date;

(m)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)        to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)        to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)        to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any Solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)        to hear, adjudicate, decide, or resolve any and all matters related to Article X of this Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(r)        to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(s)        to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t)        to enter a final decree closing each of the Chapter 11 Cases,

provided, that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the New QB First Lien Term Loan Credit Documents, the New Stockholders Agreement, and the Amended/New Organizational Documents, and each of the New QB First Lien Term Loan Credit Documents, the New Stockholders Agreement, and the Amended/New Organizational Documents shall be governed by the respective jurisdictional provisions therein or applicable thereto.

## ARTICLE XII.        MISCELLANEOUS PROVISIONS.

### 12.1        *Statutory Fees.*

(a)        All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors, the Reorganized Debtors, or the Wind Down Co, as applicable. On and after the Effective Date, the Reorganized Debtors or the Wind Down Co, as applicable, shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor, each Reorganized Debtor, the Wind Down Co, or the GUC Trust, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

(b)        Upon the first quarter following the full administration of the Chapter 11 Cases, other than reconciliation of General Unsecured Claims by the GUC Trust, all Statutory Fees due and payable shall be paid by the GUC Trust until any remaining Chapter 11 Case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### 12.2        *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, or any property under the Plan, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions approved by the Bankruptcy Court, and consummated by the Debtors on and after the Confirmation Date, including any transfers under this Plan, including pursuant to the Sale Transaction, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the New QB First Lien Term Loan Credit Documents and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfer of property without payment of any such tax, recordation fee, or governmental assessment.  Consistent with the foregoing, each recorder of

deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.3   *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.4   *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.5   *Amendments.*

(a)   **Plan Modifications**.  This Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Requisite Creditors, the Requisite Second Lien Lenders (solely to the extent provided in the Restructuring Support Agreement), or the Creditors' Committee (solely as it pertains to the UCC Settlement or General Unsecured Claims), in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors, with the consent of the Requisite Creditors and the Creditors' Committee (solely as it pertains to the UCC Settlement or General Unsecured Claims), may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.  The Debtors, subject to the consent of the Requisite Creditors, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan through the Effective Date.

(b)   **Certain Technical Amendments**.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan (subject to the consent of the Requisite Creditors) without further order or approval of the Bankruptcy Court.

### 12.6   *Revocation or Withdrawal of Plan.*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn with the prior consent of the Requisite Creditors prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; (c) nothing contained in this Plan shall (i) constitute a waiver or release of

any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person; and (d) unless otherwise agreed to by the Creditors' Committee, the Debtors, and the Consenting First Lien Lenders, the UCC Settlement shall be deemed terminated and the parties shall return to the positions they each held immediately prior to the entry into the UCC Settlement, the Creditors' Committee shall have five (5) Business Days to file responses in support of the Standing Motion, and the Standing Motion shall be scheduled on a date to be consensually agreed to by the Debtors, the Creditors' Committee, and the Consenting First Lien Lenders.

### 12.7    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Requisite Creditors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 12.7, is (a) valid and enforceable pursuant to its terms, (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and the Requisite Creditors and (c) nonseverable and mutually dependent.

### 12.8    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.9    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.10    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.11    *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.12 *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.13 *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 12.14 *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)      if to the Debtors or the Reorganized Debtors:

NPC INTERNATIONAL, INC.
4200 W. 115th Street, Suite 200
Leawood, KS 66211
Attn:    Eric Koza (ekoza@alixpartners.com)
         Penny Lindmann-Smith (penny.lindmannsmith@npcinternational.com)
         David Wahlert (david.wahlert@npcinternational.com)

– and –

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Alfredo R. Pérez (alfredo.perez@weil.com)
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C. (ray.schrock@weil.com)
         Kevin Bostel, Esq. (kevin.bostel@weil.com)
         Natasha Hwangpo, Esq. (natasha.hwangpo@weil.com)
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*

(b)      if to the Consenting Creditors represented by Consenting Creditor Counsel:

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Attn:    Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com)
          Michael J. Cohen, Esq. (mcohen@gibsondunn.com)

Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035

– and –

JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Attn:  Bruce J. Ruzinsky, Esq. (bruzinsky@jw.com)
Telephone:  (713) 752-4204
Facsimile:  (212) 308-84155

*Attorneys for Certain Consenting Creditors*

(c)      if to the Consenting Creditors represented by the Second Lien Advisors:

MILBANK LLP
55 Hudson Yards
New York, New York 10001
Attn:    Evan R. Fleck, Esq. (efleck@milbank.com)
          Matthew Brod, Esq. (mbrod@milbank.com)
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

*Attorneys for Consenting Second Lien Creditors*

(d)      if to the Creditors' Committee:

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Attn:    Eric R. Wilson, Esq. (ewilson@kelleydrye.com)
          Jason R. Adams, Esq. (jadams@kelleydrye.com)
          Maeghan J. McLoughlin, Esq. (mmcloughlin@kelleydrye.com)
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

*Attorneys for the Creditors' Committee*

(e)     If to the Stalking Horse Purchaser:

WEND AMERICAN GROUP LLC AND HUT AMERICAN GROUP LLC
225 Bush Street, Suite 1800
San Francisco, California 94104
Attn:    Lorin M Cortina (lcortina@flynnholdings.com)

– and –

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Attn:    Sarah English Tune (sarahtune@dwt.com)
Telephone:  (206) 662-3150
Facsimile:  (206) 757-7700

– and –

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Josh Sussberg, P.C. (jsussberg@kirkland.com)
          Anthony R. Grossi (Anthony.grossi@kirkland.com)
Telephone: (212) 446-4800

*Attorneys for the Stalking Horse Purchaser*

(f)     If to the Wendy's Purchaser:

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Attn:    Sean A. O'Neal (soneal@cgsh.com)
Telephone: (212) 225-2000

*Attorneys for Wendy's*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section 12.14.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the

Effective Date, the Reorganized Debtors, Wind Down Co, and GUC Trust, as applicable, are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

### 12.15    *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests prior to the Effective Date or (b) any holder of a Claim or Interest or other entity prior to the Effective Date.

### 12.16    *Rights of the Successful Bidders Under the Sale Orders.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights of the Successful Bidders under the Sale Orders.

### 12.17    *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 12.18    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, *provided* that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes:  (a) Claims and/or applications, and any relief related thereto, for compensation by professional persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

Dated:  January 18, 2021

Respectfully submitted,

/s/ Eric Koza
Name:  Eric Koza
Title:  Chief Restructuring Officer

on behalf of

NPC International, Inc.
NPC Restaurant Holdings I LLC
NPC Restaurant Holdings II LLC
NPC Holdings, Inc.
NPC Restaurant Holdings, LLC
NPC International Holdings, LLC
NPC Operating Company B, Inc.
NPC Quality Burgers, Inc.